IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAR 2 4 2006
U.S. COURT OF FEDERAL CLAIMS

**SYSTEMS DEVELOPMENT CORPORATION,**

**Plaintiff,**

**vs.** Case No. 06-232 C

**THE UNITED STATES,**

**Defendant.**

**COMPLAINT**

Comes SYSTEMS DEVELOPMENT CORPORATION (hereinafter "SDC"), and files this, its complaint, against the United States of America and shows unto the Court, as follows:

**I.**

**JURISDICTION**

Jurisdiction is founded upon 28 U.S.C. Section 1491(a)(1) and the Contract Disputes Act of 1978 (Public Law 95563) and involves claims made against the United States based on a contract entered into by the United States by and through the United States Army Aviation and Missile Command (hereinafter "AMCOM"), Redstone Arsenal, Alabama 35898-5280. SDC was awarded Contract Number DAAAH01-00-C-0077. The contract was a firm-fixed price, build-to-print contract for Army Part Number 13038120-021, Circuit Card Assembly. The government terminated the contract for convenience on February 17, 2004. SDC submitted a termination settlement proposal which included its claims for equitable adjustment caused by the defects in the technical data package. On

March 25, 2005, Mr. Paul E. Slemons, Terminating Contracting Officer, made a Contracting Officer Final Decision paying SDC's termination settlement claim and defective specification claim, in part, and denying them, in part. It is from that Final Decision that Plaintiff appeals.

## II.

## BACKGROUND

1. The contract was awarded as a build-to-print, production contract with a Level 3 Technical Data Package ("TDP"). The TDP provided by the Government contains defects and deficiencies that preclude performing the contract on a build-to-print, production basis. The Government did not correct and/or resolve defects and deficiencies in the TDP that would allow production on a build-to-print basis.

2. The delivery schedule specified in the contract was: (i) for two first articles - 8 August 2000; and, (ii) for the first twenty-two 22 production units with first article – 2/3 February 2001. After the above specified delivery schedules passed, the Government failed to terminate the contract or reestablish a new delivery schedule for the contract. The contract contained the standard provisions for fixed-price supply contracts, including the FAR 52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) clause. (Contract clause I-43) After three years of delay, the government terminated the contract for convenience.

3. The specifications and TDP purport to be Level III, ready for build-to-print, mass production.

4. The specifications and TDP were not ready for build-to-print, mass production. Generally, the TDP appears to be a package that was developed in the 1960's or 1970's

and accepted as a Level III package, while, in fact, several key pieces of data and procedures had not been procured from the developer by the government. These items include: (1) electronic programmable parts data, (2) electronic raw board fabrication and test data (*i.e.*, ICT and Gerber files), and (3) a clear and unequivocal set of functional test procedures that can be used for test, debug and acceptance of the finished product. It also appears that these packages had not been checked or updated to reflect what technical data was actually available from the development effort, and they fail to include newer regulations by military and non-military government agencies (e.g. EPA) and updated MIL-Specs and MISs.

5. Specific data defects and deficiencies include, but are not limited to, the following.

a. The TDP references program code in electronic format for Programmable Parts and it has not been made available by the Government. The Government has indicated that it will not make the required data available to SDC, although, such data is required for build-to-print production of the Hawk circuit cards.

b. There are no clearly-defined "go/no-go" test procedures for acceptance that can be performed by production technicians that document results showing the boards are acceptable to the government.

c. Ambiguity in the MIS or performance specifications, such as MIS-41341, appears to require that all the boards (not only First Articles) meet all the contents of the performance spec, even though the government said it did not actually desire that the production boards be subjected to life-draining environmental tests. The exact set of tests required for acceptance testing should be clearly defined in the RFP and contract.

d. The TDP and referenced MISs (performance specs) list old, obsolete and expensive test equipment and procedures for use in testing the boards, which are more appropriate for a developmental, not a production, effort.

e. The specs and drawings call for the use of Ozone Depleting Chemicals during cleaning and preparation of the PWBAs. However, current EPA regulations discourage or prohibit use of such materials in modern-day board processing and assembly.

6. On June 30, 2000, SDC notified AMCOM that, in order to meet the contract requirements, SDC needed an electronic version of the Gerber data. SDC also advised AMCOM that it needed mylar drawings.

7. On July 17, 2000, SDC notified the government that a substantial number of parts called for in the technical data package were, in fact, obsolete. SDC further advised the government that it had found alternate sources for some parts, but that, the lack of readily available parts would affect, and, perhaps, delay production. SDC further advised that it had not received the critical Gerber files requested earlier.

8. SDC learned on July 19, 2000, that AMCOM had no Gerber data available.

9. On July 26, 2000, SDC advised the AMCOM Contracting Officer, Georgia Walker, of deficiencies in the mylar drawings, as follows, "Examination of the MYLAR ART WORK for Printed Wiring Board P-N 13234265 provided to SDC for the manufacture of the DAAD Circuit Card Assembly P-N 13235072 proved to be copies of the originals and of insufficient quality to effectively manufacture the PWBs."

10. The MYLAR ART WORK provided by the government turned out to be Xeroxed copies made on mylar material in order to deceive SDC into believing that the

copies were, in fact, mylar drawings when they were not. AMCOM insisted throughout, that the documents were sufficient and continuously exhorted SDC to perform.

11. Throughout the next several months, SDC communicated the technical data package shortcomings to AMCOM without any successful resolution.

12. On July 9, 2001, SDC advised AMCOM Contracting Officer, Georgia Walker that, "However, because of the Government delay in providing digital data for the prom units, we have not been able to deliver a finished product as required by our contract."

13. Throughout the fall of 2001, SDC continued to request clarification of the technical data package requirements, but due to government reorganization, these requests went unanswered. At the end of October, 2001, SDC continued to communicate with the new Contracting Officer, Patty Page, regarding the defects in the technical data package and, in particular, the absence of digital data. Finally, on October 31, 2001, Ms. Page advised SDC, "There is no digital data."

14. On November 13, 2001, SDC wrote Contracting Officer, Patty Page, requesting that Contract DAAH01-00-C-0077, along with a companion contract, which is not in dispute, be terminated for convenience. SDC's letter further detailed the requirements for, "[the] copy of the drawings in disc or magnetic tape format [which] will be furnished to the successful bidder . . . " SDC also advised that, as a small disadvantaged business, SDC could not continue to absorb the financial impacts caused by the government's failure to provide the required data. On November 14, 2001, Contracting Officer, Patty Page, denied SDC's request for progress payments to lessen the financial impact on SDC.

15. Throughout the remainder of 2001 and into early 2002, SDC continued to advise AMCOM of the technical data package defects and seek some resolution, but without success.

16. On August 21, 2002, the government proposed contractual modifications extending the delivery schedule and further requesting that SDC waive any and all claims against the government that may have accrued up to the date of the modification.

17. On September 6, 2002, SDC advised Contracting Officer, Jerry Hill, that after SDC had reviewed Mr. Hill's letter of August 21, 2002, it declined to waive any of its claims or other rights under the contract. SDC further asked that the contract be terminated for convenience.

18. On September 18, 2002, SDC advised Mr. Hill that any reestablishment of a delivery date should be accomplished only after all of the serious technical defects in the TDP were resolved.

19. On November 21, 2002, SDC responding to Contracting Officer, Jerry Hill's threatened termination for default (Hill Letter dated November 6, 2002), continued to assert that the serious defects in the TDP prevented manufacture of these items.

20. After several meetings and discussions, government officials examined the mylar drawings provided to SDC and finally concluded that they were indeed inadequate to produce conforming parts. The government terminated the contract for convenience on February 17, 2004. SDC submitted a termination settlement proposal which included its claims for equitable adjustment caused by the defects in the technical data package.

21. On March 25, 2005, Mr. Paul E. Slemons, Terminating Contracting Officer, made a Contracting Officer Final Decision paying SDC's termination settlement claim and defective specification claim, in part.

22. The TCO determined that SDC was not entitled to recover any of its costs related to the three year government caused delay. In particular, the TCO denied payment of $242,162.00 on the basis that these costs could be recovered through the normal application of G & A. The delay caused by the government because of defective specifications extended over a period of three years and required work by SDC executives which were not commensurate with any recovery calculated using the typical G & A recovery. There was no stop work order and, throughout the process of the delay, the government continued to insist on full performance and on numerous occasions threatened termination for default.

**COUNT I**
**DEFECTIVE SPECIFICATIONS**

23. Plaintiff realleges paragraphs 1 through 22 as if fully set out herein.

24. Plaintiff demands judgment against the defendant in the sum of $397,000.00 for damages caused by defendant's failure to provide specifications free of defects and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act and statutory interest.

**COUNT II**

**BREACH OF THE COVENANT OF FAIR DEALING AND COOPERATION**

25. Plaintiff realleges paragraphs 1 through 22 as if fully set out herein.

26. Plaintiff demands judgment against the defendant in the sum of $500,000.00 for damages caused by defendant's breach of its duty of fair dealing and cooperation and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act and statutory interest.

**COUNT III**

**BAD FAITH**

27. Plaintiff realleges paragraphs 1 through 22 as if fully set out herein.

28. Defendants failure to correct obvious defects in the TDP for a period of over three years while having full knowledge of those defects and further exhorting plaintiff to perform the contract were actions either attended with an intent to injure and animus or were so grossly negligent as to amount to bad faith.

29. Defendant provided plaintiff with MYLAR ARTWORK which was copied on MYLAR material and represented to plaintiff that it was in fact MYLAR drawings and further exhorted plaintiff to perform and threatened defaulf if plaintiff failed to perform. The provided MYLAR material was reproduced by the government with actual knowledge that it would not be sufficient to use. Defendant's actions, while having full knowledge of those defects and further exhorting plaintiff to perform the contract, were actions either attended with an intent to injure and animus or were so grossly negligent as to amount to bad faith.

30. Plaintiff demands judgment against the defendant in the sum of $750,000.00 for damages caused by defendant's failure to provide specifications free of

defects and further demands attorney's fees and cost pursuants to the Equal Access to Justice Act and statutory interest.

## COUNT IV

## FAILURE TO PAY APPROPRIATE TERMINATION FOR CONVENIENCE COSTS

31. Plaintiff realleges paragraphs 1 through 22 as if fully set out herein.

32. Plaintiff demands judgment against the defendant in the sum of $19,316.00 for settlement expenses which are due to be paid and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act and statutory interest.

Respectfully submitted this the 22nd day of March, 2006, by:

Howell Roger Riggs
David H. Stem, Jr.
DICK, RIGGS, MILLER & STEM, LLP
Attorneys for Systems Development Corporation
200 Clinton Avenue, Suite 1050
Huntsville, AL 35801
Tele: 256+564-7317
Fax: 256+564-7319
Email: hriggs@drmslaw.net