**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SYSTEMS DEVELOPMENT CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Case No. 06-232 C (Judge Baskir)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Comes SYSTEMS DEVELOPMENT CORPORATION (hereinafter "SDC"), and files this, its First Amended Complaint against the United States of America and shows unto the Court, as follows:

**JURISDICTION**

Jurisdiction is founded upon 28 U.S.C. Section 1491(a)(1) and the Contract Disputes Act of 1978 (Public Law 95563) and involves claims made against the United States based on a contract entered into by the United States by and through the United States Army Aviation and Missile Command (hereinafter "AMCOM"), Redstone Arsenal, Alabama 35898-5280. SDC was awarded Contract Number DAAAH01-00-C-0077. The contract was a firm-fixed price, build-to-print contract for Army Part Number 13038120-021, Circuit Card Assembly. The government terminated the contract for convenience on February 17, 2004. SDC submitted a termination settlement proposal which included its claims for equitable adjustment caused by the defects in the technical data package. On March 25, 2005, Mr. Paul E. Slemons, Terminating Contracting Officer, made a Contracting Officer Final Decision paying SDC's termination settlement

claim and defective specification claim, in part, and denying them, in part. It is from that Final Decision that Plaintiff appeals.

## II.

## BACKGROUND

1. The contract was awarded as a build-to-print, production contract with a Level 3 Technical Data Package ("TDP"). The TDP provided by the Government contains defects and deficiencies that preclude performing the contract on a build-to-print production basis. The Government did not correct and/or resolve defects and deficiencies in the TDP that would allow production on a build-to-print basis.

2. The delivery schedule specified in the contract was: (i) for two first articles – 8 August 2000; and, (ii) for the first twenty-two (22) production units with first article – 2/3 February 2001. After the above specified delivery schedules passed, the Government failed to terminate the contract or reestablish a new delivery schedule for the contract. The contract contained the standard provisions for fixed-price supply contracts, including FAR 52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) clause. (Contract clause 1-43) After three years of delay, the government terminated the contract for convenience.

3. The specifications and TDP purport to be Level III, ready for build-to-print, mass production.

4. The specifications and TDP were not ready for build-to-print, mass production. Generally, the TDP appears to be a package that was developed in the 1960's or 1970's and accepted as a Level III package, while, in fact, several key pieces of data and procedures had not been procured from the developer by the government. These items

include: (1) electronic programmable parts data, (2) electronic raw board fabrication and test data (i.e., ICT and Gerber files), and (3) a clear and unequivocal set of functional test procedures that can be used for test, debug and acceptanbe of the finished product. It also appears that these packages had not been checked or updated to reflect what technical data was actually available from the development effort, and they fail to include newer regulations by military and non-military government agencies (e.g. EPA) and updated MIL-Specs and MISs.

5. Specific data defects and deficiencies include, but are not limited to, the following:

a. The TDP references program code in electronic format for Programmable Parts and it has not been made available by the Government. The Government has indicated that it will not make the required data available to SDC, although, such data is required for build-to-print production of the Hawk circuit cards.

b. There are no clearly defined "go/no go" test procedures for acceptance that can be performed by production technicians that document results showing the boards are acceptable to the government.

c. Ambiguity in the MIS or performance specifications, such as MIS-41341, appears to require that all the boards (not only First Articles) meet all the contents of the performance spec, even though the government said it did not actually desire that the production boards be subjected to life-draining environmental tests. The exact set of tests required for acceptance testing should be clearly defined in the RFP and contract.

d. The TDP and referenced MISs (performance specs) list old, obsolete and expensive test equipment and procedures for use in testing the boards, which are more appropriate for a developmental, not a production, effort.

e. The specs and drawings call for the use of Ozone Depleting Chemicals during cleaning and preparation of the PWBAs. However, current EPA regulations discourage or prohibit use of such materials in modern-day board processing and assembly.

6. Prior to award of the contract, the Army was aware of these issues, yet it never disclosed this information to SDC.

7. Furthermore, the Army was aware that the TDP had cancelled specifications that could not be replaced, yet the Army never disclosed this vital information to SDC.

8. The Army was also aware that it did not have the electronic PROM date necessary to manufacture the Circuit Card Assembly. The Army failed to disclose this fact to SDC, and proceeded to represent that it would be providing the electronic PROM data to the "successful bidder."

9. Additionally, prior to award of the contract, the Army was aware the Circuit Card Assembly needed to be procured from Raytheon, and that only Raytheon could approve a design or redesign for the HAWK Missile System. The Army never disclosed this fact to SDC.

10. On June 30, 2000, SDC notified AMCOM that, in order to meet the contract requirements, SDC needed an electronic version of the Gerber data, SDC also advised AMCOM that it needed mylar drawings.

11. On July 17, 2000, SDC notified the government that a substantial number of parts called for in the technical data package, were, in fact, obsolete. SDC further advised the government that it had found alternate sources for some parts, but that, the lack of readily available parts would affect, and, perhaps, delay production. SDC further advised that it had not received the critical Gerber files requested earlier.

12. SDC learned on July 19, 2000, that AMCOM had no Gerber data available.

13. On July 26, 2000, SDC advised the AMCOM Contracting Officer, Georgia Walker, of deficiencies in the mylar drawings, as follows: "Examination of the MYLAR ART WORK for Printed Wiring Board P-N 13234265 provided to SDC for the manufacture of the DAAD Circuit Card Assembly P-N 13235072 proved to be copies of the originals and of insufficient quality to effectively manufacture the PWBs."

14. The MYLAR ART WORK provided by the government turned out to be Xeroxe copies made on mylar material in order to deceive SDC into believing that the copies were, in fact, mylar drawings when they were not. AMCOM insisted throughout, that the documents were sufficient and continuously exhorted SDC to perform.

15. Throughout the next several months, SDC communicated the technical data package shortcomings to AMCOM without any successful resolution.

16. On July 9, 2001, SDC advised AMCOM Contracting Officer, Georgia Walker, that, "However, because of the Government delay in providing digital data for the prom units, we have not been able to deliver a finished product as required by our contract."

17. Throughout the fall of 2001, SDC continued to request clarification of the technical data package requirements, but due to government reorganization, these requests went unanswered. At the end of October, 2001, SDC continued to communicate

with the new Contracting Officer, Patty Page, regarding the defects in the technical data package and, in particular, the absence of digital data. Finally, on Octoer 31, 2001, Ms. Page advised SDC, "There is no digital data."

18. On November 13, 2001, SDC wrote Contracting Officer, Patty Page, requesting that Contract DAAH01-00-C-0077, along with a companion contract, which is not in dispute, be terminated for convenience. SDC's letter further detailed the requirements for, "[the] copy of the drawings in disc or magnetic tape format [which] will be furnished to the successful bidder . . . " SDC also advised that, as a small disadvantaged business, SDC could not continue to absorb the financial impacts caused by the government's failure to provide the required data. On November 14, 2001, Contracting Officer, Patty Page, denied SDC's request for progress payments to lessen the financial impact on SDC.

19. Throughout the remainder of 2001 and into early 2002, SDC continued to advise AMCOM of the technical data package defects and seek some resolution, but without success.

20. On August 21, 2002, the government proposed contractual modifications extending the delivery schedule and further requesting that SDC waive any and all claims against the government that may have accrued up to the date of the modification.

21. On September 6, 2002, SDC advised Contracting Officer, Jerry Hill, that after SDC had reviewed Mr. Hill's letter of August 21, 2002, it declined to waive any of its claims or other rights under the contract. SDC further asked that the contract be terminated for convenience.

22. On September 18, 2002, SDC advised Mr. Hill that any reestablishments of a delivery date should be accomplished only after all of the serious technical defects in the TDP were resolved.

23. On November 21, 2002, SDC responding to Contracting Officer, Jerry Hill's threatened termination for default, (Hill Letter November 6, 2002), continued to assert that the serious defects in the TDP prevented manufacture of these items.

24. After several meetings and discussions, government officials examined the mylar drawings provided to SDC and finally concluded that they were indeed inadequate to produce conforming parts. The government terminated the contract for convenience on February 17, 2004. SDC submitted a termination settlement proposal which included its claims for equitable adjustment caused by the defects in the technical data package.

**COUNT I**

**DEFECTIVE SPECIFICATIONS**

25. Plaintiff realleges paragraphs 1 through 24 as if fully set out herein.

26. Plaintiff demands judgment against the defendant in the sum of $397,000.00 for damages caused by defendant's failure to provide specifications free of defects and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act and statutory interest.

## COUNT II

## BREACH OF THE COVENANT OF FAIR DEALING AND COOPERATION

27. Plaintiff realleges paragraphs 1 through 24 as if fully set out herein.

28. On March 25, 2005, Mr. Paul E. Slemons, Terminating Contracting Officer, made a Contracting Officer Final Decision paying SDC's termination settlement claim and defective specification claim, in part.

29. The TCO determined that SDC was not entitled to recover any of its costs related to the three year government caused delay. In particular, the TCO denied payment of $242,162.00 on the basis that these costs could be recovered through the normal application of G & A. The delay caused by the government because of defective specifications extended over a period of three years and required work by SDC executives which were not commensurate with any recovery calculated using the typical G & A recovery. There was no stop work order and, throughout the process of the delay, the government continued to insist on full performance and on numerous occasions threatened termination for default.

30. Plaintiff realleges paragraphs 1 through 20 as if fully set out herein.

31. Plaintiff demands judgment against the defendant in the sum of $500,000.00 for damages caused by defendant's breach of its duty of fair dealing and cooperation and further demand attorney's fees and costs pursuant to the Equal Access to Justice Act and statutory interest.

## COUNT III

## BAD FAITH

32. Plaintiff realleges paragraphs 1 through 24 as if fully set out herein.

33. Defendant's failure to correct obvious defects in the TDP for a period of over three years while having full knowledge of those defects and further exhorting plaintiff to perform the contract were actions either attended with an intent to injure and animus or were so grossly negligent as to amount to bad faith.

34. Defendant provided plaintiff with MYLAR ARTWORK which was copied on MYLAR material and represented to plaintiff that it was in fact MYLAR drawings and further exhorted plaintiff to perform and threatened default if plaintiff failed to perform. The provided MYLAR material was reproduced by the government with actual knowledge that it would not be sufficient to use. Defendant's actions, while having full knowledge of those defects and further exhorting plaintiff to perform the contract, were actions either attended with an intent to injure and animus or were so grossly negligent as to amount to bad faith.

35. Plaintiff demands judgment against the defendant in the sum of $750,000.00 for damages caused by defendant's failure to provide specifications free of defects and further demands attorney's fees and cost pursuant to the Equal Access to Justice Act and statutory interest.

## COUNT IV

## FAILURE TO PAY APPROPRIATE TERMINATION FOR CONVENIENCE COSTS

36. Plaintiff realleges paragraphs 1 through 24 as if fully set out herein.

37. Plaintiff demands judgment against the defendant in the sum of $19,316.00 for settlement expenses which are due to be paid and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act and statutory interest.

## COUNT V

## SUPERIOR KNOWLEDGE

38. Plaintiff realleges paragraphs 1-24 as if fully set out herein.

39. Plaintiff contends that the defendant further breached its duty to cooperate with plaintiff by failing to disclose vital information to plaintiff.

40. As early as February 4, 1999 the defendant's Acquisition Strategy Summary Sheet documented the fact that: "During the Strategy Meeting it was determined that due to the fact that the TDP has cancelled specs (MIL-S-13949) that cannot be replaced, requirement will possibly be restricted to Raytheon Company." (Exhibit 1, SDC 840-842, 1434-1435)

41. Prior to award, the defendant failed to inform SDC that there were cancelled specifications that could not be replaced.

42. On January 24, 2000, the defendant further documented the fact that: "…this circuit card assembly must be procured from Raytheon. An SMI Form 1225-1 is being

prepared to restrict this item to Raytheon. The solicitation with SDC should be cancelled." (Exhibit 2, SDC 500)

43. On February 2, 2000, the defendant documented that: "Since Raytheon is the prime contractor, this circuit card should be procured from them, and if this board has to be redesigned then Raytheon would redesign it. Also if 13038120-021 is obsolete then part number 13038120-008 would also be obsolete since both of these parts are made from 13526671. Recommend this procurement from SDC be cancelled. Raytheon has to approve any design or redesign for the HAWK Missile System." (Exhibit 3, SDC 493)

44. Prior to award, the defendant failed to disclose to plaintiff that the circuit card assembly could only be procured from Raytheon or redesigned by Raytheon.

45. Prior to award, the defendant failed to disclose to the plaintiff that Raytheon had to approve any redesign for the HAWK Missile System.

46. Instead, the defendant awarded the plaintiff a contract that it knew should be performed by Raytheon.

47. Additionally, prior to award, the defendant failed to disclose that electronic PROM data necessary for contract performance was not available. At the outset of the contract the defendant represented that it would provide this electronic data to plaintiff, all while being aware that it did not even have this data. (Exhibit 4, SDC 1568-1572, 1576-1577).

48. Plaintiff demands judgment against the defendant in the sum of $500,000.00 for damages caused by defendant's failure to disclose vital information to the plaintiff and further demands attorney's fees and costs pursuant to the Equal Access to Justice Act and statutory interest.

Respectfully submitted this the 11th day of December, 2006, by:

s/ Howell Roger Riggs
DICK, RIGGS, MILLER, & STEM, LLP
Attorneys for Systems Development Corporation
200 Clinton Avenue, Suite 1050
Huntsville, AL 35801
Tele: 256+564-7317
Fax: 256+564-7319
Email: hriggs@drmslaw.net

# EXHIBIT 1

# ACQUISITION STRATEGY SUMMARY SHEET

PRON: D1943064

NSN: 5998-01-319-4313

APN: 13235072

PRIORITY: 11

SYSTEM: HAWK

ITEM: CIRCUIT CARD ASSEMBLY

QTY: 24

ESTIMATED AMOUNT: $130,532.36

AMC/AMSC CODE: AMC/AMSC DATE: 2/04/1999
NEEDS QA/ENGR REVIEW
GOVERNMENT TESTED FIRST ARTICLE REQUIRED
STRAT CODE: C . SIC CODE: 3674
SOLDERING STATEMENT REQUIRED
STABLE BASE DRAWINGS REQUIRED
CANCELLED SPEC (MIL-S-13949)

An Acquisition Strategy Meeting was held on 16 June 1999 and the following individuals were in attendance:

| | | |
|---|---|---|
| James Adams | AMSAM-AC-ML-L | 6-2047 |
| Vickie Patterson | AMSAM-RD-SE-IO-TL | 6-3241 |
| Margaret King | AMSAM-AC-ML-SA | 2-7553 |
| Ben Acosta | AMSAM-MMC-AD-MC | 6-4140 |
| Otto Hsu | AMSAM-DSA-WCP | 2-0320 |
| Kay Smothers | AMSAM-CIC-ED-MI | 3-2961 |
| Jolene Sisk | AMSAM-MMC-AD-MH | 6-5567 |
| Jenetta Johnson | AMSAM-MMC-AD-M | 2-6576 |

During the Strategy Meeting it was determined that due to the fact that the TDP has cancelled specs ( MIL-S-13949) that cannot be replaced, requirement will possibly be restricted to Raytheon Company.

Incremental Quantity Range: Minimum 9 Maximum 25

| | | |
|---|---|---|
| Options: | FY00 | ( 5 – 16 ) |
| | FY01 | ( 5 – 16 ) |
| | FY02 | ( 11 – 30 ) |
| | FY03 | ( 7 – 21 ) |
| | FY04 | ( 7 – 21 ) |

MAXIMUM QTY WILL BE CAPPED AT 75 EACH.

Therefore, on 17 June 1999, pron was passed to HAC for source review.

On 16 August 1999, pron amendment 02 was received increasing the quantity from 14 each to 24 each.

On 4 October 1999, received from Loop with drawings & Icapp as follows:

AMC/AMSC CODE: 2G AMC/AMSC DATE: 9/27/1999
Adequate For Unlimited Procurement
Government Tested First Article Required for a quantity of 2 each.
Strat Code: C SIC Code: 3674
ODS is required Need SAO waiver for ASTM-D4126 & MIS-14753
STABLE BASE DRAWINGS REQUIRED
DIGITAL DATA REQUIRED (INCLUDED IN DRAWINGS ON DISK)

On 7 October 1999, pron is assigned to PXA-08, Dan Conley.

This action is to be planned as Best Value.

A waiver was approved on 20 September 1999, allowing the contractor to use cancelled MIL-S-13949 for this pron D1943064 only. Waiver is enclosed in file.

RFP NUMBER: DAAH01-00-R-0013

Received amendment 03, for first article diversion dated 21 October 1999.

On 25 October 1999, package is complete.

This action was delayed in Small Business Administration Office due to the fact that they recommended to go 8(a).

Previously, this action was planned as Best Value. Also, the TDP contains Digital Data. According to Larry Nichols in Engineeering, the Digital Data for this action involve specific programs for the microchips and according to Lester James in Documentation, the Digital Data is included on disk.

Therefore, based on discussions with Mr. John Nelson & Lee Ford; Small Business, Cathy Dickens & James Adams; Acquisition Strategy Divison, this action would be a good candidate to be presented under the Team Millennium (New Business Development), involving Teledyne Brown Engineering along with Campbell Engineering & SDC, Incorporated.

Action will be initiated under the 8(a) program.

On 24 November 1999, a 2579 was initiated and sent back to Small Business Administration Office for review.

On 2 December 1999, package was returned from Small Business with a memorandum dated 1 December 1999, recommending 8(a) contractor System Development Corporation, (SDC), 215 Winn drive, Huntsville, Alabama 35805. Small Business also asked for the DD Form 2579 to reflect any optional quantities and/or options years and any increase in the total dollar amount as a result of options.

On 6 December 1999, package was passed to BSX 59 pending receipt of copy of letter of offer to SBA for this requirement.

AMSAM-SA-SD-MS (MSMB3091C) 1 Apr 03

MEMORANDUM FOR AMSAM-L-AL

SUBJECT: SDC Contract DAAH01-00-C-0077, Part Number 13235072, NSN 5998-01-319-4313

1. This memorandum provides a chronology of events on subject NSN.

Preaward

a. RDEC received Intercept Group Pre-Award Action (IGA) 00-36 from Acquisition Center, 20 Jan 2000. SDC questioned the existence of acceptance test procedures for subject part, stated that pages were missing from MIS-41341, and requested updated specification information. RDEC responded by stating that MIS-41341 defined all acceptance tests and that this specification required special test equipment that only the prime manufacturer would possess. SAMD restricted this item to Raytheon based on this information and asked that the solicitation with SDC be cancelled.

Preaward

b. RDEC received IGA 00-42 from Acquisition Center, 1 Feb 2000. SDC stated that part 13038120-021, Program Logic PROM, was obsolete and that they could redesign the part. They requested a ruling on this matter from AMCOM. RDEC responded by stating that any redesign of HAWK system parts would have to be done by the prime manufacturer, Raytheon. RDEC again stated that this solicitation should be cancelled with SDC and the item procured from the prime.

Mar 01 letter

c. RDEC received Technical Post Award Problem (TPA) 01-89 from Acquisition Center, 2 Apr 2001. SDC provided a list of supposed obsolete parts with suggested replacements offered. RDEC questioned the suggested replacement for 13038120-021, approved the replacements for three other parts, and requested that SAMD be contacted for approval on the other four parts. SAMD responded by requesting that alternate parts be in place for a first article test and acceptability would be determined by the results of that test. RDEC also stated that required computer programs listed in the Technical Data Package List was not available through JEDMICS and must be obtained through the SAMD office.

Jul 01 letter

d. RDEC received TPA 01-150 from Acquisition Center, 28 Aug 2001. SDC stated that they were not able to deliver

AMSAM-SA-SD-MS (MSMB3091C) 1 Apr 03
SUBJECT: SDC Contract DAAH01-00-C-0077, Part Number 13235072, NSN 5998-01-319-4313

30 Jul 01 letter

a product due to the governments delay in providing requested data. They requested data files for the programmable parts, ICT or manual test fixtures for testing raw boards, and acceptance test plans/procedures for printed wiring board assemblies. SDC requested that the government take their PROM units to be programmed by Raytheon at the government's expense, or deliver circuit boards without the Proms, or deliver all purchased parts to the government for compensation. RDEC responded by stating that it was the responsibility of SDC to obtain and possess the necessary test equipment as required in the Technical Data Package. The necessary tests are defined by MIS-41341. RDEC also recommended that SDC purchase the programmed microcircuits elsewhere at their expense.

e. A meeting was held on 23 Jan 2002 with SDC chaired by the Acquisition Center. Attending were representatives from Small Business Office, Legal office, AMCOM Ombudsman, and representatives from SAMD concerning the ongoing issues with the programmed microcircuits and acceptance test procedures. Mr. Jerald Tignor, SAMD, accepted the responsibility of providing the Software character Patterns needed to program the Proms on the subject Circuit Board. The approached decided in the meeting would be getting the blank microcircuits from SDC, pulling a programmed module from and existing circuit card and having the program duplicated. The AMCOM Laboratory then programmed the blank modules, tested and provided to Mr. Tignor. He then provided to SDC. The DAAD Circuit Card was provided to Lockheed Martin to develop a Test Program Set (TPS) on the GETS-1000. Mr. Tignor has tasked Lockheed Martin with developing the TPS. All of these tasks were accomplished and programmed modules delivered to SDC on 15 July 02.

f. No funding was provided by SDC or any AMCOM office to perform the above actions described in paragraph 1.e. Due to no funding, the SAMD did not provide additional services beyond the services described.

2. The point of contact is Mr. Jerald F. Tignor, AMSAM-SA-SD-MS, phone 313-6819.

for [signature]
BOB WERTZ
C, Msl Sys Mgmt Br, SAMD

# EXHIBIT 2

SUBMIT ONE COPY OF THIS FORM

DATE SUBMITTED: 1/20/00

DATE REQUIRED:

IGA No: 00-36

PMF SUSPENSE: 25 Jan 00

PRONS: D1943064

PRONS:

NSN: 5998-01-319-4313

APN: 13235072

REV

NOUN: CIRCUIT CARD ASSEMBLY

WEAPON SYSTEM HAWK

PRIORITY 11

NARRATIVE OF PROBLEM: THIS IS AN 8(a) SET-ASIDE RESTRICTED TO SDC INC. SDC HAS THREE QUESTIONS WHICH THEY E-MAILED TO ME REGARDING THIS REQUIREMENT. LIST OF QUESTIONS IS ATTACHED. PLEASE REVIEW QUESTIONS AND RESPOND ASAP.

CONTRACT SPECIALIST: GERALDINE WILLIAMS

OFFICE SYMBOL: ~~AMSAM-AC-ML-S~~

PHONE (256) 876-72[illegible]

TECHNICAL GROUP ACTION: The acceptance requirements for this item are defined in MIS-41341. Paragraph 6.3 of this document indicates that a Teledyne L200 Series Test Station must be used to test this circuit card. Based on paragraph 6.3 of MIS-41341, this circuit card assembly must be procured from Raytheon. An SMI Form 1225-1 is being prepared to restrict this item to Raytheon. The solicitation with SDC should be cancelled.

NAME OF RESPONDER (PLEASE PRINT) Don Mikell

PHONE: 2-9382

DATE: 1/24/00

AC-POC: [illegible] Kerr 2-6185/FAX 2-4[illegible]

Copy Furnished: Item Manager Code

To - Amelia Moore

Fm - Don Mikell

1/24/00

1 page

[ACT]ION REQUIRED

[ACT]ION PENDING

PMF-POC Marion Jefferson 2-7951/FAX 2-0601

SDC 500

Revised: 25 March, 1999

# EXHIBIT 3

INTERCEPT GRO[illegible] [illegible]EAWARD ACTION

| Co./Dept. | Co. AMCOM |
|---|---|
| Phone # 29354 | Phone # 6-7[illegible]8 |
| Fax # 6-7147 | Fax # 5-7737 |

SUBMIT ONE COPY OF THIS FORM
DATE SUBMITTED: 2/1/00
DATE REQUIRED:

IGA No:

PMF SUSPENSE:

PRONS: D1943064 NSN: 5998-01-319-4313 APN: 13235072 REV
PRONS:

NOUN: CIRCUIT CARD ASSEMBLY WEAPON SYSTEM HAWK PRIORITY 11

NARRATIVE OF PROBLEM: REFERENCE IGA NO. 00-36. PLEASE REVIEW THE ACCOMPANYING E-MAIL COMMUNICATIONS BETWEEN MS. GILCHRIST OF SDC AND MS. WILLIAMS OF AMCOM. PLEASE RESPOND TO MS. GILCHRIST'S REQUEST REGARDING REDESIGN AND UPDATED SPECIFICATIONS. IF YOU WOULD LIKE A CONFERENCE CALL WITH THEIR TECHNICAL PERSONNEL, PLEASE LET ME KNOW SO THAT I CAN ARRANGE IT.

CONTRACT SPECIALIST: GERALDINE WILLIAMS OFFICE SYMBOL: AMSAM-AC-ML-SA PHONE: 6-7288

TECHNICAL GROUP ACTION: The contractor has indicated that part no. 13038120-021 is obsolete and they would need to re-design this circuit card assembly.* Since Raytheon is the prime contractor, this circuit card should be procured from them, and if this board has to be redesigned then Raytheon would redesign it. Also, if 13038120-021 is obsolete then part number 13038120-008 would also be obsolete since both of these parts are made from 13526671. Recommend this procurement from SDC be cancelled. Raytheon has to approve any design or redesign for the HAWK Missile System.

NAME OF RESPONDER (PLEASE PRINT) Don Mikell PHONE: 2-9382 DATE: 2/2/00
POC: Larry Nichols 2-9354

Larry Nichols 2-9354

To- Amelia Moore
Fm- Don Mikell
1 page
2/2/00

AC-POC: Darlene Kerr 2-6105/FAX 2-6108

PMF-POC Maxine Jefferson 2-7950/FAX 2-0602

Copy Furnished: Item Manager Code

[illegible]ION REQUIRED

[illegible]N PENDING

SDC 493

Revised: 25 March, 1999

FEB-01-2000 13:48 [illegible]COM

# EXHIBIT 4

AMSAM-AC-LS-H

23 Jan 02

MEMORANDUM FOR RECORD

SUBJECT: Meeting of 23 Jan 02 with SDC on contract DAAH01-00-C-0077

A meeting was held in Building 5303, Room 3234, from 1300 hours until 1445 hours. The attached is a list of attendees.

The contractor requested this meeting to clarify TDP issues they have so they can complete the first articles. The contractor emailed their questions to Gerald Tucker, Ombudsman, on 14 Dec 00. Their questions were as follows:

1) PROM data – the contract TDPL legend directs that the copy of the digital drawing, "…included in this Technical Data Package is not used for manufacture. A copy of the drawing in disk or magnetic tape format will be furnished to the successful bidder upon request." To properly program PROMs for use on the circuit cards, SDC requires the data files for loading into the PROMs. These data files must be provided in electronic format for consistency in loading the PROMs and to prevent mistakes associated with manually entering the data. Although requested, SDC has still not received an electronic version of the data files. It appears what we have received are the very drawings the TDPL Legend directs us NOT to use. In order to manually enter and check the data, SDC will incur additional costs that were not expected or proposed in the original quotation. While such technique could be employed, the risk of programming microcircuits with incorrect data, and thereby producing scrap assemblies is very high. The Government has also made it clear that additional funding for data entry and replacement PROMs will not be provided.

The Government also suggested that SDC could buy the programmed microcircuits from Raytheon or Woodard Electric if desired. However, the original solicitation did not mention these two companies as directed or suggested sources. Therefore, our proposal was to procure the PROMs and program them with the electronic data file(s) to be provided by the Government. To change our plans at this time and purchase the programmed parts will have a significant financial impact upon this program and our company.

Jerald Tignor, SAMD, stated that the electronic PROM data is not available. It is proprietary data that Raytheon owns. However, we have furnished a hard copy of the PROM data to SDC that is adequate. Ms. Gilchrist stated that she didn't propose having a person enter the PROM data by hand – she read the TDP to say that electronic PROM data would be furnished. Patti Page asked if the TDP was adequate with regards to the PROM data. Mr. Tignor stated it was inadequate with regard to the PROM data. However, we have a Level 3 TDP (which means it is adequate for competition). Woodard Electric has produced these items for

Raytheon. How do we resolve this problem? Raytheon or SEPD RDEC can program the cards at a cost to SDC.

Patti Page asked SDC if we provide the usable PROM data and we test on the GETS2000 or the A45 in Barstow, California, then will that resolve their issues. Ms. Gilchrist stated that she was concerned about the items that fail. There's no way to tell what failed if you use the GETS2000. Jerald Tignor stated that was a risk of producing these items.

(2) Acceptance test procedures – Although SDC has requested acceptance test procedures the Government has only provided copies of specifications that call out the general performance requirements. Therefore, instead of receiving copies of existing procedures, SDC will have to pay for an acceptance test plan/procedure to be written and then forward it to the Government for comment and approval. In addition, the special test equipment required by this effort was not included in their offer. If the Government does not provide the test procedures and equipment, performing this effort for the awarded price is not feasible.

Jerald Tignor stated that the test procedures in the TDP were adequate for production. If there is additional cost for testing the items it will pass to SDC because our test procedures are adequate. It was stated by John Smith, Sparta, that any commercially available test equipment can be used to test these items.

Ms. Gilchrist stated that she bought all the material to produce these items for every option year. Patti Page told her that the contract didn't authorize her to do that. The contract only allows for procurement of the first article materials. Ms. Gilchrist stated that during the DCMA review (before award) the DCMA person accepted her material costs. Mr. Tucker stated that probably the DCMA technical person did accept the material costs. Patti stated that the contracting officer is the only one with the authority to allow contractor's to procure material before first article acceptance. The contract specifically states that.

**ACTION ITEMS:**
Acquisition Center will send SDC a letter with the PROM data and if there will be a charge for testing.

RDEC will review the TDP and the MIS to be sure that our TDP is adequate for any contractor to produce the items.

RDEC will get a board from SDC and we will program it and test it on the GETS 2000 to be sure it works. We will then give the PROM data to SDC so they can program the remaining boards.

Janet Guyette
Contract Specialist

Meeting Summary --- Hawk PWBA Meeting among AMCOM SDC and TBE on 23 January 2002
rom: Hnetynka, Marty
ent: Monday, January 28, 2002 4:56 PM
To: 'vpgilchrist@sdchsv.com'; 'gcarpenter@sdchsv.com'; Runkle, Marty; Stagg, Bob; Russell, Ed
CC: Nelson, John; Holcomb, Sandy; Costanzo, Pam
Subject: Meeting Summary --- Hawk PWBA Meeting among AMCOM, SDC and TBE on 23 January 2002

1. Time, Place and Attendees:

On Wednesday (01/23/2002) afternoon, at 13:00L, in an AMCOM Conference Room at the Sparkman Center on Redstone Arsenal, TBE Management (M. Runkle, R. Stagg, E. Russell and M. Hnetynka) met with AMCOM representatives to support SDC Management (V. Gilchrist and G. Carpenter) during discussions between SDC and AMCOM. AMCOM representatives, backed up by their contract technical support personnel included: Gerald Tucker (Ombudsman), Mit Merrit (SB Advocate), Patti Page (CO), Mark Bradley (Engr) and others. See the attached full list of attendees, as-provided by the AMCOM Contract Specialist, Ms. Janet Guyette.

2. Objectives:

The objectives of the meeting, from SDC's and TBE's viewpoint, were to find a mutually agreeable way to successfully complete the SDC contract and to receive payment for materials bought or to-be-bought by TBE for SDC.

3. Discussion Topics:

SDC and AMCOM discussed specific technical data issues that are preventing successful completion of work (and receipt of payments) by SDC and TBE on the Hawk 1, Hawk 1A and Hawk 2 board-build programs (see attached internal agenda).

4. Background and Discussions:

a. SDC and TBE attendees stated to AMCOM representatives that the following product-build information and equipment was not available to SDC. SDC and TBE said that these items were needed to successfully complete the SDC contract and to deliver acceptable tested Hawk boards to the government, while not exposing SDC and TBE to excessive technical and financial risk. The following items were specifically listed as missing:

(1) Electronic copies of code for Programmable Parts used in Hawk 1 and 1A.

(2) Functional test fixtures for testing completed Hawk 1, Hawk 1A & Hawk 2 PWBAs.

(3) Acceptance Test Procedures (ATP) for completed Hawk 1, Hawk 1A & Hawk 2 PWBAs.

b. Since these are critical pieces of government-supplied information and equipment that are not available for completion of First Article Build and Test or for completion of Production Builds for these Hawk PWBA contracts, the risks to contract completion are great and could be unreasonably expensive for TBE and SDC.

c. The AMCOM technical personnel at the meeting admitted that the PROM data for Hawk 1 and Hawk 1A were not available in electronic form and confirmed that it was not acceptable for SDC to enter the data by hand, since there was too great a risk that errors would be introduced that would cause the boards to fail. All attendees in the meeting were made aware that the contract Technical Data Package (TDP) actually prohibited use of the paper listing and required that the government provide the data for all PROMs in electronic form.

d. The Contracting Officer, Ms. Patti Page, acknowledged that the required PROM data had not been made available to SDC. She said she would write a letter to SDC

proposing a means whereby the government would extract the data from good boards, test their functionality and provide the verified PROM data to SDC in electronic form.

e. The Contracting Officer, Ms. Patti Page, also stated that she would make a decision about what support the government could provide to SDC to provide assistance in the area of obtaining test equipment and procedures (written or electronic) for SDC. Ms. Page stated that the government might decide to provide such services and/or test station access on an as-available basis. The government might request payment from SDC for providing this consideration or might require that SDC pay a third-party for such services and/or access.

4. Specific Agreed-to Action Items:

a. AMCOM - AMCOM agreed that the government procurement package was deficient in that the code for the programmable parts was not available from the government for use by SDC, as called out in the Technical Data Packages for Hawk 1 and Hawk 1A, which are each a part of two separate contracts that SDC has with AMCOM. The government agreed to address this matter in correspondence to SDC.

b. AMCOM - AMCOM agreed that it would subject known-good Hawk 1 and Hawk 1A boards, each containing the latest PROM code, to extensive functional testing to verify that the code was fully functional and would meet the government requirements when used in completed Hawk 1 and Hawk 1A PWBAs.

c. SDC - SDC agreed to send sufficient Hawk 1 and Hawk 1A unprogrammed PROMS to AMCOM, for programming with the code that AMCOM engineers will verify on known-good PWBAs. TBE is holding all of the Hawk PWBA parts for SDC and would provide a limited number of PROMs to SDC for this purpose, upon request.

d. AMCOM - AMCOM agreed that after the code was checked out on known-good boards on a Test Program Set (or on an equivalent manual test set), AMCOM would burn the code into a limited number of EPROM sets provided by SDC. AMCOM would then provide to SDC electronic magnetic media containing the code in a form readily useable by modern computer-based PROM Programmers. AMCOM would also provide a reference set of PROMS for use by SDC (or SDC's subcontract vendor) during production of the First Article PWBAs.

e. SDC - SDC agreed to build the correct number of First Article PWBAs called-for in each of the Hawk 1 and Hawk 1A PWBA contracts with soldered-in PROMS programmed with the code provided in electronic form by the government, but without conformal coding to permit possible rework. These boards would be taken to AMCOM and functionally tested by the government, with SDC in attendance. Then any rework would be performed to make the boards functional, with the conformal coating applied by SDC after the boards had been declared by the government to operate properly. Then the boards would be ready to begin full and true First Article testing.

f. AMCOM - AMCOM agreed to perform the entire set of First Article Test procedures according to the Performance Specification (MIS-41341). The government said it might substitute a GETS (TPS) type test for the engineering guidelines called out in the performance spec. The full set of environmental and EMI testing will also be conducted according to MIS-41341 by the government. SDC (and TBE, if requested) will witness the testing. AMCOM will notify SDC after the First Articles have passed their testing and production of the PWBAs is authorized.

g. AMCOM - AMCOM agreed to help SDC find a suitable government-owned TPS or a Teradyne L200-Test System for production line testing and fault isolation during production, under the condition that SDC pay for use of the equipment, if it is provided by a third party or if the government decides that payment is required for such consideration.

h. TBE - TBE agreed to work with SDC to define consideration-due to SDC and to TBE for government delays in providing the complete and proper technical information

-----Original Message-----
**From:** Tucker, Gerald G CMDGRP
**Sent:** Monday, January 07, 2002 3:29 PM
**To:** Page, Patti W ACQ
**Subject:** SDC Requested Meeting--HAWK PCB Contract

Patti...any progress on scheduling this session? Thanks, and Happy New Year. GT

-----Original Message-----
**From:** **Page, Patti W ACQ**
**Sent:** Tuesday, December 18, 2001 2:26 PM
**To:** Tucker, Gerald G CMDGRP
**Cc:** Guyette, Janet C ACQ; Smith, Floyd B LTC ACQ
**Subject:** RE: SDC Requested Meeting--HAWK PCB Contract

Both the contract specialist and the contracting officer currently assigned to the package are not scheduled to be here Friday. There is also a concern with assuring that the appropriate technical personnel are available. If possible, I would like to wait until after the holiday to schedule the meeting. That will give the contract specialist time to coordinate with the technical and quality group to assure that we have the appropriate people available to best answer Ms Gilchrist's questions. I discussed this with Col. Smith and he is in agreement. In addition, I received a call from Fred Allen, legal office. He wanted to get a little background on the contracts prior to the meeting. I answered his general questions and he also agreed that it might be difficult to get the appropriate personnel here on Friday. What I would like to do is provide the questions to our quality and technical groups to assure the right mix of players and then set the meeting for some time in the week of Jan 7. Please let me know if that is a problem

Patti W. Page
Chief, SHORAD(A)/Hawk Acquisition Branch
Air Defense Division
Logistics Support Directorate
Acquisition Center

-----Original Message-----
**From:** Tucker, Gerald G CMDGRP
**Sent:** Friday, December 14, 2001 6:55 PM
**To:** Paro, Eugene E DR SAMD; Epps, Willis ACQ; Page, Patti W. ACQ; Merritt, Mit SADBU
**Cc:** Cruze, Marlene ACQ; Allen, Cevelyne M CMDGRP; Allen, Fred W LEGAL
**Subject:** SDC Requested Meeting--HAWK PCB Contract

All,

I appreciate Dr. Paro agreeing to meet with SDC and Virginia Gilchrist relating to Contracts DAAH01-00-C-0077 and DAAH01-00-P-0741, and as we discussed a couple of days ago, Ms. Page, I appreciate you agreeing to set up the meeting once issues to be raised were established so you could ensure correct parties are present. I have confirmed with Ms. Gilchrist that the following describes the issues she and her TBE supporting team members desire to discuss (this is a duplicate of the information I gave to you, Dr. Paro):

1) PROM Data - The contract TDPL Legend directs that the copy of the digital drawing, "...included in this Technical Data Package is not used for manufacture. A copy of the drawing in disk or magnetic tape format will be furnished to the successful bidder upon request". To properly program PROMs for use on the circuit cards, SDC requires the data files for loading into the PROMs. These data files must be provided in electronic format for consistency in loading the PROMs and to prevent mistakes associated with manually entering the data. Although requested, SDC has still not received an electronic version of the data files. It appears what we have received are the very drawings the TDPL Legend directs us NOT to use. In order to manually enter and check the data, SDC will incur additional costs that were not expected or proposed in the original quotation. While such a technique could be employed, the risk of programming microcircuits with incorrect data, and thereby producing scrap assemblies is very high. The Government has also made it clear that additional funding for data entry and replacement PROMs will not be provided.

The Government also suggested that SDC could buy the programmed

microcircuits from Raytheon or Woodard Electric if desired. However, the original solicitation did not mention these two companies as directed or suggested sources. Therefore, our proposal was to procure the PROMS and program them with the electronic data file(s) to be provided by the Government. To change our plans at this time and purchase the programmed parts will have a significant financial impact upon this program and our company

2) Acceptance Test Procedures - On build to print contracts, it is routine for the customer to provide copies of the existing test procedure used to determine if the parts are acceptable. Although SDC has requested Acceptance Test Plans and Procedures, the Government has only provided copies of specifications that call out the general performance requirements. Therefore, instead of receiving copies of existing procedures, SDC will have to pay for an Acceptance Test Plan/Procedure to be written and then forward it to the Government for comment and approval. In addition, the special test equipment required by this effort was not included in our offer. If the Government does not provide the test procedures and equipment, performing this effort for the awarded price is not feasible

I believe after my last discussions with Ms. Gilchrist, her company is anxious to work through these issues and get the production done...I know this has probably become a frustrating effort for some players, but it is not atypical for an 8(a) to report to me that they did a great job for us with little government help, whether that be in repair work or TPS design/production work, and when I then talk to government customer, they say the 8(a) did OK, but we had to hold their hand. The truth is usually in the middle, but it seems appropriate that we meet with this 8(a) and try to help. I appreciate everyone agreeing to meet.

In that regard, Ms. Page, I am not sure whether this meeting can be pulled together for next week, or must wait until after the holidays, but I have a request and some info...Mr. Epps indicated in one of our conversations on this matter that he would attend the meeting....do not think he returns until next Wednesday. Also, Dr. Paro is on travel next week until late in the week, and I am on AL next week. I am not certain whether Ms Gilchrist and her crew can do this, but if possible, I would like to see the meeting occur early next Friday morning. I can come in off leave at that time if all other players can make it. We have a Christmas luncheon at 1100 that day in the Command Group, so I will be in for that anyway. Thank you. GT