IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Filed: August 31, 2007

| | | |
|---|---|---|
| SYSTEMS DEVELOPMENT CORPORATION,<br>Plaintiff, | ) | |
| | ) | Case No. 06-232C |
| v. | ) | |
| | ) | (Judge Baskir) |
| UNITED STATES,<br>Defendant. | ) | |

# PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF ENTITLEMENT AND REPLY TO DEFENDANT'S MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

Howell Roger Riggs
Attorney for the Plaintiff
Dick, Riggs, Miller & Stem, LLP
200 Clinton Avenue West
Regions Center, Suite 1050
Huntsville, Alabama 35801
Tel: (256) 564-7317
Fax: (256) 564-7319
hriggs@drmslaw.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Filed: August 31, 2007

| | | |
|---|---|---|
| SYSTEMS DEVELOPMENT CORPORATION,<br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 06-232C<br><br>(Judge Baskir) |

**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF ENTITLEMENT AND REPLY TO DEFENDANT'S MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT**

**Cross Motion for Summary Judgment on the Issue of Entitlement**

Comes now the Plaintiff, Systems Development Corporation, pursuant to Rule 56(h)(1) of the *Rules of the United States Court of Federal Claims*, and respectfully submits its Cross Motion for Summary Judgment on the Issues of Entitlement as to all claims contained in it's Amended Complaint. In support of this motion, the Plaintiff would show unto the Court as follows:

1. There is no genuine issue as to the fact that the specifications included in Contract Number DAAH1-00-C-0077 by AMCOM were defective, and did thereby cause damage to the Plaintiff.

2. There is no genuine issue as to the fact that AMCOM knew or should have known that the specifications in Contract Number DAAH1-00-

# Table of Contents

Table of Authorities....................iv

Plaintiff's Cross Motion for Summary Judgment....................1

Plaintiff's Reply to Defendant's Motion....................3

Statement of the Issues....................3

Statement of the Case....................4

Nature of the Case....................4

Statement of Facts....................6

Summary of the Argument....................6

Argument....................8

I. The U.S. Court of Federal Claims has jurisdiction to consider the claims contained in the Plaintiff's First Amended Complaint....................8

A. The Plaintiff has submitted its claims to the contracting officer....................8

B. All of the claims listed in the Plaintiff's First Amended Complaint have been presented to the contracting officer....................12

II. Summary Judgment Standard of Review....................17

III. The Government is not entitled to summary judgment on SDC's claim for failure to pay appropriate termination for convenience costs....................18

IV. The Government is not entitled to summary judgment on SDC's claim base upon AMCOM's use of defective specifications....................20

A. The Government's argument regarding SDC's claim for defective specifications is an erroneous argument of law, not fact..............................21

B. The issue of the presence of defective design specification in the contract is an incontrovertible issue of material fact that is supported by the record...............................................23

C. The Government's contention that SDC does not dispute that the contract involved only performance specifications is clearly misguided............25

V. The Government is not entitled to summary judgment on SDC's claim for breach of the covenant of good faith and fair dealing...................................27

A. SDC's claim for breach of the covenant of good faith and fair dealing is not improper as a matter of law........................................................27

B. The Government's breach of the covenant of good faith and fair dealing is an incontrovertible issue of material fact that is supported by the record....................................30

VI. The Government is not entitled to summary judgment on SDC's claims for bad faith and superior knowledge. ...........................................................35

A. The record in this action supports SDC's claim for bad faith........................................................35

1. SDC's claim for bad faith is not a claim for breach of contract based on the delivery of government furnished property..............................................................35

2. AMCOM's actions in bad faith are incontrovertible issues of material fact that are supported by the record....................................36

B. The Government's failure to disclose Its superior knowledge to SDC is an Incontrovertible issue of material fact that is supported by the record.............................................39

VI. SDC's claim for consequential damages is not improper as a matter of law....................................................46

Certificate of Service...........................................................................53

## Table of Authorities

Cases:

Aleutian Constructors v. U.S.,
24 Cl. Ct. 372 (1991)....................21,22

American Ship Building Co. v. United States,
220 F.2d 75 (Ct.Cl. 1981))....................40

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002)....................37

Bill Strong Enterprises, Inc. v. Shannon,
49 F.3d 1541 (Fed. Cir. 1995)....................11

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed.Cir.2001)....................47,48

Centex Corp. v. United States,
395 F.3d 1283 (C.A. Fed. 2005)....................29

Com.Fed. Bank, F.S.B. v. U.S.,
59 Fed. Cl. 338 (2004)....................50,51

Concrete Specialties v. H.C . Smith Constr. Co.,
423 F. 2d 670 (10th Cir. 1979)....................30

Electronic & Missile Facilities, Inc. v. United States,
189 Ct.Cl. 237 (1969)....................48

Essex Electro Eng'rs, Inc. v. Danzig,
224 F.3d 1283 (Fed.Cir.2000)....................30

Fifth Third Bank of Western Ohio v. U.S.,
55 Fed. Cl. 223 (2003)....................50,51

First Federal Lincoln Bank v. United States,
73 Fed. Cl. 633 (2006)....................47,48, 50

GAF Corp. v. U.S.,
932 F.2d 947 (Fed. Cir. 1991)........................................................................40

Gates v. United States,
33 Fed. Cl. 9 (1995)....................................................................................51,52

Gould, Inc. v. U.S.,
66 Fed.Cl. 253 (2005)...................................................................................26

Hawaiian Bitumuls & Paving Division of Dillingham
Construction Pacific, Ltd. v. U.S.,
26 Cl.Ct. 1234 (1992)...................................................................................21

Heyl & Patterson v. O'Keefe,
986 F.2d 480 (Fed. Cir. 1993)........................................................................11

James M. Ellet Construction Company, Inc. v. U.S.,
93 F.3d 1537 (Fed. Cir. 1996)......................................................9,10,11,14,15

J.L. Simmons Co. v. U.S.,
188 Cl.Ct. 684 (1969....................................................................................21

Litton Industrial Products, Inc. v. Solid State Systems Corp.,
755 F. 2d 158 (Fed. Cir. 1985).......................................................................18

Lopez v. AC&S, Inc.,
858 F.2d 712 (Fed.Cir. 1988).........................................................................40

M/A-COM Sec. Corp. v. Galesi,
904 F.2d 134 (2d Cir.1990)............................................................................30

Malone v. United States,
857 F. 2d 787 (Fed. Cir. 1988).......................................................................30

Needles v. United States,
101 Ct.Cl 535 (1944).................................................................................37,38

Neely v. U.S.,
152 Ct. Cl. 137 (1961)...................................................................................47

Placeway Construction Corporation v. U.S.,
920 F.2d 903 (Fed. Cir. 1990)....12

Olin Jones Sand Co. v. U.S.,
225 Ct. Cl. 741 (1980)....46,47

Polito v. Continental Cas. Co.,
689 F. 2d 457 (3rd Cir. 1982)....30

Price v. Symsek,
988 F.2d 1187 (Fed. Cir. 1993))....37

Ramsey v. United States,
121 Ct. Cl. 426 (1951)....46

Reflectone, Inc. v. Dalton,
60 F.3d 1572 (Fed. Cir. 1995)....9,10

Rhen v. United States,
17 Cl. Ct. 140 (1989)....46

Rumsfeld v. Freedom NY, Inc.,
329 F. 3d 1320 (Fed. Cir. 2003)....28,29

Sharman Co. v. U.S.,
2 F.3d 1564 (Fed. Cir. 1993)....9

Southern National Corporation v. U.S.,
57 Fed. Cl. 294 (2003)....51

Struck Construction Co. v. United States,
96 Ct.Cl. 186 (1942)....37,38

Tecom , Inc. v. United States,
66 Fed.Cl. 736 (2005)....38

Thermalon Industries v. U.S.,
52 Fed. Cl. 464 (Fed. Cl. 2000)....19

Transamerica Insurance Corp. v. U.S.,
973 F. 2d 1572 (Fed. Cir. 1992)....................11

U.S. v. Spearin,
248 U.S. 132 (1918)....................21,22

Utility Contractors, Inc. v. U.S.,
8 Ct.Cl. 42 (1985)....................21

Statutes:

Tucker Act
28 U.S.C. §1491 (2000)....................7,8,9

Contract Disputes Act of 1978
41 U.S.C. §601, et. seq. (1997)....................8,9

Regulations:

48 C.F.R., FAR §31.205-42(g)....................19

48 C.F.R., FAR §33.201....................10

48 C.F.R., FAR §52.209-4716....................20,24,25

48 C.F.R., FAR §52.245-2(h)(2)....................29,36

Rules:

Rule 56(h)(1) of the *RUSCC*....................1

Secondary Sources:

Restatement (Second) of Contracts, §205 (1981)....................30

13 Williston on Contracts § 38:15 (2000)
437-38; Richard A. Lord....................30

C-0077 were defective. Additionally, there is no genuine issue as to the fact that AMCOM did continually insist and exhort that SDC perform under the contract under threat of termination for default, refusing to terminate the contract for convenience or otherwise correct the defects, in violation of the covenant of fair dealing between the parties, and did thereby cause damage to the Plaintiff.

3. There is no genuine issue as to the fact that AMCOM did award contract number DAAH1-00-C-0077 to SDC with the express knowledge that it would only be capable of performance by Raytheon, and did thereafter insist upon its performance by SDC in bad faith, and did thereby cause damage to the Plaintiff.

4. There is no genuine issue as to the fact that AMCOM did fail to pay, after terminating Plaintiff's contract for convenience, allowable and allocable termination settlement costs of Nineteen Thousand Three Hundred and Sixteen and 00/100 Dollars. ($19,316.00).

5. There is no genuine issue as to the fact that AMCOM did award Contract Number DAAH1-00-C-0077 to SDC with the express knowledge that it would only be capable of performance by Raytheon without disclosure of that fact to SDC, and did thereby cause damage to the Plaintiff.

6. In support of this motion, the Plaintiff relies on the pleadings, discovery, and the Joint Statement of the Uncontroverted Facts.

WHEREFORE, these premises considered, the Plaintiff moves this Honorable Court to grant its Cross Motion for Summary Judgment on the Issue of Entitlement against Defendant.

## Reply to Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment

Comes now the Plaintiff, Systems Development Corporation (SDC), and enters this reply in opposition to the Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment. In making its reply, the Plaintiff has relied upon the consolidated statement of uncontroverted facts as amended by the Plaintiff, and the appendix supporting the consolidated statement of uncontroverted facts as supplemented by the Plaintiff. As its reply, the Plaintiff provides to the Court as follows:

## STATEMENT OF THE ISSUES

1. Does the Court have jurisdiction to entertain the claims contained in the Plaintiff's First Amended Complaint?

2. Are there any legal issues which would defeat the claims contained in the Plaintiff's First Amended Complaint?

3. Are there any genuine issues of material fact which would prevent the Court from properly granting to the Defendant, a judgment as a matter of law on the claims contained in the Plaintiff's First Amended Complaint?

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE.

On May 9, 2000, SDC was awarded contract number DAAAH01-00-C-0077, (hereinafter the "contract) a firm, fixed-price, build-to-print contract for the manufacture of a circuit card assembly, Army Part Number 13038120-021 (hereinafter the "circuit card assembly"). (Tab 31, 247-303) This contract was awarded to SDC by the United States Army Aviation and Missile Command (hereinafter "AMCOM") through sole source procurement as a result of SDC's participation in the 8(a) small business program. (Tab 32, 305; Tab 33, 334; Tab 34, 346-47) The contract was awarded as a build-to-print, production contract, with a Level 3 supporting Technical Data Package (hereinafter "TDP"). (Tab 32, 305; Tab 33, 334) A level 3 TDP is one that is adequate for open competition (i.e. would not need to be restricted to a particular manufacturer). (Tab 35, 348-49) During the preliminary negotiation of the contract and continuing throughout its existence, both AMCOM and SDC discovered numerous problems with its

terms which made performance of the contract, as written, impossible. Despite these deficiencies, AMCOM continued to demand performance of the contract, until finally, on February 17, 2004, AMCOM terminated the contract for convenience. (Tab 32, 305; Tab 33, 334, Tab 37, 361) Subsequent to the termination, SDC submitted its termination settlement proposals, which included a claim for equitable adjustment for the cost associated with the additional delay, effort, and expense exerted due to AMCOM's unlawful conduct. (Tab 36, 350-360) On March 25, 2005, Contracting Officer, Paul E. Slemons, rendered a contracting officer's final decision, denying SDC a significant part of SDC's claim, namely those claimed costs attributable to AMCOM's alleged malfeasance. (Tab 37, 361-364) This action is a direct result of this contracting officer's final opinion.

The Government's assessment of the nature of this case is, as a general matter, factually accurate. However, SDC would take exception to the Government's assertion that SDC has not submitted a certified claim or a request for a contracting officer's final decision. These issues are fully addressed in SDC's response to the Government's jurisdictional challenge.

## II. STATEMENT OF FACTS.

The facts relied upon by SDC in the formulation of this reply are those provided in the accompanying consolidated statement of uncontroverted facts, and the appendix supporting the consolidated statement of uncontroverted facts.

Generally, the Government's account of the undisputed facts is accurate. However, SDC would challenge the Government's submission as being incomplete. The Government's statement of facts is devoid of most all of the incontrovertible facts which make up the basis of SDC's claims.

Otherwise, SDC asserts that the Government's unnecessary quantification of the claims contained in the Plaintiff's First Amended Complaint display a general misunderstanding of the claims themselves, as well as a self-servingly, narrow understanding of the appropriate legal standards. (Govt. Motion at 7-8) Also, SDC refutes the Government's repeated assertion that no written claim was ever submitted to the contracting officer for final determination. (Govt. Motion at 8)

## SUMMARY OF THE ARGUMENT

The Government's assertions regarding SDC's failure to submit its claims to a contracting officer is plainly false. SDC did, on several

occasions subsequent to the termination of the contract, submit certified proposals to the contracting officer. According to the relevant legal authority, these proposals are sufficient to satisfy the jurisdictional requirements of the Tucker Act, thereby conferring jurisdiction upon this Court to determine the merits of all of SDC's claims. Thus, the Government's motion to dismiss is due to be denied.

In making its Motion for Summary Judgment, the Government has attacked each of SDC's claims as improper as a matter of law. In doing so, the Government has improperly classified the contract at issue as a performance contract, rather than a design contract. Based on this incorrect legal position, the Government has reasoned that most of SDC's claims are based on defective specifications, and are therefore improper. In actual fact, only one of SDC's claims is based upon the defects in the specifications, and this claim is proper because the specifications in question are design specifications, which imply warranty of fitness. SDC's other claims are based upon the misguided, intentional, and unlawful conduct of AMCOM employees acting in bad faith and breaching the covenant of good faith and fair dealing implicit in the contract with SDC. Otherwise, SDC has made claims based upon AMCOM's failure to disclose to SDC its superior knowledge and the terminating contracting officer's

failure to allow appropriate termination for convenience costs. The Government has not raised any proper issues of law which would defeat these claims.

Further, based upon the recorded evidence in this case, there exists no substantial dispute as to any material fact necessary to SDC's claims. Thus, it is clear that the Government's motion for summary judgment is due to be denied.

## ARGUMENT

### I. THE UNITED STATES COURT OF FEDERAL CLAIMS HAS JURISDICTION TO CONSIDER THE CLAIMS CONTAINED IN THE PLAINTIFF'S FIRST AMENDED COMPLAINT.

#### A. The Plaintiff has submitted its claims to the contracting officer.

The Government's position in favor of its Motion to Dismiss is that the claims contained in the Plaintiff's First Amended Complaint were not presented in a certified claim to the Terminating Contracting Officer, and therefore, this Court is without jurisdiction to hear said claims pursuant to the Contract Disputes Act of 1978 (CDA). This assertion is incorrect.

The Tucker Act, 28 U.S.C. §1491(a)(1) (2000), provides that "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive

department, ***or upon any express or implied contract with the United States***, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States." (emphasis added) Otherwise, the Tucker Act states that, "the Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 . . . on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. §1491(a)(2) (2000).

Section 6 of the CDA provides that, "all claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. §605 (1997). Unfortunately, the CDA neglects to define what is meant by the requirement to submit a "claim." James M. Ellet Construction Company, Inc. v. U.S., 93 F.3d 1537, 1541-42 (Fed. Cir. 1996)(citing Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995)(in banc) and Sharman Co. v. U.S., 2 F.3d 1564, 1568-69 (Fed. Cir. 1993)).

According to the Federal Acquisition Regulations, a "claim" is (1) a written demand, (2) seeking as a matter of right, (3) the payment of money in sum certain. 48 C.F.R. §33.201. Further, Reflectone, 60 F. 3d at 1576, establishes that a "claim," which comes in the form of a routine request for money, must also be in dispute. Fortunately for SDC, Ellet Construction, 93 F.3d at 1543, holds that a demand for compensation submitted after a termination for convenience "can hardly be considered routine."

The Government admits that the contract in question was terminated for convenience on February 14, 2004. (Govt. Motion at 3) It is established from the record that SDC made written claims seeking, as a matter of right, the payment of money in sum certain on April 29, 2003, April 23, 2004, November 12, 2004, and November 22, 2004. (Tab 36, 350-360; Tab 96, 489-498; Tab 97, 499-523; Tab 98, 524-551) Further, it is undisputed that the Contracting Officer entered his termination decision on March 25, 2005, rejecting SDC's demands. (Govt. Motion at 6) Therefore, it is sufficiently established by the record and the Government's own admissions, that SDC has submitted at least four (4) separate demands for a contracting officer's final decision on disputed matters concerning SDC's right to Payment in sum certain. Also, the pre and post termination circumstance of these demands supports SDC's contention that the claims

contained in these submission to the contracting officer were submitted for a final decision.

It is a requirement of a valid claim, that it state a prayer for a contracting officer's final decision. Bill Strong Enterprises, Inc. v. Shannon, 49 F.3d 1541, 1550 (Fed. Cir. 1995). Such a request for a final decision can be implied from the context of the submission or when the desire of the contractor is such a decision. Heyl & Patterson v. O'Keefe, 986 F.2d 480, 483 (Fed. Cir. 1993); Transamerica Insurance Corp. v. U.S., 973 F. 2d 1572, 1576 (Fed. Cir. 1992).

The government has admitted that SDC submitted "several written offers to settle the termination," but that the "negotiations to settle the termination did not "come to an agreement." (Govt. Motion at 3) According to the provisions of Ellet Construction, 93 F.3d at 1544, once the negotiations reach an impasse, a proposal for settlement then becomes one submitted for final decision, thereby becoming a "claim" within the definition established by the FAR.

By the Government's own admission it is established that proposals for settlement were submitted by SDC in hopes that a settlement could be negotiated. (Govt. Motion at 3) We also know that such a settlement was never agreed upon and that the negotiations came to an end with the

Contracting Officer's final opinion on March 25, 2005, if not before. (Tab 37, 361-364)(Govt. Motion at 3,6) It was at this point that the proposals submitted by SDC became claims, sufficient to support this Court's jurisdiction pursuant to the Tucker Act and the CDA. Thus, the remaining question is which claims were submitted to the contracting officer for his final decision.

### B. All of the claims listed in the Plaintiff's First Amended Complaint have been presented to the contracting officer.

According to the Federal Circuit's decision in Placeway Construction Corporation v. U.S., 920 F.2d 903, 908 (Fed. Cir. 1990), it is reversible error to consider only the form in which the contractor's claims are originally submitted to the CO. Instead, in determining matters of jurisdictional significance, the court should determine whether one or more claims existed, regardless of the form in which they were presented to the CO. Id.

SDC submitted "claims" to the Terminating Contracting Officer, Paul E. Slemons, on April 29, 2003, April 23, 2004, November 12, 2004, and November 22, 2004. (Tab 36, 350-360; Tab 96, 489-498; Tab 97, 499-523; Tab 98, 524-551)

The April 29, 2003 certified proposal contained a claim for sum certain payment of $596,123.00. (Tab 36, 351) This proposal included payment for parts procured in furtherance of the contract, specialty parts

which were only usable in connection with the contract, general and administrative expenses incurred due to the delay in performance, expenses incurred in negotiating a settlement of the contract, and payments due to SDC's subcontractors. (Tab 36, 351-354) Included with the proposal were tables relating to the wage rates and expended effort of SDC employees used in the calculation of the figures appearing in the certified schedules. (Tab 36, 355) The exact figures for these costs were itemized in certified schedules A through H. (Tab 36, 352-354) This settlement proposal also contained a chronology of events prepared by SDC, detailing the evidence which would support its potential claims against AMCOM. (Tab 36, 356-360) The documents referenced in this timeline now make up a substantial portion of SDC's submissions to the consolidated appendix in this action, and the actions referred to by its terms supply the basis for SDC's claims in this Court.

The April 23, 2004 proposal to the contracting officer contained a certified claim for payment of $789,058.00. (Tab 97, 500-503) This figure was the result of the ongoing settlement negotiations between SDC and the contracting officer, and was again certified by Virginia Gilchrist, president of SDC. Again, this proposal generally included contemplated payments for parts procured in furtherance of the contract, specialty parts which were

only usable in connection with the contract, general and administrative expenses incurred due to the delay in performance, expenses incurred in negotiating a settlement of the contract, and payments due to SDC's subcontractors. (Tab 97, 500-503) Likewise, certified schedules A through H, as well as calculation tables detailing the figures used in calculating the claim amount were included with the claim. (Tab 97, 500-503) Additionally, this claim included a precisely-detailed, certified inventory schedule listing by part number the complete inventory of SDC relating to the contract, as well as invoices and certified schedules from SDC's subcontractor, Teledyne Brown Engineering, Inc. (Tab 97, 509-519)

The November 12, 2004, SDC proposal is the one cited by the Government in its argument to this Court. (Tab 96, 482-489). The terms of this claim are the strongest evidence in favor of the jurisdiction of this Court. Included in this claim are allegations regarding defective specifications, inadequate and undefined testing procedures, the contract requirements for the use of obsolete parts, as well as AMCOM's perceived unwillingness to correct these issues. (Tab 98, 482-489) This proposal was obviously before the contracting officer when he made his final decision on March 25, 2005. Therefore, according to the holding in Ellet Construction, *supra*, the November 12, 2004 certified proposal did become

a certified "claim" for final decision once the negotiations reached an impasse. This certified claim contains sufficient information to put the contracting officer on notice of the existence of claims for damages based upon defective specifications, as well as the claims of bad faith, breach of the covenant of good faith and fair dealing, and superior knowledge. Therefore, it must be true that the contracting officers' final decision on March 25, 2005, is sufficient to support a finding that this Court has jurisdiction to decide the merits of these claims, which are now before it.

Finally, there is the issue of the November 22, 2004, proposal to Mr. Slemons. (Tab 98, 524-553) This proposal includes not only a copy of the certified claim of April 29, 2004, but also an expanded discussion of the legal issues relating to SDC's defective specifications claim. (Tab 98, 524-553) Again, a chronology of events was included to support SDC's assertions that the specifications were defective, that AMCOM had been put on notice of that fact, and that AMCOM refused to correct the defects. To the extent that the Government has argued that all of SDC's claims are based on defective specifications, this proposal turned claim should suffice to support this Court's jurisdiction here. This proposal not only includes direct allegations of the superior knowledge of contracting officer, Jerry Hill, but also, copies of the more relevant correspondence between SDC and

AMCOM. (Tab 98, 533-540) As before, a copy of the chronology of events is attached to this proposal. This chronology was intended to guide Mr. Slemons through the contracting officer's file to the documents which would shed the most light upon SDC's claims.

In conclusion, the record clearly demonstrates that on April 29, 2003, contrary to the Government's assertion, SDC presented a certified claim to the contracting officer. (Tab 36, 350-360; Tab 37, 361) This certified claim contains evidence of SDC's contract based claims.

Further, it is clear from the record that SDC made three (3) other proposals for settlement after the termination of this contract. According to the relevant authority, as discussed above, these proposals, which contain extraordinary demands for disputed payments in sum certain, became "claims" seeking a final decision, once the negotiations came to an end. The government has admitted that the negotiations reached an impasse; however, that revelation is not necessary given the circumstances surrounding the settlement proposals, which indicate that they were intended as requests for a final decision subsequent to the termination of the contract. (Govt. Motion at 3)

The three (3) additional proposals turned claims, include allegations and documentation concerning the same claims which are now before this

Court. In fact, given the information provided to the contracting officer via these three (3) proposals, the administrative record for the contracting officer's decision should have included virtually all of the documents which make up the record in this action. Thus, because the contracting officer had this information at the time of his final decision, it must be true that said decision either includes an assessment of the same facts and circumstances which are now presented to this Court, or that the contracting officer has chosen not to render a decision on those issues. Either way, the natural conclusion is that each of the claims contained in the Plaintiff's First Amended Complaint, has previously been submitted to the contracting officer, though perhaps not in their present judicially palatable form. Therefore, this Court is properly vested with jurisdiction to render a decision on the merits of the claims presented.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

SDC does not dispute the Government's selective citation of authority for the relevant standard of review for a motion for summary judgment. However, SDC zealously denies the assertion that the Defendant's Motion for Summary Judgment should be granted. The Government has failed to carry its burden to establish the absence of disputes of material fact or to establish that it is entitled to a judgment as a matter of law. Instead, the

Government has simply failed to mention or attempted to aver away all of the issues of material fact, without adequate support from the record. Further, the Government has argued incorrect legal standards and has mischaracterized SDC's claims.

SDC submits that when considering the Government's motion for summary judgment, this Court must view the evidence, and draw any inferences therefrom in a light most favorable to SDC, the non-moving party. Litton Industrial Products, Inc. v. Solid State Systems Corp., 755 F.2d 158, 163 (Fed.Cir.1985). Further, this Court must resolve all doubts regarding factual issues in favor of SDC and allocate all presumptions against the Government. Id.

## III. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON SDC'S CLAIM FOR FAILURE TO PAY APPROPRIATE TERMINATION FOR CONVENIENCE COSTS.

The Termination Settlement costs claimed by the Plaintiff are allowable and allocable to the contract as a direct cost. The Contracting Officer's Final position allows no settlement expense on the unsupported theory that the General and Administrative Cost included the settlement cost. (Tab 37, 363)

Settlement cost, like the cost in dispute, is different than typical administrative cost incurred in the normal course of business, which would

clearly be an indirect cost. The settlement cost claim of $19,303.00 was incurred as a direct result of the termination for convenience and is therefore recoverable as a direct cost of the termination and not as an indirect cost. 48 C.F.R. §31.205-42. Broadly described, cost allowed under FAR 31.205-42 are costs that would not have arisen had the contract not been terminated. Thermalon Industries v. U.S., 52 Fed. Cl. 464 (Fed. Cl. 2000).

In a report submitted by Ernest Agresto, plaintiff's expert witness, SDC challenges the Contracting Officer's determination that settlement costs are recoverable only as indirect costs. (Tab 11, 128-129) Mr. Agresto states that there are several bases to recover the costs related to buyer, procurement clerk, and data entry clerk activity, even though these costs are typically recovered through a company G & A Rate. (Tab 11, 128-129) Agresto states that recovery under this method is unreasonable and states the following reasons: (1)The original contract base period was May 8, 2000, to February 2, 2001. The contract was terminated on February 17, 2004, a delay caused by the government of more than three years. (2) During the three years of delay, the SDC employees provided support for the contract which is not commensurate with the recovery calculated using the typical G & A Recovery methodogy. (3) The hours can be verified. (4)

There was no stop work on this contract so company employees were required to perform services in an attempt to complete contract requirements. (Tab 11, 128-129) The reasonableness of their hours can be evaluated based upon the services rendered and SDC made adjustments to their DCAA annual submissions to prevent a double accounting issue, as raised by DCAA. It is Mr. Agresto's professional opinion that these costs should be paid as direct delayed and disruption cost associated with the government's actions. (Tab 11, 128-129)

## IV. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON SDC'S CLAIM BASED UPON AMCOM'S USE OF DEFECTIVE SPECIFICATIONS.

In its motion, the Government has argued that the contract at issue "involved only performance specifications." (Govt. Motion at 23) Specifically, the Government has argued that the inclusion of 48 C.F.R. §52.209-4716, a general specification governing the fabrication of electronic assemblies, makes this a performance contract rather than a design contract. (Govt. Motion at 24) Further, the Government has stated that its classification of the specifications at issue "is undisputed," and that there are no design specifications at issue. (Govt. Motion at 23, 24) These assertions are the result of a severe misinterpretation of the law, and

otherwise evidence a complete misunderstanding of the disputed facts of this case.

### A. The Government's argument regarding SDC's claim for Defective Specifications is an erroneous argument of law, not fact.

"According to the classic formulation, defining design and performance specifications, design specifications 'set forth in precise detail the materials to be employed and the manner in which the work [is] to be performed,' from which the contractor is 'not privileged to deviate ..., but [is] required to follow ... as one would read a road map. In contrast, typical 'performance' type specifications set forth an objective or standard to be achieved...,' requiring the contractor to exercise its ingenuity in achieving the standard of performance, in selecting the means, and in assuming a corresponding responsibility for that selection." Hawaiian Bitumuls & Paving Division of Dillingham Construction Pacific, Ltd. v. U.S., 26 Cl.Ct. 1234, 1240 (1992)(quoting J.L. Simmons Co. v. U.S., 188 Cl.Ct. 684 (1969)). Often government contracts contain both design and performance specifications. Utility Contractors, Inc. v. U.S., 8 Ct.Cl. 42, 50 n.7 (1985). The distinction between a design specification and a performance specification can be determined as a matter of law. Aleutian Constructors

v. U.S., 24 Cl. Ct. 372, 378 (1991)(citing U.S. v. Spearin, 248 U.S. 132, 137-138 (1918)).

SDC's claim for damages based upon defective specifications is primarily based upon the data provided to it in the Technical Data Package (TDP), which was a part of the contract. (Tab 31, 275-304; Tab 32, 302-311) Present in the TDP were specifications which, properly provided, would have indicated in excruciating detail where, how, and when each element of the Circuit Card Assembly would be acquired, manufactured, assembled and tested. (Tab 31, 275-304) These specifications came in the form of drawings, parts lists, digital data, and detailed testing requirements. (Tab 31, 275-304; Tab 59; Tab 63; Tab 64; Tab 88, 465-467; Tab 89, 463-464; Tab 95, 482-488) The specifications in question "set forth in precise detail the materials to be employed and the manner in which the work [is] to be performed." (Tab 63; Tab 64; Tab 65; Tab 66) SDC was not privileged to deviate from the specifications, but instead was instructed by AMCOM to follow their direction as one would follow a road map. (Tab 63; Tab 64; Tab 65; Tab 66)

The military specifications, Mylar drawings, and digital data provided in the TDP as part of the contract are the sort of materials which could be referenced as definitive of the term "design specifications." One need but

glance at a military design drawing, such as the Mylar drawings provided to SDC, to know these specifications are design specifications as opposed to performance specifications. (Tab 59)

However, the proper classification of these specifications is a matter of law, which is apparently controverted, and to be decided by this Court. The Government's classification of the specifications at issue in this action is an erroneous legal conclusion. The Government has used this incorrect conclusion as the basis for its motion for summary judgment on the issue of defective specifications, as well as grounds for its motion for a judgment as a matter of law on several other of the Plaintiff's claims. Because the Government is incorrect in its legal classification of the specifications at issue, its arguments and motions based thereon are properly denied.

### B. The issue of the presence of defective design specifications in the contract is an incontrovertible issue of material fact that is supported by the record.

The Government's characterization of this contract as a performance contract is illogical, and fails to accord the correct legal standard, or even a proper view of the record in this case. The contract at issue is one which provides for the manufacture of a Circuit Card Assembly capable of receiving, processing and transmitting digital data in the form of electronic signals produced by a highly advanced missile defense system used by the

U.S. military. (Tab 31, 247-303; Tab 32, 304-332; Tab 33, 333-345) Without the need for any further analysis it should be clear that the performance of such a contract could not be left to the contractor's discretion, but instead would contain very specific instructions regarding not only the materials and techniques used in the manufacturing process, but also regarding highly specialized standards of performance for such a product (i.e. design specifications).

It has been established in discovery, that the TDP incorporated into the contract inadequate Mylar drawings, deficient digital data, and requirements for special testing equipment which was not reasonably available to SDC. (Tab 55, 404; Tab 56, 407; Tab 58; Tab 59; Tab 88, 465-468 ; Tab 89, 469-470; Tab 90, 472; Tab 95, 482-487) Therefore, the record conclusively indicates that design specifications were included in the contract, and that these specifications were defective. It is an incontrovertible issue of material fact that the contract at issue contains design, as opposed to performance specifications. Therefore, the Government's motion for summary judgment on the issue of defective specifications is properly denied, as it is based on a contrary assertion.

The Government's argument appears to be that the mere inclusion of 48 C.F.R. §52.209-4716, an alleged performance specification, removes

the possibility that the contract could contain a single design specification. (Govt. Motion at 23,24) This attempt to quantify the contract at issue as either strictly a performance contract or strictly a design contract establishes a false and unnecessary dichotomy according to this Court's decision in Utility Contractors, *supra*, which clearly provides that a contract can, and often does, contain both types of specifications.

**C. The Government's contention that SDC does not dispute that the contract involved only performance specifications is clearly misguided.**

In paragraph 1, sentence 1, of its First Amended Complaint, SDC stated "the contract was awarded as a build-to-print, production contract." (Tab 32, 305) In its Answer to the Plaintiff's First Amended Complaint, the Government admitted SDC's allegation that the contract is a build-to-print contract (i.e. that it contains design specifications). (Tab 33, 334) Otherwise, the Government has stated in its Answer that the contract is the best evidence of its own contents. (Tab 33, 334) SDC completely agrees that the contract speaks for itself as to the presence of design specifications.

A "build-to-print" contract is one which is based upon design specifications rather than performance specifications. Gould, Inc. v. U.S., 66 Fed.Cl. 253, 256 (2005). A "build-to-print" contract involves a

solicitation of offers to build an item in accordance with certain previously established, pre-printed design specifications, hence the moniker build-to-print. Id. It is apparent that from the inception of this action that SDC has continually asserted that the contract at issue contains defective design specifications, not performance specifications. The Government's assertions in its motion for summary judgment attempts to create an issue of material fact where none exists.

It is abundantly clear, from even a casual glance at the contract that the entirety of the latter half of the document contains primarily detailed references to military design specifications called out by number, and referenced to Stable Base Drawings and other digital media. (Tab 31, 275-304; Tab 59) SDC agrees with the Government's initial assessment of the evidence as presented in its Answer, and feels that by looking to the terms of the contract itself that the design specifications which make up the substance of SDC's defective specifications claim are readily apparent. (Tab 33, 334) Thus, the Government's current assertion that the parties are in agreement as to the presence of only performance specifications is not only false, but also contrary to its previous position.

Furthermore, SDC is well aware of the distinction between a performance specification and a design specification. SDC is aware that

only the design specification carries a warranty of fitness. Therefore, it can be implied from SDC's efforts in making a claim based upon the defective specifications present in the contract that SDC believes these specifications to be of the sort that would allow for a claim to be made. In other words, SDC clearly disputes the Government's assertion that the specifications included in the contract are performance specifications, and its actions in bringing their claim thereon provides evidence that this issue is controverted.

A cursory review of the pleadings and record in this action demonstrates that SDC has sought enforcement of the warranty of fitness of the specifications since its inception. Thus, it should be immanently clear that SDC asserts that the specifications in the contract at issue here were design specifications. In fact, it appears that a proper review of the evidence presented in this action would lead to a decision that the presence of design specifications in the contract is incontrovertible.

## V. THE GOVERNEMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON SDC'S CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.

### A. SDC's claim for breach of the Covenant of Good Faith and Fair Dealing is not improper as a matter of law.

The Government argues that SDC's claim for Breach of the Covenant of Good Faith and Fair Dealing is improper as a matter of law because it is in fact a breach of contract claim based upon government furnished property or, alternatively, is based upon performance specifications which do not give rise to any warranty.

First, the Government's assertion that SDC's claim for breach of the covenant of good faith and fair dealing is equivalent to a claim for breach of contract based upon government furnished property is incorrect. (Govt. Motion at 24) The Government is attempting to make SDC's claim a straw man that can be knocked down with the same stick the Government has previously wielded. SDC's cause of action for breach of the covenant of good faith and fair dealing is based on the actions of AMCOM, and its employees, in failing to provide the information required by the contract, and by insisting upon the use of obsolete parts and, generally, by demanding the performance of a contract known to be impossible to perform. SDC believes that these actions legally constitute a breach of the implied covenant of fair dealing and cooperation present in all contracts, and that this breach is the proximate cause of certain damage to the Plaintiff by virtue of its efforts to perform the Contract.

Likewise, this sort of warranty claim is not precluded by the Government Furnished Property clause which provides for protection from liability for breach of contract stemming from "delivery of Government-furnished property in a condition not suitable for its intended use." 48 C.F.R. §52.245-2(h)(2). The covenant of good faith and fair dealing is present in all contracts, even those containing the Government Furnished Property Clause. Centex Corp. v. United States, 395 F.3d 1283, 1304 (C.A. Fed. 2005); Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1330 (Fed.Cir.2003). Thus, the Government's attempted dismissal of this claim as one for breach of contract based upon government furnished property is incorrect and due to be denied. (Govt. Motion at 25)

Second, the Government's assertion that SDC's claim for breach of the covenant of good faith and fair dealing is based somehow on performance specifications is incorrect. As noted previously, this claim is based on the actions of AMCOM in depriving SDC of its expected benefit of the contract. Otherwise, specifications at issue in this case are most definitely design rather than performance specifications, which do carry a warranty of fitness. Thus, the Government's assertion that this claim must fail as a matter of law is incorrect.

**B. The Government's breach of the Covenant of Good Faith and Fair Dealing is an incontrovertible issue of material fact that is supported by the record.**

"The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner." Centex Corp. v. United States, 395 F.3d 1283, 1304 (C.A. Fed. 2005). Government contracts are no exception to the implied covenant of fair dealing. Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1330 (Fed.Cir.2003); Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed.Cir.2000); Malone v. United States, 849 F.2d 1441, 1445, modified, 857 F.2d 787 (Fed.Cir.1988). "The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex at 1304 (citing Restatement (Second) of Contracts, § 205 (1981); 13 Richard A. Lord, Williston on Contracts § 38:15, at 437-38 (2000); M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir.1990); Polito v. Continental Cas. Co., 689 F.2d 457, 463 (3d Cir.1982); Concrete Specialties v. H.C. Smith Constr. Co., 423 F.2d 670 (10th Cir.1970).)

Based upon the facts presented, it is clear that AMCOM and SDC entered into a contract on May 9, 2000. (Tab 31, 247) Afterwards, AMCOM

interfered with SDC's ability to perform said Contract, effectively destroying SDC's expectations regarding the value of the Contract, and thereby breaching the herein discussed covenant.

AMCOM had knowledge of the defective nature of this contract prior to its award and had, in fact, been instructed by its engineering staff not to solicit the contract. (Tab 47, 390; Tab 50, 395) By awarding the contract to SDC without disclosing the fatal flaws known to be present, AMCOM immediately breached the implied covenant of good faith and fair dealing present in the contract by interfering with SDC's ability to perform the contract and destroying SDC's expectations regarding its own ability to perform the contract.

During the attempted performance of the contract, AMCOM continually breached its duty of good faith and cooperation, by failing to provide SDC with specifications necessary to perform the contract. Throughout the duration of this contract, SDC repeatedly requested copies of Mylar drawings or Gerber data from AMCOM. (Tab 52; Tab 53) It is now known that SDC never possessed any Gerber files, yet that information was not disclosed until October, 2001. (Tab 77, 438-439) AMCOM provided only drawings copied onto Mylar stock, which were unusable. (Tab 59; Tab 58; Tab 55, 403-405; Tab 88, 465-468; Tab 90,

471-472) However, AMCOM continued to assert to SDC that sufficient information from which to build the Circuit Card Assembly had already been provided. (Tab 64; Tab 77, 438-439; Tab 106, 599-601) Because AMCOM failed to act or advise SDC of the potential complications with the contract, even when it had notice of the existence of defects in the contractual specifications, AMCOM breached its covenant to act fairly and in good faith.

On July 30, 2001, SDC first suggested that the contract be terminated for convenience due to the lack of sufficient data from which to build, test, or even acquire the piece parts for the Circuit Card Assembly. (Tab 70) This communication initiated a barrage of reassignments within AMCOM, yet SDC's request apparently went unheard. (Tab 73; Tab 76, 434-437) On September 5, 2002, Contracting Officer supervisor, Jerry Hill, attempted to modify the contract to extend the delivery date, even though he knew that performance of the contract was impossible. (Tab 85, 454-460) Prudently, SDC rejected this request, which would have increased the economic harm to SDC by increasing the resources assigned to this impossible effort. (Tab 86, 450-463) Mr. Hill's attempt to extend the effort of SDC on a contract known to be impossible is yet another instance of the breach of the covenant of good faith and fair dealing.

After four years of requests for manufacturing information from AMCOM, SDC finally submitted a termination settlement proposal on April 29, 2003. (Tab 36) AMCOM responded by issuing three (3) unilateral contract extensions, demanding performance thereon, and threatening to terminate the SDC Contract for default. (Tab 106, 599-601) At this point AMCOM had knowledge not only of the fact that the Contract was only properly awarded to Raytheon, but also that a termination for default would be catastrophic to a known small business concern such as SDC. (Tab 47; Tab 50) This is yet another instance of AMCOM's breach of the covenant of good faith and fair dealing.

Subsequent to AMCOM's threat to terminate the Contract for default, it finally decided that a review of the TDP might be in order. (Tab 59) Upon review of the TDP, it was discovered that SDC had been correct all along, and that AMCOM had failed to provide necessary information from which the contract could be performed. (Tab 88, 465-468; Tab 95, 482-488) Further, it appeared that AMCOM had never even possessed sufficient information to allow performance of the contract. (Tab 59; Tab 95, 482-488) At the very least, AMCOM's refusal to inspect the TDP until late in 2003 is a breach of the implied covenant of good faith and fair dealing because it interfered with SDC's performance and destroyed SDC's

expectation that the contract was capable of being performed, especially considering the number of complaints AMCOM received from SDC.

AMCOM had knowledge that the TDP was insufficient and incomplete prior to the award of the contract. (Tab 47; Tab 50; Tab 42, 377-380) AMCOM had knowledge that the circuit card assembly should be procured from only from Raytheon prior to the award of the contract. (Tab 47; Tab 50) Therefore, all AMCOM communications or other actions associated with this contract, other than its termination for convenience, are properly deemed breaches of the implied covenant discussed herein because they frustrated SDC's expectations by prolonging a contractual obligation which should never have existed, or at least should have been cancelled after SDC's initial inquiry.

AMCOM's repeated failure to provide SDC with the necessary information to build the piece parts required to produce the Circuit Card Assembly is sufficient to demonstrate intentional conduct. AMCOM was completely unresponsive to SDC's request for working models and testing units used to ensure that the Circuit Card Assemblies complied with the terms of the contract. Further, AMCOM has completely frustrated SDC's ability to perform the contract by continually demanding the use of nonprocurable, obsolete parts that were called out by the terms of the

contract. (Tab 53; Tb 75; Tab 77; Tab 78, Tab 106, 599-601) Additionally, AMCOM knew that SDC was an 8(a) small business concern, and yet continually suggested that SDC bear the cost of extremely expensive, task specific equipment which would have decimated SDC's financial resources. (Tab 75; Tab 77) In conducting itself in such a manner, AMCOM did effectively destroy the reasonable expectations of SDC regarding the fruits of the contract, thereby breaching its covenant of good faith, and proximately causing harm to the Plaintiff.

## VI. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON SDC'S CLAIM FOR BAD FAITH AND SUPERIOR KNOWLEDGE.

### A. The record in this action supports SDC's claim for Bad Faith.

#### 1. SDC's claim for Bad Faith is not a claim for breach of contract based on the delivery of government furnished property.

Again, the Government has attempted to lump all of SDC's claims into this one category. (Govt. Motion at 26) This is a misinterpretation of the claim of bad faith. SDC's claim for bad faith does include factual allegations that AMCOM provided SDC with specifications which were defective; however, the claim for bad faith is based upon the facts which show that AMCOM provided these defective specifications with the knowledge that they were defective, that AMCOM defended these

specifications which were known to be defective in the face of inquiry from SDC, and that AMCOM insisted upon performance of the contract with knowledge that such a task was impossible based upon the information provided. (Tab 47; Tab 50; Tab 53; Tab 75; Tab 77; Tab 78) At the very least, AMCOM acted in bad faith by failing to review its own TDP until year four, of a proposed one year contract, even after numerous communications from SDC advising them of the problems. (Tab 95, 482-488) This is not the sort of action precluded by the government furnished property clause, 48 C.F.R. §52.245-2, as it is based primarily on the evidence of subversive intent exhibited by AMCOM throughout the attempted contract performance, and the damages related thereto.

**2. AMCOM's actions in Bad Faith are incontrovertible issues of material fact that are supported by the record.**

The Plaintiff asserts that the actions of AMCOM, and its employees, in opening for competition of a contract which they knew could only be performed by Raytheon, awarding that contract to a known small business concern, insisting upon performance of the contract, threatening to terminate SDC's contract for default, and then refusing to compensate SDC for its costs once the impossibility of performance was discovered constitutes bad faith on the part of AMCOM, and that those actions taken in

bad faith are the proximate cause of certain damage to the Plaintiff by virtue of its efforts to perform the contract.

The United States Court of Appeals for the Federal Circuit has previously established that a presumption of good faith exists in favor of government officials, which can only be rebutted by "well-nigh irrefragable" proof to the contrary. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-1240 (Fed. Cir. 2002) (citing Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993)). However, in 2005 this Court refused to extend the "well-nigh irrefragable" standard to those circumstances that do not involve accusations of fraud or quasi-criminal wrongdoing in the exercise of official duties. Tecom , Inc. v. United States, 66 Fed.Cl. 736, 769 (2005). Specifically, the Tecom Court stated that "when a government official acts under a duty to employ discretion, granted formally by law, regulation, ***or contract***, and a lack of good faith is alleged that does not sink to the level of fraud or quasi-criminal wrongdoing, ***clear and convincing evidence is not needed to rebut the presumption***. Instead, this may be inferred from a lack of substantial evidence, gross error, or the like." Id. (emphasis added) Further, the Court went on to hold that when the allegation of bad faith is based on a collection of separate actions by a group of actors, the acts "must be judged in the aggregate, and not on the

basis of any particular individual's bad faith." Id. (citing Struck Construction Co. v. United States, 96 Ct.Cl. 186, 221 1942 WL 4411 (1942); Needles v. United States, 101 Ct.Cl 535, 602-607 (1944). Finally, the Tecom court, while noting the impossibility of creating an exhaustive list, did note that interference with or failure to cooperate in another contracting party's performance and lack of diligence were among the specific types of bad faith to be previously recognized in judicial decisions. Id. at 770.

On October 10, 2001, AMCOM stated that SDC would have to bear the cost of any additional effort caused by the defects in the contract. (Tab 76, 434-438) On October 31, AMCOM scolded SDC and stated that it could perform the contract just as it has been performed by other contractors. (Tab 77, 438-440) However, this contract has **never** been performed by any contractor other than Raytheon. (Tab 38, 365-368) Thus, despite knowledge of the defective specifications, AMCOM continually asserted that SDC should perform the contract, even going so far as to threaten to terminate the contract for default if the circuit card assemblies were not produced. (Tab 106, 599-601)

It is clear that AMCOM interfered with SDC's ability to perform the contract by competing and awarding a contract which it knew to be impossible to perform. When analyzed in the aggregate, it is clear from the

evidence presented that AMCOM officials had notice that the contract would only be capable of performance by Raytheon from their own internal communications. (Tab 47; Tab 50) Also, AMCOM had knowledge that the Government did not possess sufficient data to enable SDC to complete the contract as shown by the overwhelming evidence of communications from SDC and the deposition testimony of certain AMCOM employees who described the Technical Data Package as noticeably deficient. (Tab 35, 348-349, Tab 90; Tab 92; 479)

For these reasons SDC asserts that AMCOM's actions could be held to be in bad faith even under the "well-nigh irrefragable" standard. However, that standard does not properly apply to these circumstances, as allegations of fraud or quasi-criminal conduct have not been made a part of this action. Thus, the evidence as discussed hereinabove is sufficient to establish that AMCOM acted in bad faith, thereby defeating the Government's motion.

**B. The Government's failure to disclose its Superior Knowledge to SDC is an incontrovertible issue of material fact that is supported by the record.**

AMCOM breached the terms of the Contract by failing to disclose its superior knowledge regarding the inability of SDC, or any contractor other than Raytheon, to perform the contract and by failing to disclose the

knowledge within its possession regarding the deficiencies within the TDP. This withholding of superior knowledge did proximately cause certain damage to the Plaintiff by virtue of its efforts to perform the contract.

Superior Knowledge is a doctrine which can supply the basis for a claim of breach of contract against the government. GAF Corp. v. United States, 932 F.2d 947, 949 (Fed.Cir.1991). Under the superior knowledge doctrine, the government can breach a contract by failing to disclose knowledge within its possession. Id. The Federal Circuit has enumerated the elements of a superior knowledge claim to be as follows: (1) the contractor undertook to perform the contract "without vital knowledge of a fact that affects performance, costs, or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information." Id. (citing Lopez v. AC&S, Inc., 858 F.2d 712, 717 (Fed.Cir. 1988); American Ship Building Co. v. United States, 220 F.2d 75 (Ct.Cl. 1981)).

AMCOM has breached its contract with SDC by withholding its superior knowledge of the impossibility of performance of its terms. The relevant facts or knowledge to be considered is that (1) Raytheon is the

only company capable of performing the contract in question, (Tab 47; Tab 50) and (2) that AMCOM never possessed sufficient information to allow any other contractor to perform the contract. (Tab 88, 465-468; Tab 95, 482-488) Raytheon is, in fact, the only party capable of performance because they are the only ones ever to build the Circuit Card Assembly, and they are the only ones with sufficient technical information to successfully manufacture it. (Tab 38, 365-368; Tab 47; Tab 50; Tab 95, 482-488) AMCOM never possessed a sufficient TDP to allow any other company to build the Circuit Card Assembly, because Raytheon did not provide them with that information. (Tab 95, 482-488)

In May 2000, SDC undertook to perform the contract. (Tab 31, 247) Circumstantially, it would seem clear from the acceptance of the award that SDC was without knowledge of the impossibility of the contract's performance, or the problems with the TDP. Otherwise, SDC has testified that it had no knowledge of the fact that Raytheon was the only entity capable of manufacturing the Circuit Card Assembly at the time of contract formation. (Tab 51, 397-398)

During the entire life of the contract, AMCOM possessed vital knowledge of the fact that the contract could only be performed by Raytheon. (Tab 47; Tab 50) Without the appropriate specifications, or any

means to recreate them, it is clear that AMCOM's TDP was insufficient to support the performance of the contract, and therefore the only party capable of building the Circuit Card Assembly would be the originator of said part, namely Raytheon. (Tab 47; Tab 50) As early as June 1999, AMCOM knew that the TDP associated with this contract had such significant defects as to render it inappropriate for open competition. (Tab 42, 377) Subsequently, AMCOM believed that such defects had been cured, but on January 20, 2000, SDC inquired as to three specific problems with the TDP. (Tab 47) AMCOM engineering personnel, upon review of the inquiry, recommended that the solicitation of this contract from SDC be cancelled and stated that the part "be procured from Raytheon." (Tab 47) SDC was never notified as to the result of the inquiry. By failing to disclose to SDC information which clearly affected its performance, AMCOM breached the contract by withholding Superior Knowledge.

Again in February 2000, AMCOM, after an inquiry from SDC, possessed knowledge that the Circuit Card Assembly was in need of redesign, and therefore must be procured from Raytheon. (Tab 50) AMCOM never notified SDC of this discovery. Withholding this information is yet another instance of AMCOM's breach of the contract by virtue of its Superior Knowledge.

In June and July 2000, SDC began to request Gerber data and Mylar Artwork from AMCOM. (Tab 54, 401-402; Tab 53, 400). Unfortunately, AMCOM possessed mere copies of the original Mylar Artwork, which are not functional. (Tab 55, 403-405; Tab 56, 406-407; Tab 58; Tab 59) Also, it is now known that AMCOM never possessed Gerber data, which is the electronic data from which the Mylar drawings are printed. (Tab 77, 438-439) Obviously, SDC did not know that AMCOM did not possess sufficient Mylar Artwork or Gerber data or it would not have requested that information on so many separate occasions. Likewise, the numerous instances of communication between AMCOM and SDC regarding legible Mylars and/or Gerber data were surely sufficient to put AMCOM on notice that SDC had no knowledge of the fact that the desired information had never been purchased from Raytheon. (Tab 77, 438-439; Tab 95, 482-488)

The information AMCOM supplied to SDC was misleading, and otherwise insufficient to place a burden upon SDC to inquire about the missing information. In connection with this Contract, SDC has received copies of Mylar drawings, amongst other contract specifications. This information was misleading because it lead SDC to believe that AMCOM possessed the capability to provide information sufficient to allow the

Contract to be performed. Unfortunately for SDC, the United States Government was not in possession of these items and, in fact, had never been in possession of the necessary information. (Tab 88, 465-468; Tab 95, 482-488) Further, to the extent that the information provided was sufficient to put SDC on notice of the need to inquire about the status of the contract, such inquiry was made. SDC inquired as to the status of the necessary specifications on numerous occasions, and did on at least three separate occasions request AMCOM to cancel the contract due to the absence of that information. (Tab 70, 423-424; Tab 71, 425-427; Tab 74, 430-432; Tab 75; Tab 76, 434-437; Tab 77, 438-439)

Finally, it is abundantly clear that AMCOM withheld its knowledge regarding Raytheon and the defects present in the contract from SDC. AMCOM knew that the contract with SDC should have been cancelled even prior to its award. (Tab 47; Tab 50) However, AMCOM proceeded to award the contract to SDC, and to insist upon its performance, even threatening termination for default. (Tab 106, 599-601) SDC was not notified of the lack of a sufficient TDP, or that Raytheon was the only company capable of manufacturing the Circuit Card Assembly until the institution of discovery in this action.

Based upon the uncontroverted facts, it is clear that AMCOM had knowledge that the contract should have been awarded to Raytheon, as it was the only contractor capable of producing the Circuit Card Assembly. (Tab 47; Tab 50) Further, at some point in the administration of the contract, possibly prior to award, AMCOM became aware of the fact that it did not possess sufficient data to allow a contractor other than Raytheon to produce and program the Circuit Card Assembly. (Tab 47; Tab 50) This information was not communicated to SDC during its attempted performance of the contract. The fact that SDC was unaware of the complications with the contract and deficiencies in the data is evidenced by its acceptance of the contract and subsequent communications requesting the very data which AMCOM knew that it did not possess. SDC never would have accepted a contract which was impossible to perform, required unprocurable piece parts, and was without sufficient supporting data, had they known what AMCOM had already discovered. The specifications in the Contract certainly did not provide notice to SDC that they would not be able to perform the Contract. AMCOM breached the Contract by means of its superior knowledge, and it is for this reason that AMCOM is properly liable to SDC for the proximate harm caused by its actions and omissions.

## VI. SDC'S CLAIM FOR DAMAGE IS NOT IMPROPER AS A MATTER OF LAW.

The Defendant asserts that "SDC is not entitled to recover any damages for any lost business opportunities, or other consequential damages resulting from lost business opportunities, such as increased G&A costs, and loss in company value." (Govt. Motion at 32). Citing Olin Jones Sand Co. v. U.S., 225 Ct. Cl. 741, 742, 744 (1980), the Defendant contends that even if SDC is able to prove that the Government's actions impaired their "ability to obtain other work," "these damages would be too remote and speculative to be recoverable." However, the Defendant failed to recount the Court's holding that consequential damages are recoverable where they are the "natural and probable consequence of the breach." Id. at 741 (citing Ramsey v. United States, 121 Ct. Cl. 426, 433, (1951). It is noted that the Court in Olin Jones precluded the trial judge from considering damages "relating to potential future work or contracts;" however, the Court based its decision on the circumstances of that particular case. Id. at 744. See also Rhen v. United States, 17 Cl. Ct. 140 (1989). "[D]amages remotely or consequently resulting from the breach" are not allowed;" however, "damages [that] are the natural and probable consequence of the breach complained of" are allowed. Olin Jones at 742

(citing Ramsey). Consequential damages are recoverable whenever the test set forth in Ramsey is met." Id.

The Government contends that "SDC does not provide any basis for evaluating its claims for damages except the wildly speculative report from its expert." (Govt. Motion at 33) However, no case cited by the Government refers to a plaintiff's position for damages that was based on an expert's findings.

In Neely v. U.S., 152 Ct. Cl. 137, 443 (1961), the Court stated that "loss of anticipated profits [ ] is a recognized measure of damages, where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made."

In the present matter, the expert's calculations for SDC's lost profits and business opportunities were generated from calculations based on widely accepted principles. However, this Court has noted that the "ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.' " First Federal Lincoln Bank v.

United States, 73 Fed. Cl. 633, 643 (2006) (citing Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed.Cir.2001) ("Bluebonnet III") (quoting Electronic & Missile Facilities, Inc. v. United States, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969))). Therefore, it is arguable that in the present matter, genuine issues of material fact do exist, and the Defendant's motion to dismiss, or alternatively, for summary judgment should fail.

The Plaintiff's expert, Earnest J. Agresto, a certified public accountant who specializes in working with federal government contractors and construction companies, presented his rationale as to the calculation of recoverable damages in his deposition. Mr. Agresto indicated that in order to determine the damages, he utilized financial statements from fiscal years 2001 through 2006 in order to calculate the "expected profits had not the improper actions taken place and had the company continued its normal course of business, [which he then] compared [ ] to the actual profits." (Tab 100, 554-557) To calculate expected profits, Mr. Agresto stated that

> "[he] took the revenue number from 2002 and increased it forward by three percent per year under the assumption that the company that the company would generate an increase of approximately three percent per year, which [he] thought was on the conservative side. [Then] he calculated a profit factor of ten percent, which was

> consistent with the profit for the termination for convenience proposal, and then [he] looked at that ten percent profit, determining whether it was reasonable under the DoD rated guideline methods. [he] took that ten percent profit factor as being a reasonable number, reduced it by the company's expressly unallowable costs under FAR Section 31, come up with a profit, and then further reduced it by the interest and depreciation to come up with what's called earnings before interest, depreciation, and amortization. From there on, [he] then took that information, and based upon company's factors, [he] made a projection of what the loss in profits was, in addition to the loss in company value."

(Tab 100, 554-557)

These steps enabled Mr. Agresto to determine the level of revenue that the company maintained during that same time period, which "reflect[ed] the impact of revenue lost caused by [the] 0077 contract." (Tab 100, 554-557) Mr. Agresto pointed out that the company's lost revenue was attributed to the impact resulting from management's disproportionate attention to 0077 as they attempted to remedy the problems under the contract. "It's the amount of effort that was spent under 0077 that was taken away from other functions of the management of the company." (Tab 100, 554-557) Mr. Agresto also noted that he considered how SDC's plans for expanding its business base were affected by the company's intense involvement in trying to resolve contract 0077. (Tab 100, 554-557)

Mr. Agresto further distinguished between damages for lost profits and damages for the loss in company value. "The difference between lost profits is the fact that the company looses profit. Loss of company value is basically the difference between what [ ] a company is worth based upon revenue and profitability. The denial or reduction in profitability places a value on the company." (Tab 100, 559-561) Therefore, a company with higher revenues and a significantly broader scope of business is worth more to a prospective buyer than one earning less in revenue and with a narrower scope of business. (Tab 100, 559-561)

In forming his conclusions, Mr. Agresto, as an expert in his field, considered SDC's financial information, plans & projections, and marketplace comparisons as he utilized well accepted methodologies to determine the impact of the 0077 contract and the resulting expectancy damages. Similarly, in First Federal Lincoln Bank, the plaintiff's expert determined the company's lost profits by utilizing a methodology that was the standard in the plaintiff's industry. First Federal Lincoln Bank, 73 Fed. Cl. 633, 645. The plaintiff's pre-breach and post breach performance was considered in the lost profits damages calculations; however, the Court found the plaintiff's growth rates to be inconsistent and not clear. Id. (comparing Com.Fed. Bank, F.S.B. v. U.S., 59 Fed. Cl. 338 (2004) (the

plaintiff showed continued growth of assets and capital, both of which were used to generate profits)). Unlike the expert discussed in Southern National Corporation v. U.S.,57 Fed. Cl. 294, 299 (2003) (citing Fifth Third Bank of Western Ohio v. U.S., 55 Fed. Cl. 223 (2003)), Mr. Agresto did not assume the type of business opportunities SDC had for the future, rather his predictions were based on concrete information that the company provided. Southern Nat., 57 Fed. Cl. 294, 304.

In its motion, the Defendant also cites Gates v. United States, 33 Fed. Cl. 9, 12 (1995) is support of their argument that SDC's claim for recovery lost business value has been universally rejected. The Defendant contends that in Gates, "claims for lost business opportunities were not within the Court's jurisdiction." (Govt. Motion at 34) However, in Gates, the Court pointed out that during oral arguments, "plaintiff's counsel conceded that the claims for damages from emotional distress and lost business opportunities were not within this court's jurisdiction and made no attempt to resist the government's motion to dismiss these claims," unlike the present matter. Gates at 12.

Based on the particular and unique facts set forth in the present matter, the Plaintiff believes that the Court should consider its argument that Plaintiff is entitled to recover damages for lost profits and loss of

business value. These facts were supported by expert testimony that was based on widely accepted accounting principles.

WHEREFORE, the premises considered, the Plaintiffs move this Honorable Court to deny Defendant's Motion for Summary Judgment or Alternatively Motion to Dismiss.

Respectfully submitted on this the 31st day of August, 2007.

/s/ Howell Roger Riggs
Howell Roger Riggs
Attorney for the Plaintiff
Dick, Riggs, Miller & Stem, LLP
200 Clinton Avenue West
Regions Center, Suite 1050
Huntsville, Alabama 35801
Tel: (256) 564-7317
Fax: (256) 564-7317
hriggs@drmslaw.net

Certificate of Service

I hereby certify that I have served two (2) copies of the foregoing Cross-Motion for Summary Judgment and Reply upon the following persons, by placing the same in the custody of Federal Express, postage prepaid and properly addressed to:

Joan M. Stentiford
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C., 20530

Certified on this the 31st day of August, 2007.

/s/ Howell Roger Riggs
Howell Roger Riggs
Attorney for the Plaintiff