**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SYSTEMS DEVELOPMENT CORP.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 06-232C** |
| | ) | **(Judge Baskir)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**CONSOLIDATED STATEMENT OF UNCONTROVERTED FACTS**

Pursuant to paragraphs 11 and 12 of the Court's Special Procedures Order, April 21, 2006, and Rule 56.1 of the Rules of the United States Court of Federal Claims, the parties jointly submit this Consolidated Statement of Uncontroverted Facts.

Pursuant to the Special Procedures Order, the originating parties for each statement and objection are identified as follows: "[P]" for Plaintiff and "[D]" for Defendant.

**Contract Terms**

**1. [D] On May 9, 2000, Systems Development Corporation ("SDC") was awarded contract number DAAH01-00-C-0077**

**("contract").[1] The contract was a firm-fixed price contract by the U.S. Army Aviation and Missile Command ("AMCOM") to supply circuit card assemblies (P/N 13235072, NSN 5998-01-319-4313) to be used in the Hawk missile system. The contract required SDC to supply 24 circuit card assemblies, consisting of two first articles and 22 each production quality. The contract provided for the base year and four outyear option periods. Delivery was originally established as August 8, 2000 for the first articles, contract line item number ("CLIN") 0001AA, and February 1, and 2, 2001 for the production quantity, CLIN 0001AD. The total amount of the contract, $430,000.00. SDC 7-10. Appendix ("App.") at 1.[2]**

**2. [D] After consultation between SDC and the AMCOM small business office, the contract was awarded to SDC as a Section 8(a) direct award. SDC 26, 826-829. App. at 20, 183-186.**

**3. [D] In a letter dated November 30, 1999, to John Nelson at**

---

[1]SDC was also awarded contracts DAAH01-00-P-0741 and DAAH01-01-D-0013. These contracts are not at issue in this litigation.

[2]References to "Appendix" or "App. at ___" are to the joint appendix submitted by the parties.

**the AMCOM small business office, Virginia Gilchrist, Chief Executive Officer of SDC stated:**

> **SDC is leasing manufacturing facilities from Teledyne Brown Engineering (TBE), 300 Sparkman Drive. SDC technicians will handle the assembly of the boards and our quality personnel will monitor the overall effort. TBE test technicians, in a subcontracting role, will test the boards.**

**SDC 829. App. at 183.**

**4. [D] The contract incorporated a Technical Data Package ("TDP") listing all of the parts needed for the circuit cards. The TDP stated that the Government would furnish stable base drawings, and programmable data in electronic form ("PROM data") to the contractor upon request. SDC 660, 661. App. 28-36.**

**5. [D] FAR section 52.245-2 "Government Property," was incorporated into the contract at clause I-72. Paragraph (h) provided, in part, that "The right to an equitable adjustment shall be the contractor's exclusive remedy. The Government shall not be liable to suit for breach of contract for - - (1) Any delay in delivery of Government-furnished property; (2) Delivery of Government-furnished property in a condition not suitable for its intended use. SDC 27-28. App. at 21-22.**

**FAR section 52-249-2 "Termination for Convenience" was incorporated into the contract at clause I-43. App. 18. Paragraph (g) provided that the Contracting Officer could award specified costs to the contractor to settle the termination for convenience. Id. 48 C.F.R. § 52-249-2(g).**

(PLAINTIFF'S COMMENTS)

Plaintiff contends that Clause 52.249-2 and 52.245-2 are included in the contract, however, Defendant's argument is misplaced inasmuch as specifications and drawings are not government furnished property which is a matter of law.

**6. [D] By letter dated March 13, 2001, SDC informed AMCOM that it had completed a review of the parts required by the contract, and had identified obsolete parts as well as replacement parts that were suitable to be substituted. SDC 1630-1631. App. 193-194.**

**7. [D] Contract Modification P00001 signed July 12, 2001, authorized the substitute parts identified by the contractor for acceptance for the first article test and tentatively approved for the production quantity; identified seven obsolete parts with the replacement part numbers; stated that digital data had been provided to the contractor with the Technical Data Package ("TDP") but that additional digital information was needed, had been requested, and would be provided to the contractor at a later date. SDC 35-36; SDC 1630. App. 37-40, 193.**

**8. [D] Contract Modification P00001 also extended the delivery date of the first article, CLIN 0001AA, from August 8, 2000 to November 30, 2001, as well as extending the delivery date for the production quantity, CLIN 0001AD, from February 1 and 2, 2001, to May 30, 2002 at no change in the contract price. SDC 37-38. App. 37-38.**

**9. [D] Contract Modification P00002 was proposed by AMCOM to extend revise the delivery dates of the first article to November 10, 2002, and the production quantity to May 9, 2003. In consideration of the revised delivery dates, Modification P00002 also proposed that the parties execute a mutual release of any and all claims that may have accrued to that point. SDC 586-587. It was sent to SDC for signature in August, 2002 but was never signed. SDC 41. Modifications P00003 and P00004 were not issued. Id. App. 42.**

**10. [D] Contract Modification P00005, was proposed by AMCOM as a unilateral modification to re-establish the required delivery dates for the first articles to August 29, 2003, and for the production quantity to August 24, 2004, at no change to the contract price. SDC 40-41. App. 41-45.**

**11. [D] On July 11, 2000, SDC issued a purchase order to its sub-contractor, Teledyne Brown Engineering ("TBE"), authorizing TBE to purchase all the materials needed to fabricate, assemble and deliver 129 Hawk Circuit cards. The total amount of this purchase order was $403,297.58. SDC 113. App. 77.**

**12. [D] SDC never delivered any circuit card assemblies to**

**AMCOM, at any time.**

**<u>Termination for Convenience</u>**

**13. [D] The contract was terminated for the convenience of the Government on February 17, 2004, by issuing Modification P00008. SDC 46-51. App. 46-51.**

**14. [D] SDC made an offer to settle the termination for convenience on April 23, 2004, for a total of $789,058. SDC 88-108. App. 52-72.**

**15. [D] SDC's offer included an offer from its fixed-price subcontractor, Teledyne Brown Engineering ("TBE"), which, at SDC's request, had purchased all material and piece parts necessary to make all of the 129 boards contemplated by the contract. TBE offered to resolve the termination for $394,000 in material costs, and supported this offer with a purchase order from SDC, and an inventory list of all parts purchased. SDC 109-118. App. 73-82.**

**16. [D] In its offer, SDC requested that it be reimbursed for the cost of its settlement with its subcontractor, TBE, $76,612, and the costs of the materials purchased by TBE, 321,497, for a total of $397,771.58. SDC 89, 91, 109-118. App. 53, 55, 73-82.**

**17. [D] SDC also requested $63,830 in profits, $297,500 in general and administrative expenses, $19,301 in labor costs for its procurement personnel, and $14,315 for the cost of negotiating the settlement. SDC 91. App. 55.**

**18. [D] SDC's settlement offer was audited by the Defense Contract Management Agency ("DCMA") on July 15, 2004. SDC 124-139. App. 83-109.**

**19. [D] The DCMA auditor concluded that SDC had based its proposed "Other Costs and G&A expense on unsupported judgmental estimates and computations, resulting in FAR noncompliance." SDC 125. App. 84.**

**20. [D] Additionally, the DCMA auditor concluded that the contract was in a loss position based on the following reasoning: The contract was for $430,000. SDC's subcontract with TBE for materials was in the amount of $403,297.58. SDC 113. App. 77.**

**Adding General and Administrative costs ("G&A") at 14.12 percent to the subcontract costs, the contractor's performance costs**

**rise to $460,243.[3] Additionally, full contract performance requires SDC setup and labor costs to maintain the inventory and provide it per the schedule. The outyears are only for labor and burdens since the material is included in the base year. For a quantity of 21, the cost is $1,221 per unit. Thus, for this contract, SDC labor would have cost more than $29,304 (24 circuit boards x $1,221 production cost per unit). Adding this to the subcontract costs and the G&A costs totals $489,547. SDC 132-134. App. 91-93.**

**21. [D] An exit conference was held between the DCMA auditor and SDC on July 8, 2004, at which SDC provided no comments to the auditor. SDC 135. App. 94.**

---

[3]This is the G&A rate calculated by DCMA for the most recently completed fiscal year. SDC 131.

**22. [D] On August 4, 2004, based on the DCMA audit, Paul Slemons, the Termination Contracting Officer ("TCO"), offered SDC $115,530 to settle the termination for convenience. The TCO also included a copy of the DCMA audit report and requested SDC's response to each of the questioned items. SDC 171-183. App. 111-123.**

**Plaintiff's Comments:** SDC representatives expressed disagreement with the findings. The government has admitted that SDC submitted "several written offers to settle the termination" but that the "negotiation to settle the termination did not come to an agreement." (Govt. Motion, page 3).

**23. [D] On October 28, 2004, SDC responded to the TCO with a report from Ernest Agresto, a Certified Public Accountant, and offered to settle the termination for $767,223. SDC 214-237. App. 124-147.**

**24. [D] On November 3, 2004, the TCO sent SDC an offer to settle the termination for the full contract price of $430,000, even though SDC had never supplied any circuit boards to the Government. SDC 242. App. 150.**

**25. [D] On November 12, 2004, SDC responded with a counteroffer to settle the termination for $617,641. SDC 260-269. App. 162-171.**

**26. [D] In its November 12, 2004 letter, SDC claimed that it was entitled to more than the contract price to settle the termination because the Government had provided specifications and a TDP that were inadequate or defective. SDC 264. App. 166.**

**27. [D] On March 25, 2005, the TCO issued his final decision rejecting SDC's settlement offer, and concluding that SDC was entitled to $403,563. This was based on the fact that SDC had provided supporting documentation for its subcontractor costs to TBE, but had not provided support for the other expenses claimed in**

**the settlement offers. SDC 277-280. App. 172-175.**

**28. [D] Specifically, SDC had not provided time cards or other contemporaneous supporting documents for the 500 hours of wages ($15,281) supposedly paid to a buyer, the 147 hours of wages ($2,364) supposedly paid to a procurement clerk, or the 200 hours of wages ($1,656) supposedly paid to a data entry clerk. SDC 278. App. 173.**

**Plaintiff's Comments:** Plaintiff's November 22, 2004, letter to the Contracting Officer asserted that the Contracting Officer's Decision to base recovery only on a rigid formula of direct or indirect cost violated the spirit and purpose of termination for convenience settlements which is to fairly compensate the contractor and make it whole. Settlement agreements are intended to be matters of judgment. (Tab 98, pages 524-550).

**29. [D] The claimed general and administrative expenses ("G&A") were also unsupported, were based solely on SDC's "judgmental estimates". SDC 278. The TCO allowed SDC to recover G&A costs of $55,338 which was calculated by applying the negotiated fiscal year 2002 G&A rate of 14.12 percent to the allowed subcontract settlement amount of $391,913. SDC 278. App. 173.**

**30. [D] Specifically, the TCO denied the proposed G&A expenses stating:**

> **You proposed the labor cost of an executive (2,000 hours) and a Contract Administrator (2,000 hours) as G&A expense. During the four years this program was progress prior to termination, SDC did not establish a job cost number for this project, nor did it charge any direct cost for this program to a specific job/project within its cost accounting records. The proposed costs represent normal indirect G&A activities incurred on the contract which should be recouped from the normal application of the G&A rate. Also the claimed labor hours are based on the contractor's unsupported judgmental estimates. This final decision applies the negotiated final FY02 G&A rate of 14.12 percent to subcontract settlement amount of $393,913. This allows for the normal recovery of costs associated with this contract.**

**SDC 278. App. 173.**

**31. [D] The TCO denied SDC's claim for settlement expenses stating:**

> **The contractor made a judgmental estimate of the hours required for settlement of the termination, including negotiations. SDC multiplied the labor rates of the Executive (105 hours) and Contracts Administrator (125 hours) to arrive at estimated labor cost and burdened it to arrive at the estimated settlement expense. The final decision allows no direct charges for these G&A type employees whose full salaries remain charged to the G&A expense pool. Through the normal application of the final G&A expense rate this final decision allows $55,338 in G&A expenses for recovery of G&A effort.**

**SDC 279. App. 174.**

**Plaintiff's Comments:** On November 22, 2004, Plaintiff wrote Contracting Officer, Slemons, supporting its claim to the G&A expense and indicating to Terminating Contracting Officer Slemons that the FAR required the use of business judgment rather than a strict formula in determining whether the cost claimed should be treated as direct or indirect costs. Plaintiff contended that a direct cost method was appropriate du the extraordinary amount of executive time spent. (Tab 98, pages 524-550).

**32. [D] As stated by the DCMA auditor, the contract was in a loss position. (See ¶ 12). Consequently, the TCO adjusted the 10 percent profit claimed by SDC as required by FAR 49.303. The TCO made the appropriate adjustment by taking the amount determined for settlement expenses ($447,608) less the price for acceptable units ($0),and multiplying that figure by a ratio of the total contract price ($430,000) to the total cost incurred before termination plus the estimated cost to complete the entire contract. This calculation yields a ratio of .9016 or a loss applied to the total settlement amount determined by the TCO of $44,045, and is set out in the TCO's decision as follows:**

**Net Settlement Amount = Settlement Expenses + Price for Acceptable Units + Remainder of Negotiated Settlement After subtracting Settlement Expenses and the Contract Price of Acceptable Units * Contract Price / (Incurred Costs before T4C + Est Cost to Complete)**

**= 0 + 0 + $447,608.00 * $430,000.00 / ($447,608.00 + $29,304.00) = $476,912.00**

**=$ 403,463.00**
**447,608.00 TCO determined settlement amount prior to loss calculation**
**$ 44,045.00 Loss applied**

**SDC 279. App. 174.**

**Plaintiff's Comments:** Plaintiff agrees that the document cited contains the passage quoted by defendant, but does not agree that the

passage is an uncontroverted fact.

**33. [D] Based on this calculation, the TCO determined that SDC was entitled to a settlement amount of $403,463.00. SDC 277.**

**<u>Plaintiff's Comments:</u>** Plaintiff denies that it was in a loss position on this contract because the government's actions created substantial expenses outside the contract. (Tab 103, pages 566-569).

**34. [D] The net payment resulting from this decision was $366,295.00,because SDC had already received a partial payment of $37,268.00. SDC 277. App. 172.**

**<u>Plaintiff's Comments:</u>** The TCO's determination was a unilateral determination from which plaintiff has appealed seeking additional compensation. (Tab 37, pages 361-364).

**35. [D] Payment of the TCO's final settlement amount was rendered to SDC on April 1, 2005. SDC 283-285. App. 178-180.**

**36. [D] SDC acknowledges that it received this payment. Deposition of Virginia Gilchrist 47:11-22. App. 236.**

**<u>SDC's Damages</u>**

**37. [D] SDC claims a total of $2,166,316 in damages, as follows:**

**Count 1 – $397,000 – Defective Specifications.**

**Count 2 – $500,000 – Breach of the Covenant of Fair Dealing and Cooperation.**

**Count 3 – $750,000 – Bad Faith**

**Count 4 – $19,316 – Failure to Pay Appropriate Termination for Convenience Costs.**

**Count 5 – $500,000 – Superior Knowledge.**

**38. [D] When asked at her deposition, Virginia Gilchrist, president and Chief Executive Officer of SDC, could not state any specific facts or circumstances on which these damages claims were based. Deposition of Virginia Gilchrist 42:18-46-22. App. 231-235.**

**Plaintiff's Comments:** Plaintiff supplemented its damage claim using the expert report of Ernest Agresto. Mr. Agresto used accepted accounting practices to determine lost profit, loss of business opportunities, and decrease in the value of the business. (Tab 102, page 562).

**39. [D] With respect to the damages claims for bad faith, and superior knowledge, Ms. Gilchrist testified that she had "no idea" what those damages amounts were based on. Gilchrist Depo. 45:9-18 and 46:17-21. App. 234-235.**

**Plaintiff's Comments:** Counsel advised Defendant's counsel at the deposition of Virginia Gilchrist that she would not testify concerning the calculation of damages. Ms. Gilchrist is not a lawyer and was called upon to give a legal opinion. (Tab 102, page 562).

**40. [D] SDC's expert on damages, Ernest Agresto, states in his report that SDC's damages total $7,441,145. App. 203.**

**Plaintiff's Comments:** Counsel advised Defendant's counsel at the deposition of Virginia Gilchrist that she would not testify concerning the calculation of damages. Ms. Gilchrist is not a lawyer and was called upon to give a legal opinion. (Tab 102, page 562).

**41. [D] Mr. Agresto testified at he did not know what specific Government actions caused damages to SDC except what he read in the depositions that had been provided to him by plaintiff's counsel. Deposition of Ernest Agresto 69:5-70-7. App. 227-228.**

**42. [D] Mr. Agresto also testified at his deposition that he read the depositions "quickly," gave them a "cursory review," and that he did not "really rely" on them. Agresto Dep. 20:5-22. App. 226.**

**Plaintiff's Comments:** Ernest Agresto is an expert witness hired by plaintiff in this case to give expert opinions based upon his review of records and hypothetical facts put to him at trial.

**43. [D] Mr. Agresto states that SDC's damages are based on lost profits, loss in company value, and other costs such as G&A cost increases resulting from loss of business, actual lease payments to Teledyne Brown for unused facility space, and unspecified employment costs and associated litigation expenses resulting from layoffs. App. 201-202.**

**44. [D] SDC raised no claim for lost profits, loss of company value, increased G&A cost increases resulting from loss of business, actual lease payments to Teledyne Brown for unused facility space, nor employment costs or litigation costs resulting from layoffs. SDC 88-118. App. 52-82.**

**<u>SDC's Complaints</u>**

**45. [D] In its November 12, 2004 final offer to settle the termination, SDC stated that its failure to perform the contract was caused, in part, by the "ambiguity" of testing specification MIS-41341. SDC 254. App. 156.**

**<u>Plaintiff's Comments:</u>** Plaintiff's November 12, 2004, letter is a document which speaks for itself.

**46. [D] In a pre-award e-mail from Virginia Gilchrist to the AMCOM contracting officer dated January 25, 2000, Ms. Gilchrist stated: "The first 19 pages of the MIS-41341 are on the CD. We do have access to the test station and are evaluating our options in this area." SDC 1655 App. 196-197.**

**47. There was one cancelled specification relevant to this contract. was the only cancelled one relevant to this contract. Deposition of John Farris 26:12-23. Moreover, AMCOM executed a waiver of the cancellation to allow SDC to use it despite it being cancelled. As Mr. Ferris testified:**

> **Q. What I'm concerned with is the language that says 'Cancelled MIL-SPECS that cannot be replaced.'**
> **A. That's true. That's why we allowed [SDC] to use the cancelled spec on this form.**
> **Q. I see. Okay.**
> **A. So this overrode that problem.**

**Deposition of John Farris 27:1-6. App. 240-241; 243-245.**

**<u>Plaintiff's Comments:</u>** This cancelled specification was not relevant as to whether or not the contract could be performed. (Tab 55, pages 400-405; Tab 56, pages 406-407; Tab 58, page 510, Tab 60, page 411, Tab 90, page 472; Tab 95, pages 482-487).

**48. [D] In a pre-award letter from SDC to the Small Business Administration dated November 30, 1999, SDC stated that it would subcontract with Teledyne Brown to test the boards. SDC 829. App. 183.**

**49. [D] Also in the November 12, 2004 final offer to settle the termination, SDC claimed that the Government had refused to provide the "program code in electronic format for Programmable Parts." SDC 254. App. 156.**

**50. [D] In a meeting with SDC and AMCOM, held on January 23, 2002, SDC agreed to resolve the PROM chip issue by providing unprogrammed chips to the Government and having the Government program them with the necessary data. SDC 1565. Subsequently, the Government provided usable, workable programmed chips to SDC. Deposition of Jerald F. Tignor 9:23-10:3. App. 222-223.**

**<u>Plaintiff's Comments:</u>** The government never provided usable, workable programmable chips to SDC. (Tab 104, pages 575-576).

**51. [D] SDC acknowledged that AMCOM delivered programmed chips, but refused to use them, or even to open the package they came in. Deposition of Virginia Gilchrist 39:5-17. App. 229.**

**Plaintiff's Comments:** Mr. Tignor told Ms. Gilchrist that [the government] had tried to test those chips at Barstow and they had blown up and they were going back trying to correct the problem. Ms. Gilchrist said that she was not willing to take the risk of accepting a package with no documentation and with nothing that would take the risk off of SDC. Tignor told Ms. Gilchrist that he thought the chips came from RDCC, but he was not sure where they came from.

Government representatives delivered an unmarked bag of unmarked items claiming them to be programmable chips. They were not. AMCOM never modified the contract to provide the chips to SDC as government furnished property. Without appropriate contractual coverage, the risk of failure would be on SDC. (Gilchrist Deposition page 39, lines 13-23; page 40, lines 1-19).

When questioned at deposition about the PROM data, Tignor said that he did not know if it were acquired from Raytheon or not. He also stated that the PROM data that was in the technical data package was not

adequate and when asked about where the data came from, he stated that the government took a data card apart, copied the programming on the chips and reprogrammed it and then tested it. He stated that it had been reverse engineered. (Tignor Deposition, page 31, lines 8-10, lines 21, 22; page 32, lines 2-13) (Tab 99, pages 552-553).

**52. [D] AMCOM obtained higher quality stable base drawings from Raytheon, but when AMCOM attempted to deliver them to SDC, they were not allowed in the building. Deposition of Jerald F. Tignor 18:7-22. App. 225.**

**Plaintiff's Comments:** During the deposition of Jerald F. Tignor, the following was said:

Question: And the documents before you today are not documents that could be used, read from a computer, to be adequate to produce the parts?

Answer: These looks like just copies and they are from '87. Like I stated, we got some mylar data on the CD's from Raytheon in '03, '02, somewhere around in there.

Question: But that data was not ever provided as far as you know to SDC?

Answer: I don't know if it was or not. I think the door was closed on us by then.

Question: My question was that you don't have actual knowledge that the data was provided?

Answer: No. We did have someone go to SDC to try to deliver it and we

weren't allowed in the building.

Question: I see, Who was that?

Answer: One of the contracting people. I don't know who it was.

(Tab 105, pages 577, 578).

**53. Prior to awarding the contract to SDC, the Government had paid Raytheon for Level III documentation for the PROM data technology which meant that Raytheon had agreed to provide the Government with everything necessary to allow for public competition. Deposition of Jerry Tignor 22:1-6, 35:20-36:11. App. 226-228.**

**54. All of SDC's post-termination proposals were settlement proposals related to the termination for convenience. App. 350-360, 489-498, 499-529, and 538-551.**

Plaintiff's Comments:

The Defendant failed to include any facts prior to May 9, 2000, the date of contract award. Plaintiff includes here facts numbered (1-36) 55– 81.[4]

**Pre Contract Award**

**(1) ~~[P] The Circuit Card Assembly that is now in question is a piece part that operates within the Raytheon SAM-A-1 8/M3/MIM-23 Missile System, (otherwise know as the "HAWK" or "Homing All the Way Killer" Missile) which was developed by Raytheon Corporation in the 1950s, and implemented with the United States Marine Corps in the 1960s. Prior to the award of the Contract, Raytheon Corporation (hereinafter "Raytheon") had been the only manufacturer of the Circuit Card Assembly for the HAWK Missile System.~~ (Tab 39, P 369)**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence

[4]As the moving party, the Government provided plaintiff with a draft Consolidated Statement of Uncontroverted Fact ("CSUF"), paragraphs 1-54, which are referred to in the Government's opening brief. Instead of using consecutive numbered paragraphs, plaintiff added 36 paragraphs to the beginning of the Government's draft, and re-numbered the Government's paragraphs. To avoid confusion, the Government has restored its original numbering so that the references in its opening brief remain accurate. Similarly, plaintiff's contentions are provided here with its original paragraph numbers.

of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(2) [P] ~~On March 26, 1998, the United States Government (hereinafter the "Government") began its pursuit of privatization of the manufacturing of the Circuit Card Assembly by revising Military Specification MIL-R-3900813-RCR32G911JS, which had previously mandated sole source procurement of the Circuit Card Assembly from Raytheon.~~ (Tab 40. P370)**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(3) [P] ~~On July 27, 1998, the Director of the Missile Research, Development and Engineering Center for the United States Army requested a waiver of the Military Specifications supporting the HAWK system, so that the manufacturing contracts related to the parts could be opened for competition.~~ (Tab 41 P375)**.

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(4) [P] ~~This request was approved by AMCOM on July 28, 1998~~. (Tab41 P 375).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(5) [P] In the following months, the Government did issue a pair of Notices of Revision altering the part numbers and specification numbers for several of the components of the Circuit Card Assembly. (Tab 41 P375-376)**.

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(6) [P] On June 16, 1999, AMCOM officials met to discuss an acquisition strategy for the HAWK Missile System's Circuit Card Assembly. (Tab 42 P377)**.

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(7) [P] ~~At this meeting, AMCOM officials determined that due to the fact that the applicable TDP still contained cancelled Military Specifications, procurement of this part had to be restricted to Raytheon.~~ (Tab 42 P377-379)**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(8) [P] On September 15, 1999, the HAWK Systems Manager at AMCOM ~~sought to remedy the defects of the TDP by~~ requesting a waiver of cancelled Military Specification MIL-S-13949. (Tab 43 P380-383).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents.

**(9) ~~[P] The Waiver Request form indicated that nearest equivalent to a part designed from the cancelled specification was a part labeled IPC 4101.~~ (Tab 43 P380).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(10) ~~[P] The difference between the original and the replacement was stated to be "MIL-S-13949 requires specific testing and frequencies and has a QPL which requires re-certification periods.~~ (Tab 43 P381).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(11) [P] ~~IPC 4101 does not require specific tests and has no certification requirements.~~" (Tab43 P381)**.

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(12) [P] ~~The impact of the waiver upon the Missile System was specifically noted as a point of concern due to the absence of reliability data for products built to IPC 4101.~~ (Tab 43 P381).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(13) ~~[P] Additionally, the waiver request notes that "there is 25 years of history that demonstrate the materials procured and tested to MIL-S-13949 have a high degree of reliability. IPC 4101 leaves the determination of testing requirement up to the buying activity. This is a 'fox in the hen house' scenario."~~ (Tab 43 P381).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(14) [P] ~~Despite the foregoing,~~ AMCOM approved the waiver request on September 20, 1999, for the stated reason that there was *no cost-effective alternative.* (Tab 43 P383).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents.

**(15) [P] On October 4, 1999, AMCOM determined that part IPC 4101 could be procured through open competition for use in the HAWK Missile System upon receipt of Stable Base Drawings and digital data used to manufacture it. (Tab 42,page 841).**

**(16) [P] On October 12, 1999, AMCOM requested a copy of the Stable Base Drawings for the Circuit Card Assembly. At this point AMCOM thought it was ready to open the manufacturing contract to full competition. (Tab 44, page 384).**

**(17) [P] On October 18, 1999, SDC entered into a Teaming Agreement with Teledyne Brown Engineering, a division of Teledyne Brown Industries, Inc., a California corporation. (Tab 46, page 386).**

**(18) [P] ~~Previously, SDC had entered into a similar agreement with Campbell Engineering, Inc., and this triumvirate of business became known by the moniker "Team Millennium."~~ By the terms of their agreement, SDC would be supported by Teledyne Brown in the performance of any contracts that it was awarded. (Tab 56, page 445)**

**Defendant's Objection:** Defendant objects to the this contention as it is not supported by the record citation. Additionally, it is irrelevant to any issue properly before the Court.

**(19) [P] ~~The support of Team Millennium was a factor in the decision to award the contract to SDC.~~ (Tab 42, page 379)**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(20) [P] ~~On December 2, 1999, the Small Business Administration recommended an 8(a) contractor, SDC, to AMCOM as the potential recipient of the Contract to manufacture the Circuit Card Assembly.~~ (Tab 42, page 379).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(21) ~~[P] On December 10, 1999, the Small Business Administration accepted the contract solicitation from AMCOM on behalf of SDC.~~ (Tab 45, page 385).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(22) [P] On January 5, 2000, SDC acquired the TDP associated with the Contract from AMCOM, and ~~within just a few days SDC had identified three (3) potential problems with the TDP, namely (1) the lack of acceptance test procedures, (2) missing Military Specification Data, and (3) the need for updated Specification Data due to cancellation of some of the required information.~~ (Tab 46, page 386, Tab 47, page 390).**

**<u>Defendant's Objection:</u>** Defendant objects to this contention as it is not supported by the record citation.

**(23) [P] On January 20, 2000, SDC contacted AMCOM contracting specialist Geraldine Williams regarding these concerns. (Tab 47, page 390).**

**(24) [P] Ms. Williams, in response to SDC's inquiry, did submit a request to the AMCOM technical department for additional information. (Tab 47, page 390).**

**(25) ~~[P] On January 24, 2000, Don Mikell, a member of the United States Army Research, Development and Engineering Center, responded to Ms. Williams's request.~~ (Tab 47, 390).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Defendant further objects because Mr. Mikell's personal opinion does not bind the Government in this procurement.

**(26) ~~[P] Mr. Mikell responded that the Circuit Card Assembly must be procured from Raytheon, that he was preparing a form to restrict said procurement to Raytheon, and that the procurement of the Circuit Card Assembly from SDC should be cancelled. (Tab 47, page 390, Tab 48, page 391, 392).~~**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Defendant further objects because Mr. Mikell's personal opinion does not bind the Government in this procurement.

**(27) ~~[P] Mr. Mikell's suggestions regarding the Circuit Card Assembly contract were based upon the expert opinions of his staff in suggesting that the Assembly needed to be redesigned, a feat only Raytheon could accomplish. (Tab 49, page 393).~~**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Defendant further objects because Mr. Mikell's personal opinion does not bind the Government in this procurement. Furthermore, SDC assured the Government, prior to award of the contract, that it had access to the specialized testing equipment. App. 181-183.

**(28) ~~[P] Additionally, Mr. Mikell's recommendation were based in part upon knowledge of special testing requirements for the Circuit Card Assembly which would not be available to SDC. (Tab 50, page 395).~~**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support SDC's characterization, and because Mr. Mikell's personal opinion does not bind the Government in this procurement.

**(29) [P] Less than two weeks after their first inquiry, SDC contacted Ms. Williams again regarding another potential problem in the TDP. (Tab 50, page 395).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(30) [P] SDC had discovered that the canceled specifications, which had been previously waived in order to create the TDP, called for obsolete part number 13038120-021. (Tab 53, page 400).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(31) [P] AMCOM ~~immediately~~ sent an intercept request to its Technical Department regarding the issues of obsolescence raised by SDC. (Tab 50, page 385).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(32) ~~[P] On February 2, 2000, Don Mikell again responded that SDC should not be allowed to redesign any of the parts of the Circuit Card Assembly, and therefore those parts would have to be procured from or redesigned by Raytheon. (Tab 50, page 395).~~**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because Mr. Mikell's personal opinion does not bind the Government in this procurement.

**(33) [P] ~~For a second time, Mr. Mikell suggested that procurement of this part from SDC be cancelled in favor of a sole source contract with Raytheon.~~ (Tab 49, page 393; Tab 50, page 395))**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because Mr. Mikell's personal opinion does not bind the Government in this procurement.

**(34) [P] This response was returned to the contracting office. (Tab 50, page 395).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because Mr. Mikell's personal opinion does not bind the Government in this procurement.

**(35) [P] ~~Despite the repeated warnings of its own technical department~~, AMCOM proceeded to award the Contract to SDC on May 9, 2000.**

**Defendant's Objection:** Defendant objects because this contention does not reference any supporting document in the record.

**(36) ~~[P] SDC was never provided with answers to its inquiries, and was never informed of the severity of the problems which had previously identified. SDC was also not made privy to the concerns raised by its inquiries, nor AMCOM's own internal sentiment that the Contract should be cancelled in favor of a sole source contract with Raytheon. (Tab 51, pages 397, 398).~~**

**<u>Defendant's Objection:</u>** Defendant objects because this contention is not supported by the citation provided. The citation provided is plaintiff's own unsupported, self-supporting conclusion that does not constitute valid evidence. <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 61 Fed. Cir. 175, 181 (2004) (quoting <u>McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.</u>, 66 F.3d 89, 92)(5th Cir. 1995)

**(42) [P] On June 30, 2000, SDC first requested from AMCOM a copy of certain electronic data, otherwise known as Gerber data, related to the manufacturing of the circuit cards. (Tab 52, page 399)**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents.

**(43) [P] SDC also suggested that in the absence of Gerber data, AMCOM could provide the Stable Base or Mylar Drawings for the circuit cards. (Tab 52, page 399).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents.

**(44) [P] Additionally, SDC requested a working Circuit Card Assembly from which to run comparative testing. (Tab 53, page 400).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents.

**(45) [P] ~~AMCOM did not respond.~~ On July 17, 2000, SDC notified AMCOM of ~~yet another deficiency in the TDP,~~ specifically that it contains instruction on the use of obsolete parts, ~~which would inevitably delay delivery.~~ (Tab 53, page 400).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Additionally, this contention is irrelevant to any issue properly before the Court in this case.

**(46) [P] On this date, SDC provided to AMCOM a list of suitable alternate parts for use in performance of the Contract, and ~~did again~~ request the Gerber data. (Tab 53, page 400).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Defendant Defendant further objects to Plaintiff's implied legal conclusion that the Government owed SDC any obligation to provide her with Gerber Data.

**(47) [P] ~~Eventually,~~ AMCOM did supply SDC with ~~some~~ drawings printed on Mylar stock. (Tab 54, page 401).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents.

**(48) [P] Mylar drawings are specialized patterns that are read by the machine that produces the circuit card stock. (Tab 55, page 404).**

**<u>Defendant's Objection:</u>** Defendant objects to this contention as it is vague, and is not supported by the document cited.

**(49) [P] A true Mylar drawing is produced by a specialized printer which accepts input data, usually in the form of a CD, which it then prints onto special Mylar stock. (Tab 56, page 406, 407).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the witness's deposition testimony, which speaks for itself.

**(50) [P] Also Mylar drawings can be produced using electronic Gerber data, but AMCOM ~~never possessed the Gerber data relevant to the circuit card assembly, so it was ever supplied to SDC.~~ (Tab 57, page 408).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the witness's deposition testimony, which speaks for itself. Defendant further objects to plaintiff's implied legal conclusion that the Government was obligated to provide SDC with Gerber data.

**(51) [P] The "Mylar artwork" provided to SDC appeared to be a Xerox copy of the original Mylar drawings, ~~rendering them unusable~~. (Tab 57, page 408, 409;Tab 58, page 410; Tab 60, page 411).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the witness's deposition testimony, which speaks for itself.

**(52) [P] ~~Upon discovery of the defects in the Mylar drawings,~~ SDC took it upon itself to contact Raytheon directly to inquire about the existence of original Mylar artwork. (Tab 54, page 402).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention.

**(53) [P] SDC was instructed that such artwork was available at the government's request. (Tab 54, page 402).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Defendant further objects because this contention is vague and not supported by the document cited.

**(54) [P] On July 26, 2000, SDC wrote to Ms. Georgia Walker, the AMCOM Contract Specialist assigned to the Contract, regarding the ~~deficiencies~~ in the Mylar artwork, and the necessary contact information from Raytheon to procure useable Mylar Drawings.(Tab 54, pages 401, 402).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents.

**(55) [P] At this time, SDC did again request a working Circuit Card Assembly to use in comparison testing. (Tab 54, page 402).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents.

**(56) [P] No useable Mylar Drawings, Gerber data, or working models were delivered by SDC. On September 22, 2000, SDC contacted Ms. Walker again. (Tab 60, page 411).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention. Defendant further objects to plaintiff's implied legal conclusion the Government was obligated to provide SDC with Gerber data or working models.

**(57) [P] This time SDC ~~restated the deficiencies~~ in the Mylar Drawings, and ~~simply~~ asked for the Gerber Data from which the drawings could be originally produced. (Tab 60, page 411).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Defendant further objects to plaintiff's implied legal conclusion that the Government was obligated to provide SDC with Gerber data.

**(58) [P] AMCOM has never provided Gerber Data to SDC. On October 25, 2000, SDC contacted AMCOM to request the digital PROM data for use in programming the Circuit Card Assembly. (Tab 61, page 412, 413).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document cited; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention. Defendant further objects to SDC's implied legal conclusion that the Government was obligated to provide SDC with Gerber data.

**(59) [P] On October 26, 2000, Ms. Walker responded to SDC's repeated requests for Mylars, Gerber data, and PROM data by stating that all the information sought had already been provided to SDC. (Tab 61, page 412).**

**Defendant's Objection:** Defendant objects to SDC's characterization of Ms. Walker's electronic mail message; the message is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention. Defendant further objects to SDC's implied legal conclusion that the Government was obligated to provide SDC with Gerber data.

**(60) [P] Ms. Walker's statement is incorrect because the Mylars provided to SDC were unusable, AMCOM never owned any Gerber data, and the PROM data was never provided to SDC as provided by the Contract. On November 20, 2000, Ms. Walker confessed that she had not provided the PROM data and would need further instruction on where to obtain it. (Tab 61, pages 412, 413, Tab 62, page 414).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the documents cited; the documents are the best evidence of their contents. Defendant further objects because the documents do not support plaintiff's contention. Defendant further objects to SDC's implied legal conclusion that the Government had any obligation to provide SDC with Gerber data.

**(61) [P] On January 24, 2001, Ms. Walker stated, on behalf of AMCOM, that SDC would be provided with the PROM data which it required, and further that AMCOM would modify the contract, with consideration, to extend the date of delivery. (Tab 62, page 414).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention.

**(62) [P] On January 29, 2001, SDC renewed its request for legible Mylar drawings and approval of its previously submitted list of alternate parts. (Tab 63, page 415).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(63) [P] In response to this request, AMCOM denied SDC's list of alternate parts, and demanded that it send a list of the obsolete parts in its possession for testing. (Tab 63, page 415).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention.

**(64) [P]On March 2, 2001, SDC notified AMCOM that the obsolete parts previously listed in its request to use alternate parts were in fact unprocurable; and, therefore SDC had no such parts in its possession. (Tab 64, page 416).**

**(65) [P] On March 13, 2001, SDC did again submitted for approval, a list of alternatives to the obsolete/unprocurable parts called out by the contract. (Tab 65, page 417).**

**(67) [P] On March 22, 2001, SDC again requested the PROM data. (Tab 66, page 418)**.

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(68) [P] ~~This request~~ was forwarded to AMCOM again on June 1, 2001. (Tab 67, page 419).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention, the document cited requests Gerber data, not PROM data. Defendant further objects to SDC's implied legal conclusion that the Government was obligated to provide SDC with Gerber data.

**(69) [P] ~~After almost one (1) year of requesting the digital data,~~ SDC did on June 9, 2001, issue a list of three (3) possible alternatives to AMCOM providing the digital data, Mylar drawings, or working Circuit Card Assemblies. (Tab 68, page 420).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(70) [P] These alternatives included allowing SDC to submit unprogrammed units, units without the programmable piece parts, or simply selling back to AMCOM everything that had been procured to date in pursuit of the performance of the Contract. (Tab 68, page 420) ~~AMCOM issued no response.~~**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention.

**(72) [P] On July 13, 2001, representatives of SDC met with the management personnel of Teledyne Brown Engineering and agreed that ~~due to the significant exposure of both parties due to their inability to perform the contract without the requested information, they would both cease efforts in furtherance of the contract~~ and pursue a termination for convenience determination from AMCOM. (Tab 69, page 421, 422).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(73) [P] On July 30, 2001, SDC contacted AMCOM regarding this proposal. (Tab 70, page 423, 424).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention.

**(74) [P] In its letter, SDC specifically set out the information which would be required to complete the contract. (Tab 70, page 423).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention.

**(75) [P] That information being the same that had been repeatedly requested, yet never delivered. In closing SDC suggested that AMCOM either (1) agree to cover the cost of SDC's acquisition of the necessary information through supplemental purchases or reverse engineering; or (2) terminate the contract for convenience. (Tab 41, page 70, page 423).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document cited does not support plaintiff's contention.

**(76) [P] ~~After no response was received,~~ SDC's letter of July 30, 2001, was sent again on August 1, 2001 and August 6, 2001. (Tab 71, pages 425- 427; Tab 72, page 428).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention.

**(77) [P] On August 7, 2001 SDC was notified that contracting specialist, Georgia Walker, had been reassigned and replaced by a new contracts specialist, Patti Page. (Tab 73, page 429).**

**(78) [P] On August 8, 2001, a copy of the letter was sent to Ms. Page. (Tab 74, page 430).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention. Defendant further objects because this contention is vague; the letter to which SDC refers is not identified.

**(79) [P] ~~No response from Ms. Page was ever received, aside from her email of October 10, 2001~~, stating that due to reassignment Carolyn Gay was now the contract specialist assigned to the Contract. (Tab 75, page 433).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(80) [P] Ms. Gay responded to SDC's suggestions in a memo of October 10, 2001. (Tab 76, page 436).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(81) [P] In this memo Ms. Gay stated that AMCOM was now in possession of the PROM data, and that SDC would be responsible for bearing the cost of any additional procurement or the creation of test procedures. (Tab 76, pages 434, 436).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention.

**(82) [P] Also, Ms. Gay noted, that reverse engineering was not a viable option. (Tab 76, page 436).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(83) [P] At this time AMCOM knew that the Circuit Card Assembly test procedures were going to be a problem for SDC. In fact, even prior to award of the contract, Mr. Mikell had suggested cancelling the solicitation with SDC for that very reason. (Tab 47, page 390; Tab 48, page 381) ~~However, AMCOM willfully ignored the suggestions of its Research, Development and Engineering Center.~~**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because Mr. Mikell's personal opinion does not bind the Government in this procurement. Defendant furthermore, SDC assured the Government, prior to award of the contract, that it had access to the specialized testing equipment. App. 181-183. Defendant further objects to the stricken portion of this contention as SDC does not provide any supporting citation.

**(84) [P] On October 31, 2001, SDC contacted Ms. Patti Page to arrange for delivery of the digital data as provided in the memo from Ms. Gay. (Tab 77, page 438).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(85) [P] In response, Ms. Page indicated, contrary to the previous position of AMCOM, that there was no digital data. (Tab 77, page 438).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(86) [P] Further, Ms. Page admitted the government had never purchased that data from Raytheon. (Tab 77, page 438).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(87) [P] ~~Finally,~~ Ms. Page ~~incorrectly~~ proclaimed that these parts had been manufactured in the past by other companies. (Tab 77, page 438) (Tab 38, pages 365, 366).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document does not support plaintiff's contention.

**(88) [P] On November 6, 2001, SDC contacted Ms. Gay in regard to the hard copy of the digital data which she claimed to posses in her memo of October 10, 2001. (Tab 78, page 440)(Tab 79, page 441).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(89) [P] On November 7, 2001, SDC was contacted by Ms. Page with the information ~~that yet another reassignment had occurred,~~ but that SDC could acquire the digital data from the new specialist, Janet Guyette. (Tab 79, page 441).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(90) [P] On November 13, 2001, SDC contacted AMCOM's Commander to request that the Contract be terminated for convenience. (Tab 80, pages 442, 443).**

**(91) [P] Specifically, SDC cited the lack of adequate data to allow for manufacturing of the part and absence of procedures for testing the Circuit Card Assembly. (Tab 80, page 442, 443).**

**(92) [P] It was at this point that SDC requested a meeting with AMCOM officials to discuss the issues surrounding the performance of the Contract. (Tab 81, page 444).**

**(93) [P] On January 23, 2002, that meeting did occur. (Tab 81, page 444, 445).**

**(94) [P] At that meeting it was decided that AMCOM would submit its TDP to the Research, Development and Engineering Department for analysis of its sufficiency and would provide SDC with a preprogrammed circuit board for use as a model. (Tab 81, pages 441, 445).**

**(95) [P] On February 14, 2002, as a result of the meeting, Contracting Officer Supervisor, Jerry Hill, sent a letter to SDC ~~promising, among other things,~~ to provide adequate PROM data. (Tab 82, pages 447, 448).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(97) [P] During the spring and summer of 2002, AMCOM and SDC worked together to make sure that AMCOM had the parts it needed to produce one (1) fully programmed circuit board which SDC could then use as a model to produce the Circuit Card Assembly. ~~Unfortunately,~~ the model created by AMCOM failed the testing procedures, and was returned for modification. (Tab 83, page 449).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents.

**(98) [P] On August 21, 2002, Contracting Officer, Jerry Hill, sent a letter to SDC suggesting an extension of the delivery dates provided in the contract in exchange for a waiver of all claims against AMCOM by SDC. (Tab 84, pages 451, 452).**

**(99) [P] On September 5, 2002, Mr. Hill forwarded to SDC copies of the contractual modifications. (Tab 85, pages 454-458).**

**(100) [P] SDC rejected AMCOM's offer to amend the contract, stating specifically that an amendment was not in its best interest until the problems with the TDP had been cured. (Tab 86, pages 460-462).**

**(101) [P] Mr. Hill responded on behalf of AMCOM on November 6, 2002, stating that all problems with the TDP had been cured. (Tab 87, pages 463, 464).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document cited does not support plaintiff's contention.

**(102) [P] Mr. Hill ~~was thereafter unresponsive~~ to SDC's request for a statement of AMCOM's position regarding the ~~numerous deficiencies that had been addressed at the January 23, 2003 meeting, which remained unrepaired.~~ (Tab 36, page 350).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because the document cited does not support plaintiff's contention.

**(103) [P] On April 29, 2003, SDC submitted a copy of its termination settlement proposal to AMCOM, along with a letter which stated that SDC considered the contract to be constructively terminated for convenience, due to the inaction of AMCOM in response to SDC continued requests for sufficient data from which to produce the Circuit Card Assembly. (Tab 36, pages 350-360).**

**(104) [P] On June 2, 2003, Mr. Hill responded to SDC's settlement proposal by denying the veracity of SDC's claims as to deficiencies in the TDP, ~~even specifically~~ stating that the Mylar Drawing were legible. (Tab 106, pages 599-601).**

**<u>Defendant's Objection:</u>** Defendant objects because the document cited is not provided. There is no Tab 106 attached to plaintiff's documents.

**(105) [P] Additionally, Mr. Hill enclosed three (3) unilateral contract modifications executed by AMCOM, which established new deliverydates, and directed SDC to comply with these dates or else be subjected to termination for default. (Tab 5, pages 46-51).**

**<u>Defendant's Objection:</u>** Defendant objects because the document cited is not provided. There is no Tab 5 attached to plaintiff's documents.

**(107) [P] On August 25, 2003, in preparation for a meeting between SDC and AMCOM officials, Mr. John Farris of the AMCOM Engineering Directorate was asked to review the TDPs provided to SDC. (Tab 88, pages 465- 468)**

**(108) [P] On August 26, 2003, Mr. Farris reported that the TDP for PN 13235072, the Circuit Card Assembly at issue had three specific problems, (1)it was missing data, namely computer program digital data; (2) it contained inadequate Mylar drawings, and (3) it required special testing equipment. (Tab 88, page 467)**.

**Defendant's Objection:** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because Mr. Farris's personal opinion does not bind the Government in this procurement. Furthermore, SDC assured the Government, prior to award of the contract, that it had access to the specialized testing equipment. App. 181-183.

**(109) [P] Mr. Farris also reported that the TDP was restricted to Raytheon and was coded 3N, which means that the part could only be manufactured by Raytheon. (Tab 88, page 467).**

**(110) [P] ~~The problems with the TDP regarding testing had been discovered prior to the award of the contract.~~ (Tab 47, page 390; Tab 50, page 395, 396).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the document; the document is the best evidence of its contents. Defendant further objects because Mr. Mikell's personal opinion does not bind the Government in this procurement. Furthermore, SDC assured the Government, prior to award of the contract, that it had access to the specialized testing equipment. App. 181-183.

**(111) [P] ~~Further, the other problems with the TDP were discernable upon review.~~ (Tab 90, page 472).**

**<u>Objection [D]:</u>** Defendant objects to SDC's characterization of the witness's testimony; the testimony speaks for itself.

**(112) [P] Raytheon had never provided AMCOM with a sufficient data package for open competition. (Tab 91, page 473).**

**(113) [P] In fact, AMCOM's actions in opening this contract for competition were a mistake, ~~which should have been discovered in initial review of the TDP.~~ (Tab 92, pages 474, 475).**

**<u>Defendant's Objection:</u>** Defendant objects to SDC's characterization of the witness's testimony; the testimony speaks for itself. Defendant further objects to the stricken portion of this contention as SDC does not provide any supporting citation.

**(114) [P] In August 2003, AMCOM officials and engineers met with SDC representatives ~~to discuss the deficiencies in the TDP.~~ (Tab 93, page 480).**

**Defendant's Objection:** Defendant objects to the stricken portion of this paragraph as the document cited does not support plaintiff's contention.

**(115) [P] On that date, the condition of the TDP, was inspected by all attendees. (Tab 95, page 482).**

**Defendant's Objection:** Defendant objects to this contention as it is not supported by the document cited.

**(116) [P] Subsequent to this meeting, internal communications within AMCOM confirm that the ~~TDP was insufficient~~ and that the parts previously solicited from SDC ~~could not be produced~~ by that contractor based ~~upon the information~~ with which they had been provided. (Tab 95, page 482-488).**

**Defendant's Objection:** Defendant objects to SDC's characterization of the documents; the documents are the best evidence of their contents. Defendant further objects because AMCOM's internal communications do not state that there was anything wrong with the technical data package.

**(121) [P] ~~Following the TDP review meeting,~~ on February 17, 2004, the Contract was terminated for convenience by AMCOM. (Tab 32, Tab 33).**

**<u>Defendants' Objection:</u>** Defendant objects to the stricken portion of this paragraph as the documents cited do not provide support for this contention.

**(122) [P] On April 23, 2004, SDC submitted its Settlement Proposal to the Termination Contracting Officer, Paul E. Slemons, in the amount of Seven Hundred Eighty-Nine Thousand Fifty-Eight Dollars ($789,058.00). (Tab 36, pages 350-360).**

**(123) [P] On March 25, 2005, Mr. Slemons entered his Contracting Officer Final Decision awarding SDC the sum of Three Hundred Sixty-Six Thousand Two Hundred Ninety-Five Dollars ($366,295.00). (Tab 37, pages 361 -363).**

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Joan M. Stentiford
JOAN M. STENTIFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Phone: (202) 616-0341
Fax: (202) 514-8624
Attorneys for Defendant

SYSTEMS DEVELOPMENT CORP.

s/ Howell Roger Riggs
Howell Roger Riggs
Dick, Riggs, Miller & Stem, LLP
200 Clinton Avenue, Suite 1050
Huntsville, Alabama 35801
hriggs@drmslaw.net
Telephone: (256) 564-7317
Facsimile: (256) 564-7319

October 29, 2007

Counsel for Plaintiff