**DEFENSE CONTRACT MANAGEMENT AGENCY**
DEFENSE CONTRACT MANAGEMENT AGENCY ATLANTA
ATTN: DCMAE-GATC
2300 Lake Park Drive, Suite 300
Smyrna, GA 30080-4091
Tel: (678) 503-6351
Fax: (678) 503-6034
E-mail: Paul.Slemons@dcma.mil

IN REPLY REFER TO

PRENEGOTIATION MEMORANDUM TO FILE

DATE August 4, 2004

SUBJECT: Contract DAAH01-00-C-0077 Docket A049531EA

## PART I - GENERAL INFORMATION

1. Contractor

   a. Name: SYSTEMS DEVELOPMENT CORP. (SDC)

   b. Address: 225 SPRAGINS STREET, SUITE G
   HUNTSVILLE, AL

   c. Affiliations with subcontractors: Contract was subcontracted to Teledyne Brown Engineering

   d. Contractor personnel present at negotiations:

| NAME | TITLE |
|---|---|
| Ms. Virginia Gilchrist | Contracts Administrator |
| Mr. Gilliam Carpenter | Vice President |

   e. Government personnel present at negotiations:

| NAME | TITLE |
|---|---|
| PAUL E. SLEMONS | Termination Contracting Officer |

2. Description of terminated contract

   a. Contract Number and Date: DAAH01-00-C-0077 May 9, 2000

   b. Type of Contract: CIRCUIT CARD ASSY

   c. General Description of Contract Items:

| CLIN | DESCRIPTION | QTY | UNIT OF MEASURE | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|---|---|
| 0001AA | Circuit Card Assy First Article | 2 | ea | $21,516.00 | $43,032.10 |
| 0001AD | Circuit Card Assy Production Qty | 22 | ea | $17,589.45 | $386,967.90 |
| Totals | | | | | $430,000.00 |

   d. Total Contract Price: $430,000.00

   e. Termination Article: FAR 52.249-2, Termination for Convenience of the Government (Fixed Price)

3. Termination Notice

a. Termination Notice from USA AVIATION AND MISSILE COMMAND

b. Effective Date: February 17, 2004

c. Termination Items:

| CLIN | DESCRIPTION | QUANTITY TERMINATED | UNIT OF MEASURE | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|---|
| 0001AA | Circuit Card Assy First Article | 2 | ea | $21,516.00 | $43,032.10 |
| 0001AD | Circuit Card Assy Production Qty | 22 | ea | $17,589.45 | $386,967.90 |
| Totals | | | | | $430,000.00 |

d. CPIT: $430,000.00

e. If termination notice was amended, explain: n/a

PART II - CONTRACTOR'S SETTLEMENT PROPOSAL

1. Date(s) and Amount(s): 4/23/04 $789,058.00

2. Type of Reviews made and by whom:

a. Audit: 01201-2004J1710001dated July 15, 2004

b. Technical: n/a

c. Cost/Price Analysis: n/a

d. Plant Clearance: Requested April 20, 2004 (S0101A427-4C) but not yet received. Action halted on August 2, 2004 due to first article limitation issues.

e. Legal: n/a

f. Other: n/a

3. Other Comments

Reduction of Costs for First Article Limitation

The DCAA Audit did not address the first article limitation clause of the contract. The contractor ordered parts not just for the two first article units, and not even for just the 24 units on contract but for all 129 units through four option years that were never exercised. A detailed discussion of potential government liability follows:

The contract contains clause I-65, FAR 52.209-4[1] which limits the costs in a termination to the costs of producing the first article. The contractor did not procure material costs for just the two first article units or even for the two first article units and the 22 production units but rather for all 129 units for the base year and all four of the option years. If SDC were to be held to a strict application of the first article limitation clause, the total settlement would be $41,780. If the first article limitation is ignored and all units currently under contract are allowed, the settlement would be $115,530. There is no viable argument for Government liability for the units in the option years. It must also be noted that the reduction in the proposal to the contract quantities may not necessarily impact SDC's liability to Teledyne Brown. This is computed as $385,816.

SDC states they were authorized to procure for all 129 units and sent me a letter from the Industrial Specialist, Mr. Charles Kirch. Mr. Kirch performed a preaward survey and issued a letter dated March 31, 2000 to Ms. Geraldine Williams of AMCOM stating in pertinent part,

> SDC used a bill of materials that assumed the entire possible contract quantity of 129 unit sets of material is procured in one material procurement action. The Contract has an initial quantity of 24 units including the two First Articles. There are five option years with minimum and maximum quantities. It is not economic or realistic in the current Diminishing Manufacturing Source supplier environment for the Contractor to perform separate material procurements for each option year. The PC board in question is being built to a 1990 drawing. Several of the required material items were no longer being produced and SDC had to buy residual inventories in stock. In several years many more material items would be expected to no longer be available. If SDC proposed separate bills of materials for making separate material purchasing actions in each option year, with risk allowances for premium pricing of obsolete items, and possible engineering costs for qualifying replacement components, the option pricing would have to be very high. In the current DMS environment, SDC will need to buy the entire material quantity for all possible options if the firm is to commit itself to supply the subject PC board for the next five years, The costs of additional First Article submissions and parts replacements and recertification efforts due to DMS issues expected to develop over the next five years would require the Contractor to propose huge risk premiums that would dominate the current year material costs for a single purchasing effort the of the entire contract quantity during the initial production lot buy. In addition there is a significant probability that some material items may become unavailable and SDC may not be able to find a replacement component part and so would not be able to perform on the out year options. This is why the Contractor did propose buying the material for all 129 potential units in one lot, Once SDC revises the material costs for the entire lot of 129 units to reflect proper per unit pricing for a single buy of 129 units at one time, the economic incentives of the single material procurement action will become apparent. The material would then be considered a production assurance stock and this stock could be a separate contractual line item.

---

[1] 52.209-4 -- First Article Approval -- Government Testing (Sep 1989)
As prescribed in 9.308-2(a) and (b), insert the following clause:
First Article Approval -- Government Testing (Sep 1989)
[Contracting Officer shall insert details]
(a) The Contractor shall deliver ***2*** unit(s) of Lot/Item ***0001AA or 0003AA*** within ***90*** calendar days from the date of this contract to the Government at ***Trans Officer Bldg 8022, RSA Tech Center 4500, ATTN: STERT-TE-E-CS, Redstone Arsenal, AL 35898-8052*** [insert name and address of the testing facility] for first article tests. The shipping documentation shall contain this contract number and the Lot/Item identification. The characteristics that the first article must meet and the testing requirements are specified elsewhere in this contract....
(h) ***Before first article approval, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor. Before first article approval, the costs thereof shall not be allocable to this contract for***
(1) progress payments, or
***(2) termination settlements if the contract is terminated for the convenience of the Government. [Emphasis mine]....***

This letter was addressed to AMCOM as part of the preaward review of March 31, 2004. However, while not shown on the letter, SDC says Mr. Kirch also provided them a copy of the letter. They view this letter as their authorization to procure for all 129 units. Mr. Kirch lacked authority to change the solicitation terms and there is no waiver of the first article limitation clause in the contract.

The seminal case in this area is *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S. Cr. 1, 92 L.Ed 10 (1947). As the Supreme Court stated in this case:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. (332 U.S. at 384, 68 S.Ct. at 3).

Consequently, in *United States v. Georgia-Pacific Company*, 421 F.2d 92, 100-101 (9th Cir. 1970), the Court set up two prerequisites that must be met before estoppel can be contended against the Government:

> Thus the courts have held that an equitable estoppel may be found against the Government (1) if the Government is acting in its proprietary rather than sovereign capacity; and (2) if its representative has been acting within the scope of his authority.

In *Woodcraft Corporation v. United States*, 146 Ctr. Cl. 101 (1959), the Court was faced with the contention that the actions of a government inspector in requiring the contractor to change its method of manufacturing tables did not preclude the Government from denying responsibility for the added expense to the contractor. Here, the Court said, the contract gave the contracting officer the sole power to resolve ambiguities in the table specifications is a case pertinent in DCAA's analysis. There the contracting officer approved a preproduction finished table submitted by the contractor. Also, the Court noted that the contractor had been told that it accepts responsibility for relying on advice from the inspector.

The Court in Richard L. Thoen v. United States, 5 Ct.Cl. 823 (1984), was faced with a contract provision that specifically stated that the Contracting Officer's Technical Representative did not have the authority to alter any contract terms or conditions. The Court made the following statements at page 828:

> Under the language of the contract ... quoted, ... plaintiff was bound to take notice of the limits of the authority of the contracting officer's representatives, and the Government, as a result, is not bound by unauthorized acts, solicitations, directions or urgings of these representatives.

When the Board in *Varo, Inc.*, DOTCAB No. 1695, 87-3 BCA 20199 (1987) dealt with the above cases, it stated the following at page 54719:

> The general rule which we derive from these cases is that the government is not bound by the unauthorized acts of its agents where the contractor is on notice that the government representative is authorized to act only in a certain capacity but where the act upon which the contractor relies goes outside of the limitation of that authority. A contractor dealing with a government representative has a duty to determine whether the agent is authorized to take a particular action.

Thus, the rule is that the actions of a Government employee are not imputed to the Contracting Officer nor do they warrant invocation of estoppel such if the contractor is on notice that such knowledge and actions were outside the scope pf that employee's authority. Se,, *Bruce Andersen Co., Inc.*, ASBCA No. 29412, 89-2 BCA 21,872, at 20289-90 (1989); *Allen's of Florida, Inc.*, ASBCA No. 14,656, 71-1 BCA 8646 (1971); *Barton & sons co.*, ASBCA No. 9477, 65-2 BCA 4874 (1965); *Norman & Henderson, Ph.D.*, ASBCA No. 27,612, 85-1 BCA 17,881 at 39345 (1985) [citing *Putnam Mills Corporation v. United States* (179 F.2d 1334 (Ct. Cl. 1973) and *California-Pacific Utilities Company v. United States*, 194 Ct. Cl. 703, 720 (1971)]; HUB Testing Laboratories, DOTCAB No. 1780, 88-3 BCA 20,887, at 54505 (1988).

In *California-Pacific Utilities Co. v. United States,* supra, the rule was characterized in the following way: In that case, the court held that the contractor could not claim reliance on an alleged agreement to include an indemnification clause in a permit when it had notice that the Government official who allegedly agreed to include the clause did not have authority to do so, Cibinic & Nash, Administration of Government Contracts, p. 91 (2d ed. 1985).

Some of the policy considerations for such a rule are as follows:

> If, on the other hand, any such person acts outside the scope of the authority actually held by him, the United States is not estopped to deny his unauthorized or misleading representations, commitments, or acts, because those who deal with a Government agent, officer, or employee are deemed to have notice of the limitations of his authority, and also because even though a private individual might be estopped, the public should not suffer for the act or representation of a single Government agent.... *California-Pacific Utilities Co. v. United States*, supra, at 720.

The reason for excepting the Government from the rule of apparent authority generally applicable to private contracts has been oft-stated as grounded in the difference between protecting the public treasury, a public right or public interest on the one hand, and protecting private concerns on the other, *Federal Crop Insurance Co. v. Merrill*, supra at 385, and *Utah Power & Light Co. v. United States*, 243 U.S. 389, 37 S. Ct. 387, 351 (1916). Also, the Government practice of specifically designating only one person, the Contracting Officer, as having exclusive authority for dealing with the administration of a contract avoids the chaos and lack of protection for those government interests which would result if a contractor were allowed to rely on the authority of any one or dozens of potentially hundreds of Government "agents" who might have some relationship with the contract. See *Dresser Industries, Inc. v. United States*, 596 F.2d 1231, 1237 5th Cir. (1979). Cibinic & Nash, Administration of Government Contracts, P. 48 (2d ed. 1985).

This area is succinctly summarized in *Hughes Aircraft Corp.*, ASBCA No. 24,601, 83-1 BCA 16,396 at p. 47888 (1983) which deals with a contract overrun:

> Even assuming that the Government technical directions concerning the work otherwise reasonably might be construed as a waiver by the contractor, here virtually all such directions were given by persons without authority to waive the contract's funding limitations. Only the performance inducing conduct of agents with the power to authorize the funding of overruns may be construed as waivers. The conduct in question purportedly relied on as encouraging continued performance despite the overrun, must be within the scope of the Government agent's authority.... Only where the authority is clearly and properly delegated to a representative would it be permissible for us to find that a communication from someone other than the contracting officer might affect these important statutory, regulatory and contractual strictures.

I spoke to Ms. Geraldine Williams, the addressee of Mr. Kirch's letter. She did not recall the letter but said if she had agreed with it, she would have used Alternate II[2] in the contract and not the general First Article limitation clause.

---

[2] Alternate II (Sep 1989). As prescribed in 9.308-2(a)(3) and (b)(3), substitute the following paragraph (h) for paragraph (h) of the basic clause:

(h) Before first article approval, the Contracting Officer may, by written authorization, authorize the Contractor to acquire specific materials or components or to commence production to the extent essential to meet the delivery schedules. Until first article approval is granted, only costs for the first article and costs incurred under this authorization are allocable to this contract for

(1) progress payments, or

(2) termination settlements if the contract is terminated for the convenience of the Government....

I do not believe SDC has established a compelling case for estoppel. Mr., Kirch's memorandum should not have induced the contractor to act. Even if the contention is accepted that Mr. Kirch's memorandum induced them to action, the contract did not exercise the option years and thus liability would be limited to the base year. Further, the letter was not addressed to SDC; it was an internal memorandum that clearly was arguing for the government to consider allowing the purchase of all materials but was in no way was directive in nature. Lastly, the bill of materials presented was already predicated on purchasing all 129 units so there was no reliance on Mr. Kirch's actions.

I have computed two positions, the first is based on a strict interpretation of the first article limitation clause, and the second is based on allowing all materials for the contract quantity, but not the option years.

PART III - TABULAR SUMMARY OF CONTRACTOR'S PROPOSAL

| Cost Elements | Proposed | Questioned | Difference (Note 1) | TCO Position-Lo | TCO Position-Hi | Ref |
|---|---|---|---|---|---|---|
| Purchased Parts On Hand | $321,497 | $321,497 | $0 | $0 | $0 | 2 |
| Other Costs | 19,303 | 19,303 | 0 | 0 | 0 | 3 |
| G&A Expenses | 297,500 | 242,162 | 55,338 | 3,352 | 12,366 | 4 |
| Subtotal: | $ 638,300 | $ 582,962 | $ 55,338 | $ 3,352 | $ 12,366 | |
| Profit | 63,830 | 63,830 | 0 | 371 | 1,272 | 5 |
| Settlement Expenses | 14,316 | 0 | 14,316 | 14,316 | 14,316 | 6 |
| Total | $ 716,446 | $ 646,792 | $ 69,654 | $ 18,039 | $ 27,954 | |
| Settlements With Subcontractors | 72,612 | (319,301) | 391,913 | 23,741 | 87,576 | 7 |
| Acceptable Finished Product | 0 | 0 | 0 | 0 | 0 | |
| Gross Settlement | $ 789,058 | $ 327,491 | $ 461,567 | $ 41,780 | $ 115,530 | |
| Disposal and Other Credits | 0 | 0 | 0 | 0 | 0 | |
| Net Proposed Settlement | $ 789,058 | $ 327,491 | $ 461,567 | $ 41,780 | $ 115,530 | |
| Prior Payments | 0 | 0 | 0 | 0 | 0 | |
| Net Payment Requested | $ 789,058 | $ 327,491 | $461,567 | $ 41,780 | $ 115,530 | |
| Adjustment for Loss Ratio | | | (85,962) | 0 | 0 | 8 |
| Net Amount | | | $375,605 | $41,780 | $115,530 | |

**Explanatory Notes**

1. **Difference**

The amounts in this column are presented by DCAA solely for the convenience of the termination contracting officer in developing its negotiation objective. They represent only the arithmetic difference between amounts proposed and related questioned cost. The amounts are not audit approved or recommended amounts. DCAA does not approve, or recommend prospective costs because the amounts depend partly on factors outside the realm of accounting expertise, such as opinions on technical and production matters.

2. **Purchased Parts**

a. **Basis of Contractor's Proposal:** ($321,497) The basis for the contractor's proposed cost for purchased parts is from cost or pricing data in the subcontractor termination settlement proposal submitted by Teledyne Brown Engineering and supported by an inventory schedule showing the parts are located at Teledyne Brown Engineering.

b. **DCAA Position:** ($0) DCAA questioned the $321,497 cost of purchased parts in its entirety, because these costs should be considered as part of a settlement with a subcontractor, Teledyne Brown Engineering (TBE). After DCAA determined that the $321,497 proposed was based solely on the subcontractor termination settlement proposal, DCAA reclassified the costs as "settlement with subcontractor." See Note 7.

c. **TCO Position:** ($0) Concur with reclassification by DCAA. However $357 of purchased parts was delivered by TBE to SDC and this amount should bear profit. No need to reclassify here as both subcontract and purchased parts would bear G&A.

3. <u>Other Costs</u>

a. **Basis of Contractor's Cost:** ($19,303) The contractor proposed the labor cost of a buyer (500 hours), procurement clerk (147 hours) and a data entry clerk (200 hours) as Other Cost. These functions are normally recorded as G&A expense in the contractor's books and records. The contractor asserts these are judgmental estimates. During the four years this program was in progress prior to termination, SDC has not established a job cost number for this project, nor has it charged any direct cost for this program to a specific job/project within its cost accounting records. SDC's established practice is to include procurement-related functions and activities such as those claimed here in its G&A pool. These costs are allocated to final projects/final cost objectives using a total cost input base. In its claimed G&A expense (see note 4 below), the contractor claimed its normal G&A expenses.

b. **DCAA Position:** ($0) DCAA questioned the proposed Other Costs of $19,303 in their entirety. The costs represent normal procurement related G&A activities incurred on the contract which should be recouped from the normal application of the G&A rate. They represent the contractor's normal procurement activity incurred for the contract. Consequently, direct charging these expenses results in duplication of cost claimed. It is also in noncompliance with FAR 31.202 which states in part, "... No final cost objective shall have allocated to it as a direct cost any cost, if other costs incurred for the same purpose in like circumstances have been included in any indirect cost pool to be allocated to that or any other final cost objective." DCAA questioned the $19,303 Other Cost because it represents the cost of functions that are normally recorded as G&A expense in the contractor's books and records for routine activities. Charging these routine indirect costs as direct effort in the performance of the contract is in noncompliance with FAR 31.202 and will result in double counting of this cost on other contracts.

Also, the claimed labor hours are based on the contractor's unsupported, judgmental estimates. DCAA further considers the labor hours claimed to be unreasonable/excessive. A review of the contractor's job cost ledger indicates that no costs have been recorded or incurred during the four years of contract performance prior to termination. The contractor's representative could not provide any supporting evidential matter for the hours proposed; it did not provide any timesheets, logs, etc. In DCAA's opinion, the hours appear excessive and unreasonable since this generally indirect activity resulted in only the issuance of an original and a revised purchase order to its subcontractor, TBE, who purchased all of the required parts.

c. **TCO Position:** ($0) Concur with DCAA. A substantial number of cases have permitted direct charging of pre-termination indirect costs that the FAR does not specifically allow as direct costs.[3] This concept is rooted in FAR 31.202. One notable case is Okaw Industries,[4]

> "We conclude that the appellant's reclassification of costs from indirect to direct charges not only should be permitted but is required pursuant to the provisions of DAR 15-202 (FAR 31.202). We are confident that if the appellant's indirect cost accounts include charges which were in fact direct costs for other work, Government personnel would insist that those costs be reclassified and charged directly to those contracts."

However, the Board has warned against double counting:

---

[3] <u>General Electric</u>, ASBCA 24111, 82-1 BCA 15725, *motion for reconsid. denied,* 82-2 BCA 16207 "It is axiomatic that certain costs normally treated as overhead expenses may, upon termination of the contract with which those costs are associated, properly be allocated directly to the termination contract and be recoverable in a termination settlement ... Such direct allocation of otherwise indirect costs is singularly appropriate in situations where, as here, no end items have been produced or delivered and not direct labor costs, against which overhead rates may be applied, have been incurred."

[4] <u>Okaw Industries, Inc.</u>, ASBCA 17863, 77-2 BCA 12793.

> "There is nothing objectionable about charging any cost directly, provided it is properly allocable to the contract, and other costs of the same character are excluded from indirect cost pools charged to the contract in order to avoid 'double screening' or duplicate charging. In particular, in a termination for convenience situation, it is common to remove some or all types of indirect costs from overhead or G&A and to charge them directly in order to achieve equitable allocation."[5]

There are several cases where claimed costs were denied because the contractor sought recovery of costs already included in his composite rate for shop overhead and general and administrative expenses. The costs were disallowed to avoid double payment.[6]

Based on the Bermite case (see bottom of footnote 6), I believe the most appropriate course of action is to leave the expenses as indirect costs.

**4. General and Administrative Expenses**

---

[5] Switlik Parachute Company, ASBCA 18024, 75-1 BCA 11434, at 54,443

[6] Rossen Builders, ASBCA 32305, 87-1 BCA 19538 at 98,727 (holding bid estimator's time and delivery costs were already in G&A -- allowance as direct costs would permit double recovery); Arctic Corner, Inc., VABCA 2393, 86-3 BCA 19278 at 97,457 (holding that bid preparation costs are normally a part of overhead; also finding a lack of credible evidence as to what it cost to bid the contract); Worsham Construction, ASBCA 25907, 85-2 BCA 18016 at 90,377 (salary of owners allowed only as an indirect cost -- Board had allowed unabsorbed overhead and considered direct recovery duplicative); Tera Advanced Services, GSBCA 6713-NRC, 85-2 BCA 17940 at 89,888 (outside services and subscriptions/publications were so inherently overhead in nature that they were disallowed as direct charges in the absence of a specific explanation as to why they were charged directly); Bailfield Industries, Division of A-T-O, ASBCA 20006, 76-2 BCA 12096 at 58,114-15; Robert M. Tobin, HUD BCA 79-388-C20, 84-3 BCA 17,651 at 87,971 (disallowing work force recruitment as a direct cost); Starks Contracting, VACAB 1339, 79-2 BCA 1448 at 68,847-48 (contractor's accounting system was inadequate to allow reclassification of indirect costs -- identification of costs with contract was based on contractor's estimates which the Board found speculative); Systems & Computers Information, Inc., ASBCA 18458, 78-1 BCA 129456 at 63,137 (costs of persuading the contracting officer not to default terminated contractor and the metis of changes claimed by contractor were already included as indirect charges); R-D Mounts, Inc., ASBCA 17422, 75-1 BCA 11077 at 52,733-34 (disallowing freight costs as a direct cost because the amount was unsubstantiated and could not be specifically identified with the terminated contract; Cryo-Sonics, Inc., ASBCA 13219, 70-1 BCA 8313 at 38,640 (disallowing as a direct cost the cost of small tools because they were used on other jobs after termination); Process Equipment Co., Inc., (1975) ERDA BCA No. 2-1-75,75-2 BCA 11426 see also Sherkade Construction Corp., (1968) DOT CAB No. 8-29, 68-2 BCA 7365; Airtech Services, Inc., (1968) DOT CAB No. 68-19, 68-2 BCA 7290; Dunbar Kapple, Inc., ASBCA 3631, 57-2 BCA 1448; Fiesta Leasing and Sales, ASBCA 29311, 87-1 BCA 19622 at 99,292 (disallowing marketing expenses associated with obtaining the contract -- no indication officer's salary was removed from G&A and evidence was too speculative as to the amount of the proposed direct charge); Bob Tucker and Associates, LBCA 83 BCA 16, 86-2 BCA 18990; Celesco Industries, ASBCA 22460, 84-2 BCA 17295; Sundstrand Turbo v. United States, 389 F.2d 486 (Ct. Cl. 1968), Marlin Associates, GSBCA 5663, 82-1 BCA 15738; and lastly, Bermite Div. of Tasker Industries, ASBCA 18280, 77-1 BCA 12349, *aff'd on motion for reconsid.*, 77-2 BCA 12731. In Bermite, the Board stated,

> "Expenses carried as an element of G&A are assumed to be recovered in the year they are incurred and recorded, absent persuasive evidence to the contrary, and this recovery is derived from the totality of the contractor's then on-going business. Expenses so recorded and presumably recovered cannot retrospectively be removed from the indirect expense pool. Such 'relief' can be done only prospectively, i.e. before the expenses are recorded or, more importantly, before they are allocated to and recovered from the on-going business. In a situation such as is present here, we are faced with recovery which has already taken place. Thus, we are not concerned with 'relieving the G&A pool' retrospectively but we are concerned with and faced with the fact that recovery as a direct settlement expense would now result in double recovery of these expenses."

a. **Basis of Contractor's Proposal:** ($242,162) The contractor proposed the labor cost of an Executive (2000 hours) and a Contract Administrator (2000 hours) as G&A expense. The contractor calculated the cost of this burdened labor as a direct charge for performance on the contract. The contractor multiplied 2000 hours times the labor rate for each labor category to come up with a total direct labor cost of $160,000. The contractor then burdened the direct labor cost with a direct labor overhead rate of 46 percent ($73,600) and then burdened labor and overhead cost with a G&A rate of 10.18 percent ($23,780) to arrive at total burdened labor cost of $257,380. Further, the contractor added to the $257,380 of proposed burdened labor, G&A expense of $40,120, which represents the G&A rate of 10.18 percent applied to total subcontractor cost of $394,109. During the four years this program was in progress prior to termination, SDC has not established a job cost number for this project, nor has it charged any direct cost for this program to a specific job/project within it cost accounting records. SDC's established practice is to include indirect G&A functions and activities such as those claimed here in its G&A pool. These costs are allocated to final projects/final cost objectives using a total cost input base. In its claimed G&A expense (see note 4 below), the contractor claimed its normal G&A expenses.

b. **DCAA Position:** ($55,338) DCAA questioned the $242,162 of proposed G&A expense. The proposed costs represent normal indirect G&A activities incurred on the contract which should be recouped from the normal application of the G&A rate. Also, the claimed labor hours are based on the contractor's unsupported judgmental estimates. DCAA further considers the labor hours claimed to be unreasonable/excessive. The questioned G&A expense represents the cost of functions that are normally recorded as G&A expense in the contractor's books and records for routine activities. Charging these routine indirect costs as direct effort in the performance of the contract is in noncompliance with FAR 31.202 and will result in double counting of this cost on other contracts. FAR 31.202 states in part, "… No final cost objective shall have allocated to it as a direct cost any cost, if other costs incurred for the same purpose in like circumstances have been included in any indirect cost pool to be allocated to that or any other final cost objective." A review of the contractor's job cost ledger indicates that no costs have been recorded or incurred during the four years of contract performance prior to termination. The contractor's representative could not provide any supporting evidential matter for the hours proposed; it did not provide any timesheets, logs, etc., that directly identified chares to this contract. In DCAA's opinion, the hours appear excessive and unreasonable since this generally indirect activity resulted in only the issuance of an original and a revised purchase order to its subcontractor, TBE, who purchased all of the required parts. A review of the most recently completed fiscal year (2003) reflects a G&A rate of 14.12 percent. DCAA also noted that for 2004, the interim rate appears to be approximately 21 percent. DCAA believes use of the 14.12 percent is appropriate; and it should be applied to the amount finalized for settlement with subcontractors. Currently, based on Audit Report No. 1201-2004J17100002, the settlement with subcontractor is $391,913. DCAA's analysis of the most recently completed fiscal year indicates a G&A rate of 14.12 percent. This rate should be applied to the settlement with subcontractor costs of $391,913 for a recoverable amount of $55,338.

c. **TCO Position: Lo** ($3,352) Applied the G&A rate of 14.12 percent to subcontract settlement amount of $23,741.

**TCO Position: Hi** ($12,366) Applied G&A rate of 14.12 percent to subcontract settlement amount of $87,576.

5. **Profit**

a. **Basis of Contractor's Proposal:** ($63,830) The contractor applied a 10 percent profit rate to its total contract cost to compute its proposed profit of $63,830 ($638,300 x 10 percent).

b. **DCAA Position:** ($0) Based on DCAA's examination, it appears the contract is in a loss position; therefore, they have questioned all of the proposed profit based on FAR 49.203(a), which states "In the negotiation or determination of any settlement, the TCO shall not allow profit if it appears that the contractor would have incurred a loss had the entire contract been completed." The contractor reported an estimated cost at completion (EAC) of $507,837. The audit evaluated EAC is $532,304. The increase in EAC from $507,837 to $532,304 is the result of two adjustments. First, SDC reported an EAC for the subcontract with TBE of $397,773; however, the purchase order value is $403,298. Additionally, DCAA adjusted the G&A rate to reflect the 14.12 percent for the most-recently completed fiscal year. The contract price is $430,000. Because the estimate at completion is in excess

of the contract price, the contract is in a loss position and FAR 49.203(a) precludes recovery of profit in a termination if this condition exists.

c. **TCO Position: Lo** ($371) There is no indication the contract would have been performed at a loss. The DCAA calculation compares an EAC for 129 units (the base year and the four option years) to the contract price for the first 24 units in the base year. The contract price of the option years is not known as these options have never been exercised, and an EAC for the base year is not known. I have allowed the 10 percent profit requested on the $357 of purchased parts delivered by TBE and on the G&A expenses of $3,352 ($357+$3,352 = $3,709* 10%). FAR 49.202(a) states in pertinent part, "Profit shall not be allowed the contractor for material or services that, as of the effective date of termination, have not been delivered by a subcontractor, regardless of the percentage of completion…."

**TCO Position: Hi** ($1,272) I have allowed the 10 percent profit requested on the $357 of purchased parts delivered by TBE and on the G&A expenses of $12,366 ($357+$12,366 = $12,723* 10%).

6. <u>Settlement Expenses</u>

a. **Basis of Contractor's Proposal:** ($14,316) The contractor made a judgmental estimate of the hours required for settlement of the termination, including negotiations. SDC multiplied the labor rates of the Executive and Contracts Administrator times a total of 230 hours (105 for Executive and 125 for Contracts Administrator) to arrive at estimated labor cost and burdened it to arrive at the estimated settlement expense.

b. **Audit Position:** ($14,316) Based on DCAA's examination, they found no basis to take exception to the proposed settlement expenses. Using the criteria contained in FAR 31.205-42(g), DCAA reviewed the items proposed by the contractor for settlement expenses. DCAA's review disclosed that the costs are of the type and nature considered in FAR 31.205-42(g). DCAA verified the labor rates. DCAA believe the hours proposed appear reasonable.

c. **TCO Position:** ($14,316) Concur with DCAA.

7. <u>Settlements With Subcontractors</u>

a. **Basis of Contractor's Cost:** ($72,612) The contractor's proposed amount for settlements with subcontractors ($72,612) does not represent a settlement agreement with its subcontractor, TBE, but rather reflects incorporation of TBE's termination settlement proposal amount to SDC. SDC has not performed any review or analysis of the settlement proposal, nor has it been ratified by the terminating contracting officer. Additionally, SDC fragmented the subcontractor's termination settlement proposal and reported $321,497 as Purchased Parts (see Note 2 above) and reported the balance of the proposed cost of TBE labor, ODC, G&A expense and profit as settlement with subcontractors. Summary of Conclusions:

b. **DCAA Position:** ($391,913) Based on DCAA's examination, they have determined that the prime contractor, SDC, has not reached any settlement with its primary subcontractor, Teledyne Brown Engineering (TBE). DCAA have evaluated TBE's subcontractor termination settlement proposal under Audit Report No. 1201-2004J17100002, dated July 13, 2004 (see the Appendix). As a result of that examination, they questioned $2,196 of the proposed amount of $394,109. The $394,109 ties to the subcontractor's claim and includes the $321,497 claimed as purchased parts (see Note 2 above), plus the $72,612 claimed as settlements with subcontractors. DCAA's examination disclosed that the subcontractor, TBE, has possession of the purchased parts. DCAA reclassified the amount reported for Purchased Parts (see Note 2) to this section for a total amount for Settlement With Subcontractors of $394,109, which ties to TBE's termination settlement proposal. The evaluation of the termination settlement proposal was under Audit Report No. 1201-2004J17100002. DCAA also coordinated with the contractor and confirmed that no specific analysis was performed of the TBE settlement proposal, nor has any settlement been ratified by the Terminating Contracting Officer. It is also DCAA's understanding that the Government has not determined the disposition of the inventory, DCAA's results are qualified accordingly.

c. **TCO Position: Lo** ($23,741) As explained in attachment 1, the position for the two first article units is $23,741. It is under separate cover as TBE objects to the release of any burden rates to SDC. The proposed

amount consists of purchased parts of $321,497, direct labor of $7,759, other costs of $1,776, burdens, and profit at 7 percent for a total of $394,109. I questioned purchased parts allowing only $^{2}/_{129ths}$ of $321,497 or $4,984. In addition, $1,750 of other costs was questioned as not allocable. The balance of questioned costs represents burdens questioned as a basis of the questioned base. Profit was allowed at 7 percent.

**TCO Position: Hi** ($87,576) As explained in attachment 1, the position for the two first article units is $87,576. It is under separate cover as TBE objects to the release of any burden rates to SDC. The proposed amount consists of purchased parts of $321,497, direct labor of $7,759, other costs of $1,776, burdens, and profit at 7 percent for a total of $394,109. I questioned purchased parts allowing only $^{24}/_{129ths}$ of $321,497 or $59,813. In addition, $1,750 of other costs was questioned as not allocable. The balance of questioned costs represents burdens questioned as a basis of the questioned base. Profit was allowed at 7 percent.

**8. Reduction of Costs for Loss Position**

a. **Basis of Contractor's Proposal:** ($0) The contractor termination settlement proposal did not include any reduction in costs even though its contract was in a loss position; therefore, it does not appear to consider the requirements of FAR 49.203(b). The contractor proposed a profit.

b. **DCAA Position: (-$85,962)**

| | Proposed | Questioned | Audit Adjusted |
|---|---|---|---|
| Settlements with Subcontractor | $ 394,109 | $ 2,196 | $ 391,913 |
| Other Costs | 19,303 | 19,303 | - |
| G&A | 297,500 | 242,162 | 55,338 |
| Total costs (a) | $ 710,912 | $ 263,661 | $ 447,251 |
| x loss-ratio factor | | | 80.78% |
| Allowable cost multiplied by loss-ratio factor (b) | | | $ 361,289 |
| Unallocable (a) - (b) = (c) | | | $ 85,962 |

* Slight differences occur due to rounding.

As part of DCAA's examination of the profit proposed, DCAA determined that the contract was in a loss position. Therefore, DCAA calculated the loss ratio of 80.78 percent as shown in the table below:

**SDC Termination Loss-Ratio Calculation for Contract No. DAAH01-00-C-0077**

| | |
|---|---|
| Total Contract Price (a) | $430,000 |
| Estimate of Cost at Completion for Contract (b) | $532,304 |
| Loss Ratio Factor (a)/(b) | 80.78% |

DCAA applied the loss-ratio factor to the audit-adjusted costs of $447,251 as shown in the schedule above. FAR 49.203(b) states, "If the settlement is on an inventory basis ... the contractor shall not be paid more than ... (d) The remainder of the settlement amount otherwise agreed upon or determined ... reduced by multiplying the remainder by the ratio of (i) the total contract price to (ii) the total cost incurred before termination plus the estimate cost to complete the entire contract." This contract termination proposal was submitted on the inventory basis, and it is in a loss position as discussed in Note 5 above; therefore, application of this FAR limitation is appropriate and results in an adjustment of $85,962.

c. **TCO Position:** ($0) There is no indication the contract would have been performed at a loss. The DCAA calculation compares an EAC for 129 units (the base year and the four option years) to the contract price for

the first 24 units in the base year contract. The contract price of the option years is not known as these options have never been exercised and an EAC for the base year is not known. I have allowed the 10 percent profit requested.

PART V - RECOMMENDATIONS

1. The settlement in the net amount of $41,780 is determined to be fair and reasonable to both contractual parties. *In an attempt to reach settlement the government position may be increased to a maximum of $115,530.* The Supplemental Agreement cannot be executed until plant clearance actions have been completed.

2. By writing this Prenegotiation Memorandum, the TCO has complied with the requirements of Contract Audit Follow-up by disposing of Audit Report Nos. 01201-2004J1710001dated July 15, 2004 (SDC) and 01201-2004J1710002dated July 13, 2004 (TBE).

3. This document does not constitute a final binding decision to the negotiated price. Only authorized signatures on a supplemental agreement shall constitute a binding settlement.

PAUL E. SLEMONS
Termination Contracting Officer
Date August 4, 2004

SDC

28 October 2004

DCMA - Atlanta
Attn: DCMAE-GATC/Mr. Paul Slemons
805 Walker Street, Suite 1
Marietta, GA 30060-2789

Subject: Response to TCO Positions Related to Termination Proposal for Contract DAAH-00-C-0077, Docket A049531

Dear Mr. Slemons:

Systems Development Corporation submits the attached report in response to your offer dated 5 August 2004. We have retained the services of the preparing CPA in order to expedite the termination process.

Please review our report and inform us when we may begin negotiations. If you need additional information, please contact me at (256) 382-4600.

Sincerely,

V. P. Gilchrist

Virginia P. Gilchrist
President

Attachment

(256)
382
4600
GIL

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

# Report Regarding DCAA and TCO Positions Related To Termination Proposal Submitted By Systems Development Corporation Under Contract DAAH01-00-C-0077

I. QUALIFICATIONS

I am a Certified Public Accountant (CPA) in private practice since 1980. My practice is primarily related to Government Contract and construction accounting. As I established my accounting practice, I was a full time assistant professor of accounting at Rutgers University. Prior to starting my practice I was an auditor for the Defense Contract Audit Agency (DCAA) a Federal Government agency. During that time I was also an Instructor of accounting at Morris County and Bergen County Colleges. I received my bachelor and master's degrees from Seton Hall University.

I have been accepted as an expert in the following judicial fora:

a. United States District Court.

b. New Jersey Superior Court.

c. Armed Services Board of Contract Appeals.

d. Department of Transportation Board of Contract Appeals.

e. General Services Administration Board of Contract Appeals.

f. Department of Energy Board of Contract Appeals.

g. United States Federal Court of Claims.

h. Various State Courts.

i. Various County Courts.

j. Various Arbitration and mediation hearings.

I have published for the Small Business Administration, under the Small Business 7 (J) program; a manual and seminar workbook entitled "How to Survive a DCAA Audit".
I have conducted numerous seminars as a paid lecturer with Technology Training Corporation.

I have also been a guest lecturer on numerous occasions for the following organizations:

A) National Contract Management Association.

B) Association of Government Accountants.

C) Association of Women Owned Businesses.

I am a member of various professional organizations and as a committee member of the Defense Contractor's Committee, I was part of the final review of the Audit and Accounting Guide "Audits of Federal Government Contractors" published by the American Institute of Certified Public Accountants.

I have consulted and testified on the calculation and the review of damages in a variety of circumstances over the past 27 years.

II. SCOPE OF EFFORT

I was retained by Systems Development Corporation to review, offer my opinions and to provide comments to the DCAA audit report and the position of the TCO, as set forth in the settlement offer.

I have relied upon the following:

A) FAR 49

B) FAR 31

C) Contract Terms including modifications

D) Contract Price

E) DCAA Contract Audit Manual

III. CONCLUSIONS

The following represent my opinion regarding the DCAA and TCO position along with the calculations of what I consider to be a reasonable settlement.

A) <u>DCAA Position</u>

1) <u>Purchase Parts and Settlements with Subcontracts</u>

I do not object to the inclusion of the subcontractor claim as a settlement. Furthermore the amount questioned by the DCAA assist audit is immaterial so I have accepted the amount the DCAA figured.

2) <u>Other Costs</u> - Questioned - <u>$19,303</u>

As stated by DCAA these costs represent effort related to buyer, procurement clerk and data entry clerk activity. Though these costs are typically recovered through the company G&A rate, this method of recovery is unreasonable for the following reasons:

a) The original contract for the base period had a period of performance of 8 May 2000 through 2 February 2001. The contract was terminated on 17 February 2004. A Government caused delay of more than three (3) years was experienced.

b) During the over three (3) year delay the SDC buyer procurement clerk and data entry clerk provided support to the contract which is not commensurate with the recovery calculated using the typical G&A recovery methodology.

c) The hours proposed can be verified to events that took place during the contract performance. The timeline is attached.

d) Since the contract was not on a stop work basis, the company employees were required to perform services in an attempt to complete the contract requirements.

The hours claimed have been identified by employee and period

and can be verified to payroll records. Since the employees are typically indirect employees, the employees did not charge a specific job number. However, the reasonableness of the hours can be evaluated based upon the services rendered.

SDC has made an adjustment to their DCAA annual submissions in order to eliminate the double accounting issue raised by the DCAA. The basis for this adjustment is that the services provided were unlike the normal services provided during contract performance. The services under the subject contract were unique and caused by the delay and disruptions resulting from the Government's actions. SDC has elected to include the delay and disruption costs in the termination claim rather than submit a separate request for equitable adjustment.

Consequently, it is my opinion that the reasonableness of these costs can be determined and should be included in the termination proposal, as direct delayed and disruption costs associated with the Government's actions.

3) <u>G&A Expense</u> - Questioned - <u>$242,162</u>

As stated by DCAA, these costs represent effort related to the executive and contract administrator functions for the subject contract. DCAA contends that these costs are not settlement costs and represent normal indirect G&A activities incurred on the contract which should be recouped from the normal application of the G&A rate.

I agree that the claimed costs are not settlement expense nor do I believe that SDC proposed them as such. These costs represent the

executive and contract administration effort resulting from the in excess three (3) year delay caused by the Government. The hours claimed can be reviewed by comparing the proposed hours by employee and period to the attached timeline. Furthermore, the recovery of these costs through the normal application of G&A is unreasonable for the following reasons:

a) The original contract for the base period had a period of performance of 8 May 2000 through 2 February 2001. The contract was terminated on 17 February 2004. A Government caused delay of more than three (3) years was experienced.
b) During the over three (3) year delay, the executive and contract administration provided support to the contract, which is not commensurate with the recovery calculated using the typical G&A recovery.
c) The hours claimed can be reviewed by comparing the proposed hours by employee and period to the attached timeline.
d) Since the contract was not on a stop work order, the company employees were required to perform services in an attempt to complete the contract requirements.

As indicated in the response to other costs, the claimed hours have been identified by employee and period, which can be verified to payroll records. Since the employees are typically G&A, they did not charge a specific job number. However, the reasonableness of the hours can be evaluated based upon the services rendered.

SDC has made an adjustment to their DCAA annual submissions in

order to eliminate the double accounting issue raised by the DCAA. The basis for the adjustment is that the services provided were unlike the normal services provided during contract performance. The services under the subject contract were unique and caused by the delay and disruption resulting from the Government actions.

4) Profit - Questioned - $149,792

DCAA has questioned the proposed profit of $63,830 and calculated a loss adjustment of $85,962. The DCAA position is based on the failure to understand that the proposed other costs and G&A expense are attributable to delay and disruption costs caused by the Government actions. Since the contract experienced a delay in excess of three (3) years as a result of the Government actions it is my position that an actual profit experience can not be measured. Consequently, it is my position that a 10% factor is reasonable utilizing the DOD weighted guidelines applied to the DCAA accepted Teledyne Brown Engineering costs. Therefore, profit should be $39,191 (10% x $391,913).

B) TCO Settlement Offer

1) Teledyne Brown Engineering Costs

The TCO's general position is based upon FAR 52.209-4 which was included in the subject contract. The TCO has failed to consider the following:

a) The Government extended the delivery period for first article to 29 August 22003 from 8 August 2000 in unilateral modification P00005. These extensions were the result of Government actions and

failure to provide the Digital Data as required under the contract.

b) On 13 March 2000, SDC provided Ms. Geraldine Williams of AMCOM with a revised proposal B. In this proposal, the material costs bid "assumes a lot purchase of required materials for a procurement of 129 boards." Further the letter states "Material costs are based on a one (1) lot material purchase for 129 boards to accommodate obsolescence issues associated with some of the parts."

This document shows that AMCOM was aware that all material was being purchased.

c) On 4 April 2000, SDC provided Ms. Geraldine Williams of AMCOM with a revised proposed C. In this proposal SDC stated the following: "Due to obsolescence issues and to ensure SDC's ability to meet contract requirements, our direct material price contained in the attached pricing options includes the contract requirement for producing 129 boards. The method of up-front material purchasing provides the most beneficial cost and effective means of producing the boards under this solicitation. Material is burdened with material handling, general and administrative costs, and fee."

This document again shows that AMCOM was aware that all material was being purchased.

d) This Government utilized Revision C to make a bottom line counter offer as indicated in a fax from Geraldine Williams of AMCOM on 4/26/00. In the fax, Ms. Williams states "I am forwarding a bottom line counter offer to your most recent proposal (Revision C) for 2 each

first articles and 22 each production units (know quantity) and five option years to the above referenced Request for Proposal." I would also like to point out that Ms. Williams left it necessary to remind SDC that "options are exercised as needed and these options may or may not be exercised." However, Ms. Williams did not reiterate the first article clause, most likely since she was aware that all material was being purchased prior to first article approval. In fact Ms. Williams identified the 24 units as "Known Quantity".

e) In the material review review performed by DCMC and furnished to Ms. Geraldine Williams of AMCOM, the Industrial Specialist indicated that "The costs of additional First Article submissions and parts replacement and requalification efforts due to DMS issues expected to develop over the next five years would require the contracts to propose huge risk premiums that would dominate the current year material costs for a single purchasing effort for the entire contract quantity during the initial production lot buy." The Government was able to take advantage of the quantity buy since the huge risk premiums were not incurred nor passed on to the Government.

f) The DCAA did not take exception to the material costs based upon the TCO position, even though their Contract Audit Manual specifically addresses this issue as follows:

"A contract may specify that the government must approve a preproduction model before delivery of any production units. The

contract may also prohibit the contractor from obtaining materials or proceeding with production before the government can test and approve the preproduction model. When the government terminates a contract containing these restrictions before preproduction model approval, only allowable design costs and costs incurred for the preproduction model are acceptable a termination costs. The presence of inventory items and costs for making deliverable items may suggest that the contractor unreasonable accelerated production. Ordinarily, these costs would be unallowable."

It is my opinion that all of the above items demonstrate that the Government negotiator was well aware of the proposal by SDC to purchase all material prior to the first article approval. Therefore by acceptance of the proposal, SDC was authorized to purchase the material . In addition it appears that the DCAA believed that the Government approved the purchase and therefore did not question the costs.

In summary, it is my opinion that though these costs would ordinarily be unallowable, the circumstances regarding the Government knowledge, the Government price advantage and the Government caused delay and disruption, justifies the inclusion of the Teledyne Brown Engineering costs in the termination proposal.

2) G&A Expense

The TCO has taken the G&A rate calculated by the DCAA and applied it to calculated cost input. It is my opinion that the normal application of

G&A does not provide a reasonable recovery of costs incurred for the reasons set forth in III A2 and 3 above. Furthermore, it is my opinion that the actual hours expended by company representatives should be used to negotiate a reasonable business settlement.

3) Profit

The TCO has calculated a 10% profit which is reasonable based upon my analysis as set forth in III A4 above.

C) Recommended Settlement Proposal

I have calculated a reasonable settlement to be $767,223 based upon the calculations in Exhibit A.

The above calculations have been made within a reasonable degree of accounting certainty.

Ernest Agresto
10/28/04

EXHIBIT A

# Systems Development Corporation
# Summary of Recommended
# Termination Settlement

| | | Note |
|---|---|---|
| Settlement With Subcontractors | $ 391,913 | 1 |
| Other Cost | 19,303 | 2 |
| G&A Expense | 297,500 | 3 |
| Profit | 39,191 | 4 |
| Settlement Expense | 19,316 | 5 |
| **Total Recommended Termination Settlement** | **$ 767,223** | |

## Notes

1. This represents the amount accepted by the DCAA in their audit report based upon an assist audit.
2. Represents delay and disruption costs incurred for the buyer, procurement clerk and data entry clerk effort during contract performance.
3. Represents delay and disruption costs incurred for executive and contract administration effort during contract performance.
4. The profit represents the application of the TCO accepted 10% profit factor to the settlement with subcontractors of $391,913. Profit was not applied to other cost and G&A expense since they are proposed as delay and disruption costs and not costs applicable to normal production.
5. Settlement costs represent the accepted $14,316 plus estimated $5,000 additional costs which includes effort related to the response.

# Report Regarding DCAA and TCO Positions Related To Termination Proposal Submitted By Systems Development Corporation Under Contract DAAH01-00-C-0077

I. QUALIFICATIONS

I am a Certified Public Accountant (CPA) in private practice since 1980. My practice is primarily related to Government Contract and construction accounting. As I established my accounting practice, I was a full time assistant professor of accounting at Rutgers University. Prior to starting my practice I was an auditor for the Defense Contract Audit Agency (DCAA) a Federal Government agency. During that time I was also an Instructor of accounting at Morris County and Bergen County Colleges. I received my bachelor and master's degrees from Seton Hall University.

I have been accepted as an expert in the following judicial fora:

a. United States District Court.

b. New Jersey Superior Court.

c. Armed Services Board of Contract Appeals.

d. Department of Transportation Board of Contract Appeals.

e. General Services Administration Board of Contract Appeals.

f. Department of Energy Board of Contract Appeals.

g. United States Federal Court of Claims.

h. Various State Courts.

i. Various County Courts.

j. Various Arbitration and mediation hearings.

I have published for the Small Business Administration, under the Small Business 7 (J) program; a manual and seminar workbook entitled "How to Survive a DCAA Audit". I have conducted numerous seminars as a paid lecturer with Technology Training Corporation.

I have also been a guest lecturer on numerous occasions for the following organizations:

A) National Contract Management Association.

B) Association of Government Accountants.

C) Association of Women Owned Businesses.

I am a member of various professional organizations and as a committee member of the Defense Contractor's Committee, I was part of the final review of the Audit and Accounting Guide "Audits of Federal Government Contractors" published by the American Institute of Certified Public Accountants.

I have consulted and testified on the calculation and the review of damages in a variety of circumstances over the past 27 years.

II. SCOPE OF EFFORT

I was retained by Systems Development Corporation to review, offer my opinions and to provide comments to the DCAA audit report and the position of the TCO, as set forth in the settlement offer.

I have relied upon the following:

A) FAR 49

B) FAR 31

C) Contract Terms including modifications

D) Contract Price

E) DCAA Contract Audit Manual

III. CONCLUSIONS

The following represent my opinion regarding the DCAA and TCO position along with the calculations of what I consider to be a reasonable settlement.

A) DCAA Position

1) Purchase Parts and Settlements with Subcontracts

I do not object to the inclusion of the subcontractor claim as a settlement. Furthermore the amount questioned by the DCAA assist audit is immaterial so I have accepted the amount the DCAA figured.

2) Other Costs - Questioned - $19,303

As stated by DCAA these costs represent effort related to buyer, procurement clerk and data entry clerk activity. Though these costs are typically recovered through the company G&A rate, this method of recovery is unreasonable for the following reasons:

a) The original contract for the base period had a period of performance of 8 May 2000 through 2 February 2001. The contract was terminated on 17 February 2004. A Government caused delay of more than three (3) years was experienced.

b) During the over three (3) year delay the SDC buyer procurement clerk and data entry clerk provided support to the contract which is not commensurate with the recovery calculated using the typical G&A recovery methodology.

c) The hours proposed can be verified to events that took place during the contract performance. The timeline is attached.

d) Since the contract was not on a stop work basis, the company employees were required to perform services in an attempt to complete the contract requirements.

The hours claimed have been identified by employee and period