and can be verified to payroll records. Since the employees are typically indirect employees, the employees did not charge a specific job number. However, the reasonableness of the hours can be evaluated based upon the services rendered.

SDC has made an adjustment to their DCAA annual submissions in order to eliminate the double accounting issue raised by the DCAA. The basis for this adjustment is that the services provided were unlike the normal services provided during contract performance. The services under the subject contract were unique and caused by the delay and disruptions resulting from the Government's actions. SDC has elected to include the delay and disruption costs in the termination claim rather than submit a separate request for equitable adjustment.

Consequently, it is my opinion that the reasonableness of these costs can be determined and should be included in the termination proposal, as direct delayed and disruption costs associated with the Government's actions.

3) G&A Expense - Questioned - $242,162

As stated by DCAA, these costs represent effort related to the executive and contract administrator functions for the subject contract. DCAA contends that these costs are not settlement costs and represent normal indirect G&A activities incurred on the contract which should be recouped from the normal application of the G&A rate.

I agree that the claimed costs are not settlement expense nor do I believe that SDC proposed them as such. These costs represent the

executive and contract administration effort resulting from the in excess three (3) year delay caused by the Government. The hours claimed can be reviewed by comparing the proposed hours by employee and period to the attached timeline. Furthermore, the recovery of these costs through the normal application of G&A is unreasonable for the following reasons:

a) The original contract for the base period had a period of performance of 8 May 2000 through 2 February 2001. The contract was terminated on 17 February 2004. A Government caused delay of more than three (3) years was experienced.

b) During the over three (3) year delay, the executive and contract administration provided support to the contract, which is not commensurate with the recovery calculated using the typical G&A recovery.

c) The hours claimed can be reviewed by comparing the proposed hours by employee and period to the attached timeline.

d) Since the contract was not on a stop work order, the company employees were required to perform services in an attempt to complete the contract requirements.

As indicated in the response to other costs, the claimed hours have been identified by employee and period, which can be verified to payroll records. Since the employees are typically G&A, they did not charge a specific job number. However, the reasonableness of the hours can be evaluated based upon the services rendered.

SDC has made an adjustment to their DCAA annual submissions in

order to eliminate the double accounting issue raised by the DCAA. The basis for the adjustment is that the services provided were unlike the normal services provided during contract performance. The services under the subject contract were unique and caused by the delay and disruption resulting from the Government actions.

4) <u>Profit</u> - Questioned - <u>$149,792</u>

DCAA has questioned the proposed profit of $63,830 and calculated a loss adjustment of $85,962. The DCAA position is based on the failure to understand that the proposed other costs and G&A expense are attributable to delay and disruption costs caused by the Government actions. Since the contract experienced a delay in excess of three (3) years as a result of the Government actions it is my position that an actual profit experience can not be measured. Consequently, it is my position that a 10% factor is reasonable utilizing the DOD weighted guidelines applied to the DCAA accepted Teledyne Brown Engineering costs. Therefore, profit should be $39,191 (10% x $391,913).

B) <u>TCO Settlement Offer</u>

1) <u>Teledyne Brown Engineering Costs</u>

The TCO's general position is based upon FAR 52.209-4 which was included in the subject contract. The TCO has failed to consider the following:

a) The Government extended the delivery period for first article to 29 August 22003 from 8 August 2000 in unilateral modification P00005. These extensions were the result of Government actions and

failure to provide the Digital Data as required under the contract.

b) On 13 March 2000, SDC provided Ms. Geraldine Williams of AMCOM with a revised proposal B. In this proposal, the material costs bid "assumes a lot purchase of required materials for a procurement of 129 boards." Further the letter states "Material costs are based on a one (1) lot material purchase for 129 boards to accommodate obsolescence issues associated with some of the parts."

This document shows that AMCOM was aware that all material was being purchased.

c) On 4 April 2000, SDC provided Ms. Geraldine Williams of AMCOM with a revised proposed C. In this proposal SDC stated the following: "Due to obsolescence issues and to ensure SDC's ability to meet contract requirements, our direct material price contained in the attached pricing options includes the contract requirement for producing 129 boards. The method of up-front material purchasing provides the most beneficial cost and effective means of producing the boards under this solicitation. Material is burdened with material handling, general and administrative costs, and fee."

This document again shows that AMCOM was aware that all material was being purchased.

d) This Government utilized Revision C to make a bottom line counter offer as indicated in a fax from Geraldine Williams of AMCOM on 4/26/00. In the fax, Ms. Williams states "I am forwarding a bottom line counter offer to your most recent proposal (Revision C) for 2 each

first articles and 22 each production units (know quantity) and five option years to the above referenced Request for Proposal." I would also like to point out that Ms. Williams left it necessary to remind SDC that "options are exercised as needed and these options may or may not be exercised." However, Ms. Williams did not reiterate the first article clause, most likely since she was aware that all material was being purchased prior to first article approval. In fact Ms. Williams identified the 24 units as "Known Quantity".

e) In the material review review performed by DCMC and furnished to Ms. Geraldine Williams of AMCOM, the Industrial Specialist indicated that "The costs of additional First Article submissions and parts replacement and requalification efforts due to DMS issues expected to develop over the next five years would require the contracts to propose huge risk premiums that would dominate the current year material costs for a single purchasing effort for the entire contract quantity during the initial production lot buy." The Government was able to take advantage of the quantity buy since the huge risk premiums were not incurred nor passed on to the Government.

f) The DCAA did not take exception to the material costs based upon the TCO position, even though their Contract Audit Manual specifically addresses this issue as follows:

"A contract may specify that the government must approve a preproduction model before delivery of any production units. The

contract may also prohibit the contractor from obtaining materials or proceeding with production before the government can test and approve the preproduction model. When the government terminates a contract containing these restrictions before preproduction model approval, only allowable design costs and costs incurred for the preproduction model are acceptable a termination costs. The presence of inventory items and costs for making deliverable items may suggest that the contractor unreasonable accelerated production. Ordinarily, these costs would be unallowable."

It is my opinion that all of the above items demonstrate that the Government negotiator was well aware of the proposal by SDC to purchase all material prior to the first article approval. Therefore by acceptance of the proposal, SDC was authorized to purchase the material. In addition it appears that the DCAA believed that the Government approved the purchase and therefore did not question the costs.

In summary, it is my opinion that though these costs would ordinarily be unallowable, the circumstances regarding the Government knowledge, the Government price advantage and the Government caused delay and disruption, justifies the inclusion of the Teledyne Brown Engineering costs in the termination proposal.

2) G&A Expense

The TCO has taken the G&A rate calculated by the DCAA and applied it to calculated cost input. It is my opinion that the normal application of

G&A does not provide a reasonable recovery of costs incurred for the reasons set forth in III A2 and 3 above. Furthermore, it is my opinion that the actual hours expended by company representatives should be used to negotiate a reasonable business settlement.

3) <u>Profit</u>

The TCO has calculated a 10% profit which is reasonable based upon my analysis as set forth in III A4 above.

C) <u>Recommended Settlement Proposal</u>

I have calculated a reasonable settlement to be $767,223 based upon the calculations in Exhibit A.

The above calculations have been made within a reasonable degree of accounting certainty.

Ernest Agresto
10/28/04

EXHIBIT A

# Systems Development Corporation Summary of Recommended Termination Settlement

| | | Note |
|---|---|---|
| Settlement With Subcontractors | $ 391,913 | 1 |
| Other Cost | 19,303 | 2 |
| G&A Expense | 297,500 | 3 |
| Profit | 39,191 | 4 |
| Settlement Expense | 19,316 | 5 |
| Total Recommended Termination Settlement | $ 767,223 | |

## Notes

1. This represents the amount accepted by the DCAA in their audit report based upon an assist audit.

2. Represents delay and disruption costs incurred for the buyer, procurement clerk and data entry clerk effort during contract performance.

3. Represents delay and disruption costs incurred for executive and contract administration effort during contract performance.

4. The profit represents the application of the TCO accepted 10% profit factor to the settlement with subcontractors of $391,913. Profit was not applied to other cost and G&A expense since they are proposed as delay and disruption costs and not costs applicable to normal production.

5. Settlement costs represent the accepted $14,316 plus estimated $5,000 additional costs which includes effort related to the response.

**DEFENSE CONTRACT MANAGEMENT AGENCY**
DEFENSE CONTRACT MANAGEMENT AGENCY ATLANTA
ATTN: DCMAE-GATC
2300 Lake Park Drive, Suite 300
Smyrna, GA 30080-4091
Tel: (678) 503-6351
Fax: (678) 503-6034
E-mail: Paul.Slemons@dcma.mil

IN REPLY REFER TO DCMAE-GATC

November 3, 2004

SUBJECT: Terminated Contracts DAAH01-00-C-0077 and DAAH01-00-P-0741, Systems Development Corporation, Huntsville, AL, Docket A049531EA

Systems Development Corporation
ATTN: Ms. Virginia P. Gilchrist, President
225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256)382-4600
FAX: (256)382-4601
E-mail: vpgilchrist@sdchsv.com

Dear Ms. Gilchrist:

On Contract DAAH01-00-C-0077, the first article limitation clause (FAR 52.209-4, incorporated at ¶ I-65 of the contract) states, "(g) Before first article approval, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor. Before first article approval, the costs thereof shall not be allocable to this contract for (1) progress payments, or (2) termination settlements if the contract is terminated for the convenience of the Government." Further, Alternate II of the clause allows the PCO to state, "(h) Before first article approval, the Contracting Officer may, by written authorization, authorize the Contractor to acquire specific materials or components or to commence production to the extent essential to meet the delivery schedules." No such exception was incorporated. Your proposal dated April 4, 2000 states, "Due to obsolescence issues and to ensure SDC's ability to meet contract requirements, our direct material price contained in the attached pricing options includes the contract requirement for producing 129 boards." Your argument is this notice and an absence of government response represents tacit approval of the entire purchase prior to first article approval. Such is not the case; knowledge does not equate to permission.[1] In this case, SDC seeks not only to place the risk of purchasing production material onto the Government, but even the risk of purchasing production material for unexercised option years despite the PCO's explicit warning that, "Please remember that options are exercised as needed and these options may or may not be exercised" [emphasis hers]. While SDC proposed to buy all of the materials in the base year, it did not have to do so before acceptance of the first articles.

[1] In fact, even if the government is aware the contractor is acquiring production materials before first article approval this knowledge does not then foist this risk onto the Government. See *Century Electronics* (ASBCA No. 29,123, 85-3, BCA ¶ 18,231) "Nor did silence of the Government, with knowledge that production was proceeding, imply a waiver of the written approval requirement of the First Article clause. Century had a right to proceed with production, at its own risk, and the Government had no obligation to repeat a warning of the risk that was already expressly stated in the contract. There is no 'forfeiture' or 'harshness of result' in the fact that Century took the risk of proceeding with production, without legal or practical compulsion to do so, and lost."

However, I would like to amicably settle this termination. FAR 49.207 -- Limitation on Settlements states, "The total amount payable to the contractor for a settlement, before deducting disposal or other credits and exclusive of settlement costs, must not exceed the contract price less payments otherwise made or to be made under the contract." I would like to offer to settle the contract for the contract price of $430,000 (additional payment of $392,732). There is no basis in the proposal for an equitable adjustment which would raise the contract price. An equitable adjustment reflects a change in the scope of the contract. The termination was merely the exercise of a contractual clause, not a change.

On contract DAAH01-00-P-0741, SDC proposed $20,783. I would like to offer $1,462 [$1,281(TBE settlement)*1.1412 (for G&A) = $1,462] to settle this contract, contingent on SDC providing support for TBE's charges of $1,281.00. The proposed costs consist of $1,929 for procurement people with no supporting timesheets, $14,559.00 for G&A consisting of executive (G&A) labor with no supporting timesheets for $14,429 and the application of the G&A rate for $130.00 on the subcontract costs, 10 percent profit on these costs, settlement expenses of $1,366 with no timesheets, and a $1,281.00 settlement with the subcontractor, Teledyne Brown Engineering. The labor charges are not adequately supported. While convenience termination proposals should be settled on the principle of fair compensation to the contractor rather than on a strict accounting basis, mere speculation and did not discharge the contractor's burden of proving that the purported costs were in fact incurred[2]. See also Humphrey Logging Co. (1985) AGBCA Nos. 84-339-3, 85-181-3, 85-204-3 BCA ¶ 18,343 "Under a termination for convenience, a contractor has the burden of proving costs incurred. *John M. Brown*, AGBCA No. 77-105, 78-1 BCA ¶ 12,892. Damages must be substantiated and supported by a preponderance of the evidence. *Wunderlich Contracting Co. v. United States [11 CCF ¶ 80,069], 175 Ct.Cl. 180, 351* F.2d 956 (1966). The brief argues that the amount sought represents Appellant's 'reasonable outlay of expenditures.' Since there is no

[2] Arctic Corner, Inc. (1986) VABCA No. 2393, 86-3 BCA 19278 see also: Lisbon Contractors, Inc. v. U.S. (CA-FC 1987) 34 CCF 75,358;828 F.2d 759; Meyer Labs, Inc. (1989) ASBCA No. 28640, 90-1 BCA 22,570; Structural Painting Corp. (1989) ASBCA No. 33841, 89-3 BCA 21,969; Wolfe Construction Co. (1988) ENG BCA No. 5309, 88-3 BCA 21,122; Air Cool, Inc. (1987) ASBCA No. 32838 88-1 BCA 20,399; Wolverine Aerial Spraying, Inc. (1987) No. 87-326-3, 88-1 BCA 20,373; Tagarelli Bros. Construction Co., Inc. (1987) ASBCA No. 34793, 88-1 BCA 20,363; Breed Corp. (1987) ASBCA No. 15163, 87-3 BCA 19,999; H.H. Christian Co.(1987) AGBCA No. 82-262-1, 84-279-1, 86-201-1, 87-1 BCA 19,650; Martha S. Langford (1987) ASBCA No. 33017, 87-1 BCA 19,509; Reese Industries (1986) ASBCA No. 29029, 86-2 BCA 18,962; Walber Construction Co. (1986) HUD BCA No. 79-428-C46, 86-2 BCA 18,886,A-American, Inc. (1984) ASBCA No. 28823, 84-2 BCA 17,479; Walber Construction Co. (1983) HUD BCA No. 79-421-C40, 83-2 BCA 16,641; Martin Machine Works, Inc. (1977) ASBCA Nos. 20914, 20915, 77-2 BCA 12,685; James W. Frey (1976) ASBCA No. 20258, 76-2 BCA 12,060; John James Eatrides (1976) ASBCA No. 20247, 76-2 BCA 11,980; R-D Mounts, Inc. (1975) ASBCA No. 17668, 17669, 75-1 BCA 11,237; Bell and Howell Co. (1974) ASBCA No. 18464, 18465, 75-1 BCA 10,993; Clary Corp. (1974) ASBCA No. 19274, 74-2 BCA 10,947; Herbert R. Button (1972) ASBCA No. 17281, 73-1 BCA 9780; Carl D. Rutledge (1972) ASBCA No. 17108, 72-2 BCA 9744; Colonial Metals Co. (1972) ASBCA No. 15860, 72-1 BCA 9328 Roberts International Corp. (1971) ASBCA No. 15118, 71-1 BCA 8869; Delaware Tool & Die Works, Inc. (1971) ASBCA No. 14033, 71-1 BCA 8860 Chamberlain Mfg. Corp. (1971) ASBCA No. 14759, 71-1 BCA 8837; Jules Teitelbaum (1970) ASBCA No. 12885, 70-1 BCA 8210; Algonac Mfg. Co. (1966) ASBCA No. 10534, 66-2 BCA 5731; Rheem Mfg. Co. (1958) ASBCA No. 4001, 58-1 BCA 1822; D.R. Haddox (1957) IBCA No. 84, 57-2 BCA 1466 Chris Kaye Plastics Mfg. Co. (1956) ASBCA No. 3667, 56-2 BCA 1124; and Sturdy-Cage Projects, Inc. (1950) ASBCA No. T-433, 5 CCF 61,175.

corroborative evidence in the record to support this claim element, the burden of proof has not been met and this portion of the appeal is denied."

Thus the Government is offering $431,462 to settle these two contracts. This is an offer made in an attempt to reach settlement. I strongly urge you to consider this offer. In the event we cannot achieve a bilateral settlement, the government's unilateral position will be considerably lower.

Should you have any questions, please contact the undersigned at (678) 503-6351, FAX (678) 503-6034, or e-mail Paul.Slemons@dcma.mil.

Paul E. Slemons

PAUL E. SLEMONS
Termination Contracting Officer

cc:
DCMAE-GATC/Leigh Owens, Esq.

SDC

November 12, 2004

DCMA Atlanta
ATTN: DCMAE-GATC/P. Slemons
2300 Lake Park Drive, Suite 300
Smyrna, GA 30080-4091

Dear Mr. Slemons:

Unfortunately after discussions with our subcontractor, they are unwilling to accept the inventory in order to reduce their claim. As a good faith attempt to settle, we offer to discount the subcontractor costs, SDC costs, other than settlement costs, and profit at 20%. The proposal therefore is as follows:

| | | |
|---|---|---|
| Settlements with Subcontractor | $313,530 | (80% x $391,913) |
| Other Cost | 15,442 | (80% x $ 19,303) |
| G & A | 238,000 | (80% x $297,500) |
| Profit | 31,353 | (80% x 39,191) |
| Settlement Expense | 19,316 | |
| | $617,641 | |

We understand that this amount is in excess of contract value but it should be noted that the excess costs are due to delays and disruption caused by the Government during contract performed and therefore should be considered as an equitable adjustment to the original contract. This will partially reimburse SDC for the excess costs incurred resulting from the Government actions. Our subcontractor TBE has provided the following analysis to substantiate their entitlement to payment for the inventory:

"**GOVERNMENT OBLIGATIONS ON SDC HAWK I CONTRACT**

**I. SUMMARY.**

A. In May 2000, AMCOM awarded Contract No. DAAH01-00-C-0077 ("the Contract") to SDC for supply of Hawk circuit card units. The Contract was awarded as a build-to-print, production contract with a Level 3 Technical Data Package ("TDP"). The TDP provided by the Government contains defects and deficiencies that preclude performing

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

the Contract on a build-to-print, production basis. The Government has not corrected and/or resolved defects and deficiencies of the TDP to allow production on a build-to-print basis.

B. The delivery schedule specified in the Contract was: (i) for two first articles - 8 August 2000; and, (ii) for the first twenty-two 22 production units with first article – 2/3 February 2001. After the above specified delivery schedules passed, the Government failed to terminate the Contract or reestablish a new delivery schedule for the Contract. Consequently, the Government has waived the delivery schedule for the Contract, and no delivery schedule currently exists. To unilaterally reestablish a new delivery schedule, the Government must take the contractor (SDC) as the Government finds SDC. That means without correcting the TDP to allow production on a build-to-print basis, and providing SDC the information/equipment it needs, the Government cannot unilaterally reestablish a new delivery schedule.

C. During negotiations for the Contract, the parties understood and agreed that SDC's pricing was based on SDC acquiring all material required for contract performance on a one-time buy, including material necessary for option quantities. Accordingly, the Contract authorized SDC to procure all material quantities necessary for contract performance, including unexercised option quantities, prior to first article approval. Pursuant to such contract authority, on 6 June 2000, SDC awarded Purchase Order SDC006 ("the Subcontract") to TBE to acquire material for parts required by the Contract. TBE did acquire all the material required by the Subcontract with SDC, which parts are ready for delivery. The Government cannot now refuse to accept and pay for material acquired/contracted for prior to first article approval.

## II. FACTS.

### The Basic Contract

1. The Government and SDC executed the Contract in May 2000.

2. The Contract is a build-to-print, production Contract for 2 first articles and 22 production units, with remaining possible units priced in range quantities as options (up to a total of 129 units). Contract, Section B.

3. The Contract's delivery schedules are listed as ---

   a. for two first articles - 8 August 2000 (Contract CLIN 0001AA);

   b. for the first twenty-two 22 production units with first article – 2/3 February 2001 (Contract CLIN 0001AD).

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

5. SDC's Offer was incorporated in the Contract. Contract, SF26, Block 18.

6. At Contract provision I-65, the Contract contains the First Article Clause at FAR 52.209-4, without Alternate I. The clause without Alternate I puts the risk of purchase of production quantities prior to first article approval on the contractor. The clause with Alternate I permits the contractor to purchase production quantities prior to first article with the approval of the contracting officer.

7. The Contract contained the standard contract provisions for fixed-price supply contracts, including the FAR 52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) clause. Contract clause I-43.

**SDC's Offer**

8. In SDC's Proposal Revision B (dated 13 March 2000), submitted to AMCOM's Geraldine Williams, SDC's proposed prices were based on buying material for the entire quantity of 129 Boards, which includes first articles and production units (including option quantities), as an up-front, one-time buy.

9. In a 31 March 2000 Memo to AMCOM's Geraldine Williams, DCMC Industrial Specialist Charles Kirch noted that:

   a. he had performed a material cost review of SDC's proposal at AMCOM request;

   b. he approved of SDC's pricing concept of a one-time, up-front material buy (but questioned some of SDC's cost and pricing data for the material);

   c. any other material pricing methodology would mean that SDC's option year pricing would have to be very high;

   e. the economic incentives of a one-time, up-front buy was obvious; and

   f. the material could be a separate contract line item.

10. In SDC's Proposal Revision C (dated 4 April 2000), submitted to AMCOM's Geraldine Williams, SDC -

    a. noted that it continued its proposal pricing based on the concept of a one-time, up-front material buy for the entire quantity of 129 Boards (which includes first articles and production units (including option quantities), as an up-front, one-time buy), and

    b. revised its pricing based on Mr. Kirsh's comments.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

c. Revision C, Attachment B pricing basic contract quantities (24) and option range quantities (105) , total 129 is based on the one-time, up-front buy of material for 129 boards.

11. In a 2 May 2000 letter, SDC's Ms. Gilchrist

a. accepted AMCOM's counter offer for a fixed quantity of 2 first article and 22 production units and option year pricing as reflected in SDC's Revision C proposal; and

b. reiterated unit prices, to include prices for option year ranges in Attachment A to that letter, which, for option years: (I) are the same as reflected in Revision C, Attachment B, and (ii) do not include costs for materials for option years.

12. Unit prices, including option unit prices, as reiterated in Attachment A to Ms. Gilchrist's 2 May letter and as stated in the Contract, were clearly based on the one-time, up-front material buy communicated to AMCOM by SDC and DCMC.

13. Costs of a one-time, up-front material buy: (i) were priced into Contract quantities, (ii) were the basis of the award price; and, (iii) AMCOM was, or should have been, aware of such pricing.

**The Subcontract**

14. After award of the Contract, SDC took timely action to make a one-time, up-front material buy as the parties had envisioned for material quantities required for Contract performance. Namely, on 6 June 2000, SDC awarded TBE the Subcontract (SDC Purchase Order SDC006) in the amount of $397,771.58 to acquire material for parts required for SDC Contract performance.

15. By Revision 2 to the Subcontract, dated 11 July 2000, the total Subcontract purchase price for delivery of material to fabricate, assemble, and deliver 129 Hawk circuit cards, including kitting and delivery to SDC, was increased to $403,297.58 to cover costs for receiving, inspection, and kitting.

16. TBE did timely acquire Contract conforming parts required by the Subcontract with SDC, which parts are ready for delivery.

17. TBE has completed all Subcontract requirements and awaits only delivery instructions and payment for final Subcontract close-out.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

**The TDP**

18. The specifications and TDP purport to be Level III, ready for build-to-print, mass production.

19. The specifications and TDP were not ready for build-to-print, mass production. Generally, the TDP appears to be a package that was developed in the 1960's or 1970's and accepted as a Level III package, while, in fact, several key pieces of data and procedures had not been procured from the developer by the government. These items include: (1) electronic programmable parts data, (2) electronic raw board fabrication and test data (*i.e.*, ICT and Gerber files), and (3) a clear and unequivocal set of functional test procedures that can be used for test, debug and acceptance of the finished product. It also appears that these packages have not been checked or updated to reflect what technical data is actually available from the development effort, and it fails to include newer regulations by military and non-military government agencies (e.g. EPA) and updated MIL-Specs and MISs.

20. Specific data defects and deficiencies include, but are not limited to, the following.

   a. The TDP references program code in electronic format for Programmable Parts that has not been made available by the Government as provided in the TDP. The data is not available to SDC, and the Government has indicated that it will not make the required data available to SDC. Such data is required for build-to-print production of the Hawk circuit cards.

   b. There are no clearly-defined "go/no-go" test procedures for acceptance that can be performed by production technicians that document results showing the boards are acceptable to the government.

   c. Ambiguity in the MIS or performance spec, such as MIS-41341, appears to require that all the boards (not only First Articles) meet all the contents of the performance spec, even though the government said it was not actually desired that the production boards be subjected to life-draining environmental tests. The exact set of tests required for acceptance testing should be clearly defined in the RFP and contract.

   d. The TDP and referenced MISs (performance specs), list old, obsolete and expensive test equipment for use in testing the boards, equipment and procedures more appropriate for a developmental, not a production, effort.

   e. The specs and drawings call for use of Ozone Depleting Chemicals during cleaning and preparation of the PWBAs. However, current EPA regulations discourage or prohibit use of such materials in modern-day board processing and assembly.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

21. While the parties have been discussing alternatives in an attempt to overcome specification and TDP defects/deficiencies so that SDC might complete the Contract, AMCOM has been unable to supply the necessary data and procedures that will allow SDC to perform the Contract on a build-to-print, production basis.

## III. ANALYSIS.

### A. The Defective Specifications Provided by the Government Constitute a Constructive Change, Entitling SDC to an Equitable Adjustment..

The law is very clear that the Government warrants the adequacy of specifications it provides, and that a contractor is entitled to an equitable adjustment under the Changes clause if the Government provides defective specifications. The basis for this legal premise may be best set forth in Greenbrier Industries, ASBCA 22121, 81-1 BCA ¶15,057, where the Board noted at 74,135:

> Since each appears to be an innocent party, the law of warranty permits the [contractor] to have recourse against the Government as author of the specifications, the root cause of the … production problems.

The Government's failure to provide SDC program code in electronic format for Programmable Parts as required by the TDP (FACTS 20a) can be considered either as a Government constructive change under the doctrine of implied warranty of specifications or as a constructive change for failure to provide required property under the Government provided property clause. The result is the same. The Government is legally responsible for all costs that SDC has and will incur due to that failure. If the Government is insistent that SDC develop those codes, than the Government would be responsible for all developmental and production costs associated therewith.

The Government is also liable for increased costs of performance if the specification prescribes procedures and tests (or fails to provide such procedures and tests) that make performance at the contemplated level of production impossible. See *e.g.*, La Crosse Garment Manufacturing Co. v. United States, 432 F.2d 1377 (Ct. Cl. 1970). The lack of clearly-defined "go/no-go" test procedures for acceptance, the ambiguities in performance specifications, and the specification-listed old and obsolete test equipment and procedures (FACTS 20b-d) clearly prohibit production of the Hawk circuit boards on a build-to-print, mass production basis. These defects fall within the types noted in La Crosse, where the Board explained at 180-81:

> "Mass production" is a variable; there are countless degrees between laborious production of units, one at a time, and there rapid flow on a production line.
>
> * * *

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

Performance may become unsatisfactory and costs may increase in varying degrees by reason of [specification defects] which may cause difficulties, interruptions, slowdowns and delays which interfere with mass production without making it impossible. The measure for determination of damages is therefore the degree of interference with satisfactory production.

Here, SDC's damages as a result of these interferences may also rise to the level of commercial impracticality due to the anticipated very high additional cost of performance because of the defects and deficiencies.

The specs and drawings which call for use of Ozone Depleting Chemicals during cleaning and preparation of the PWBA run afoul of current EPA regulations. FACTS 20e. This also makes the specifications defective. See, *e.g.*, Castle Construction Company, ASBCA 28509, 84-1 BCA ¶17,045.

Given that AMCOM has waived the delivery schedule and must take SDC as AMCOM currently finds SDC (see section IIIB below), specification defects and deficiencies must be corrected, with attendant costs, so as to allow SDC to perform before AMCOM may unilaterally reestablish a new delivery schedule.

**B. AMCOM has Waived the Delivery Schedule and Must Take SDC as it Finds SDC in order to Unilaterally Reestablish a New Delivery Schedule.**

The delivery schedule specified in the Contract is 8 August 2000 for two first articles, and 2/3 February 2001 for the first 22 production units with first article. FACTS 3. We are now in 2003, and SDC has not delivered (and cannot with current specification defects and deficiencies deliver) units called for by the schedule. We are way beyond any reasonable period of forbearance, and the Government has clearly waived the delivery schedule. *E.g.*, D. Joseph De Vito v. United States, 413 F 2d 1147 (Ct. Cl. 1969).

Any AMCOM unilaterally reestablished delivery date must be reasonable based on the performance capabilities of SDC at the time the schedule is unilaterally reestablished. See *e.g.*, Spasors Electronics Corp., ASBCA 12877, 70-1 BCA ¶8119. Without curing the specification defects and deficiencies, SDC will be unable to perform. AMCOM must first correct the specification defects and deficiencies before AMCOM can unilaterally reestablish a delivery schedule.

The Contract must come to some end. Since AMCOM has indicated that it cannot or will not correct the specification, performance completion according to the Contract is not a viable option, nor is a termination for default as AMCOM has waived the delivery schedule. It appears the only viable alterative for the parties is a termination for convenience.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

C. In any Convenience Termination, SDC is Entitled to Recover All its Material Costs.

1. The Contract Authorized an Up-Front Material Buy of Material for 129 Boards.

The Contract incorporated SDC's offer (FACTS 5), which included a one-time, up-front buy of material for 129 boards. FACTS 8-11. Contract pricing was based on a one-time, up-front buy of material for 129 boards. FACTS 12, 13.

The Contract contained the First Article Clause at FAR 52.209-4, without Alternate I. This would normally put the risk of purchase of production quantities prior to first article approval on the contractor. However, that is not the case here because of the incorporation of SDC's offer into the Contract, and the Government's clear influence on and acceptance of Contract pricing --- pricing which included a one-time, up-front buy of material for all quantities, including option quantities, required by the Contract. The Government would be obligated to reimburse SDC for SDC's entire up-front buy of material quantities if the Contract were terminated for convenience. This outcome is dictated, not only be the Contract itself, but also by well recognized legal principles of Mistake in Integration, Interpreting Ambiguities, and Estoppel.

With respect to a Mistake in Integration -

While it appears that there is more of a conflict between provisions (incorporation of SDC's offer versus incorporation of FAR 52.209-4 without Alternate I), the Contract must be reformed to reflect the parties intent. That intent is evidenced by the FACTS 8-13, which show the incorporation of SDC's offer into the Contract and the Government's influence on and acceptance of SDC pricing. Both of these factors show that the parties intent was to authorize SDC to make a one-time, up-front buy of all material quantities necessary to deliver, whether first article or production (including option quantities).

With respect to Ambiguity –

Where two Contract provisions appear to conflict, the overriding principle of contract interpretation is to interpret a contract as whole so as to avoid rendering terms meaningless, to avoid conflict, and to fulfill the principal purpose of parties. Here those principles dictate that the incorporation of SDC's offer means that the Contract must be read to mean that FAR 52.209-4 with Alternate 1 applies.

The Contract clearly incorporated SDC offer, which included a one-time, up-front buy of material for 129 boards. The principal purpose of the one-time, up-front buy of material for 129 boards, which was reflected in Contract pricing, was to save money for the Government. The Government participated in and accepted this pricing strategy. Reading the Government's acceptance of the incorporated offer as an agreement to reimburse SDC for the

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

one-time, up-front buy of material for 129 boards is the only way to: (i) avoid rendering SDC's incorporated offer meaningless, (ii) avoid conflict between SDC's offer and Contract pricing, and (iii) fulfill the parties' principal purpose of saving the Government money.

With respect to Estoppel (*See, e.g.*, American Electronics Laboratories v. United States, 774 F.2d 1110,1113 (1985) -

All the elements of estoppel are met.

1. The Government knew that SDC's offer and pricing were based on the one-time, up-front buy of material for 129 boards.

2 The Government, in accepting SDC's offer, intended for SDC to make a one-time, up-front buy of material for 129 boards, and/or SDC had a right to so believe.

3 SDC was not aware that the Government did not intend for SDC to make a one-time, up-front buy of material for 129 boards.

4 SDC relied on the Government's conduct by making the one-time, up-front buy of material for 129 boards.

Consequently, the Government is stopped from denying that the Contract authorizes a one-time, up-front buy of material for 129 boards.

**D. Impact on TBE of a termination for convenience.**

In the event that AMCOM terminates the Contract for convenience, there would be no impact on TBE. Under standard termination for convenience procedures, the Government is obligated to reimburse SDC its allowable costs, including material costs and costs of settlements with subcontractors, *e.g.*, TBE.

Under TBE's Subcontract, TBE is entitled to be reimbursed at the Subcontract price with respect to deliverable Subcontract items ready for delivery at the time of any SDC convenience termination. Since all items required by the Subcontract have been completed, TBE is entitled to be paid the full Subcontract price of $403,297.58. See FAR 49.108-3(a), 49.205(a). SDC is entitled to be reimbursed these costs.

If SDC or the Government requires TBE to take action other than delivery (*e.g.*, to take special action with respect to inventories, prepare justifications), such costs could be categorized as termination settlement expenses. In addition to the Subcontract price, TBE would be entitled to be reimbursed any such costs. A separate account should be opened to accumulate such costs. These possible additional TBE costs are allowable costs to SDC in the event AMCOM terminates the Contract for convenience.

SDC

TBE would deliver all Subcontract material to SDC, who would in turn provide them to the Government. Since the subcontracted material is conforming, the Government could provide the termination inventory to any replacement Hawk circuit card contractor as Government furnished material.

V. **Conclusion.**

It appears that the only viable option for all parties is to terminate the Contract for convenience because, *inter alia*, the Contract specification is defective, the Contract delivery schedule has been waived, and there appears to be no other way to end the Contract. Since SDC's offer incorporated in the Contract and the Contract's pricing included the one-time, up-front buy of material for 129 boards, the Government is obligated to reimburse SDC the costs of that material. TBE is entitled to be reimbursed in accordance with standard termination accounting. The Government is entitled to Contract inventories, which in turn can supply to other contractors as Government furnished material."

SDC believes that the TBE position is the correct legal position. In order to reach settlement SDC has proposed the above counter offer.

We hope to resolve this matter as soon as possible.

Sincerely,

Virginia P. Gilchrist
President

VPG/eds



225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

November 12, 2004

DCMA Atlanta
ATTN: DCMAE-GATC/P. Slemons
2300 Lake Park Drive, Suite 300
Smyrna, GA 30080-4091

Dear Mr. Slemons:

Unfortunately after discussions with our subcontractor, they are unwilling to accept the inventory in order to reduce their claim. As a good faith attempt to settle, we offer to discount the subcontractor costs, SDC costs, other than settlement costs, and profit at 20%. The proposal therefore is as follows:

| | | |
|---|---|---|
| Settlements with Subcontractor | $313,530 | (80% x $391,913) |
| Other Cost | 15,442 | (80% x $ 19,303) |
| G & A | 238,000 | (80% x $297,500) |
| Profit | 31,353 | (80% x 39,191) |
| Settlement Expense | 19,316 | |
| | $617,641 | |

We understand that this amount is in excess of contract value but it should be noted that the excess costs are due to delays and disruption caused by the Government and therefore should be considered as an equitable adjustment to the original contract. This will partially reimburse SDC for the excess costs incurred resulting from the Government actions. Our subcontractor TBE has provided the following analysis to substantiate their entitlement to payment for the inventory:

**"GOVERNMENT OBLIGATIONS ON SDC HAWK I CONTRACT**

**I. SUMMARY.**

A. In May 2000, AMCOM awarded Contract No. DAAH01-00-C-0077 ("the Contract") to SDC for supply of Hawk circuit card units. The Contract was awarded as a build-to-print, production contract with a Level 3 Technical Data Package ("TDP"). The TDP provided by the Government contains defects and deficiencies that preclude performing the Contract on a build-to-print, production basis. The Government has not corrected

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com