SDC

and/or resolved defects and deficiencies of the TDP to allow production on a build-to-print basis.

B. The delivery schedule specified in the Contract was: (i) for two first articles - 8 August 2000; and, (ii) for the first twenty-two 22 production units with first article – 2/3 February 2001. After the above specified delivery schedules passed, the Government failed to terminate the Contract or reestablish a new delivery schedule for the Contract. Consequently, the Government has waived the delivery schedule for the Contract, and no delivery schedule currently exists. To unilaterally reestablish a new delivery schedule, the Government must take the contractor (SDC) as the Government finds SDC. That means without correcting the TDP to allow production on a build-to-print basis, and providing SDC the information/equipment it needs, the Government cannot unilaterally reestablish a new delivery schedule.

C. During negotiations for the Contract, the parties understood and agreed that SDC's pricing was based on SDC acquiring all material required for contract performance on a one-time buy, including material necessary for option quantities. Accordingly, the Contract authorized SDC to procure all material quantities necessary for contract performance, including unexercised option quantities, prior to first article approval. Pursuant to such contract authority, on 6 June 2000, SDC awarded Purchase Order SDC006 ("the Subcontract") to TBE to acquire material for parts required by the Contract. TBE did acquire all the material required by the Subcontract with SDC, which parts are ready for delivery. The Government cannot now refuse to accept and pay for material acquired/contracted for prior to first article approval.

## II. FACTS.

**The Basic Contract**

1. The Government and SDC executed the Contract in May 2000.

2. The Contract is a build-to-print, production Contract for 2 first articles and 22 production units, with remaining possible units priced in range quantities as options (up to a total of 129 units). Contract, Section B.

3. The Contract's delivery schedules are listed as ---

   a. for two first articles - 8 August 2000 (Contract CLIN 0001AA);

   b. for the first twenty-two 22 production units with first article – 2/3 February 2001 (Contract CLIN 0001AD).

5. SDC's Offer was incorporated in the Contract. Contract, SF26, Block 18.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

6. At Contract provision I-65, the Contract contains the First Article Clause at FAR 52.209-4, without Alternate I. The clause without Alternate I puts the risk of purchase of production quantities prior to first article approval on the contractor. The clause with Alternate I permits the contractor to purchase production quantities prior to first article with the approval of the contracting officer.

7. The Contract contained the standard contract provisions for fixed-price supply contracts, including the FAR 52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) clause. Contract clause I-43.

**SDC's Offer**

8. In SDC's Proposal Revision B (dated 13 March 2000), submitted to AMCOM's Geraldine Williams, SDC's proposed prices were based on buying material for the entire quantity of 129 Boards, which includes first articles and production units (including option quantities), as an up-front, one-time buy.

9. In a 31 March 2000 Memo to AMCOM's Geraldine Williams, DCMC Industrial Specialist Charles Kirch noted that:

    a. he had performed a material cost review of SDC's proposal at AMCOM request;

    b. he approved of SDC's pricing concept of a one-time, up-front material buy (but questioned some of SDC's cost and pricing data for the material);

    c. any other material pricing methodology would mean that SDC's option year pricing would have to be very high;

    e. the economic incentives of a one-time, up-front buy was obvious; and

    f. the material could be a separate contract line item.

10. In SDC's Proposal Revision C (dated 4 April 2000), submitted to AMCOM's Geraldine Williams, SDC -

    a. noted that it continued its proposal pricing based on the concept of a one-time, up-front material buy for the entire quantity of 129 Boards (which includes first articles and production units (including option quantities), as an up-front, one-time buy), and

    b. revised its pricing based on Mr. Kirsh's comments.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

c. Revision C, Attachment B pricing basic contract quantities (24) and option range quantities (105) , total 129 is based on the one-time, up-front buy of material for 129 boards.

11. In a 2 May 2000 letter, SDC's Ms. Gilchrist

a. accepted AMCOM's counter offer for a fixed quantity of 2 first article and 22 production units and option year pricing as reflected in SDC's Revision C proposal; and

b. reiterated unit prices, to include prices for option year ranges in Attachment A to that letter, which, for option years: (I) are the same as reflected in Revision C, Attachment B, and (ii) do not include costs for materials for option years.

12. Unit prices, including option unit prices, as reiterated in Attachment A to Ms. Gilchrist's 2 May letter and as stated in the Contract, were clearly based on the one-time, up-front material buy communicated to AMCOM by SDC and DCMC.

13. Costs of a one-time, up-front material buy: (i) were priced into Contract quantities, (ii) were the basis of the award price; and, (iii) AMCOM was, or should have been, aware of such pricing.

**The Subcontract**

14. After award of the Contract, SDC took timely action to make a one-time, up-front material buy as the parties had envisioned for material quantities required for Contract performance. Namely, on 6 June 2000, SDC awarded TBE the Subcontract (SDC Purchase Order SDC006) in the amount of $397,771.58 to acquire material for parts required for SDC Contract performance.

15. By Revision 2 to the Subcontract, dated 11 July 2000, the total Subcontract purchase price for delivery of material to fabricate, assemble, and deliver 129 Hawk circuit cards, including kitting and delivery to SDC, was increased to $403,297.58 to cover costs for receiving, inspection, and kitting.

16. TBE did timely acquire Contract conforming parts required by the Subcontract with SDC, which parts are ready for delivery.

17. TBE has completed all Subcontract requirements and awaits only delivery instructions and payment for final Subcontract close-out.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

**The TDP**

18. The specifications and TDP purport to be Level III, ready for build-to-print, mass production.

19. The specifications and TDP were not ready for build-to-print, mass production. Generally, the TDP appears to be a package that was developed in the 1960's or 1970's and accepted as a Level III package, while, in fact, several key pieces of data and procedures had not been procured from the developer by the government. These items include: (1) electronic programmable parts data, (2) electronic raw board fabrication and test data (*i.e.*, ICT and Gerber files), and (3) a clear and unequivocal set of functional test procedures that can be used for test, debug and acceptance of the finished product. It also appears that these packages have not been checked or updated to reflect what technical data is actually available from the development effort, and it fails to include newer regulations by military and non-military government agencies (e.g. EPA) and updated MIL-Specs and MISs.

20. Specific data defects and deficiencies include, but are not limited to, the following.

   a. The TDP references program code in electronic format for Programmable Parts that has not been made available by the Government as provided in the TDP. The data is not available to SDC, and the Government has indicated that it will not make the required data available to SDC. Such data is required for build-to-print production of the Hawk circuit cards.

   b. There are no clearly-defined "go/no-go" test procedures for acceptance that can be performed by production technicians that document results showing the boards are acceptable to the government.

   c. Ambiguity in the MIS or performance spec, such as MIS-41341, appears to require that all the boards (not only First Articles) meet all the contents of the performance spec, even though the government said it was not actually desired that the production boards be subjected to life-draining environmental tests. The exact set of tests required for acceptance testing should be clearly defined in the RFP and contract.

   d. The TDP and referenced MISs (performance specs), list old, obsolete and expensive test equipment for use in testing the boards, equipment and procedures more appropriate for a developmental, not a production, effort.

   e. The specs and drawings call for use of Ozone Depleting Chemicals during cleaning and preparation of the PWBAs. However, current EPA regulations discourage or prohibit use of such materials in modern-day board processing and assembly.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

21. While the parties have been discussing alternatives in an attempt to overcome specification and TDP defects/deficiencies so that SDC might complete the Contract, AMCOM has been unable to supply the necessary data and procedures that will allow SDC to perform the Contract on a build-to-print, production basis.

## III. ANALYSIS.

### A. The Defective Specifications Provided by the Government Constitute a Constructive Change, Entitling SDC to an Equitable Adjustment..

The law is very clear that the Government warrants the adequacy of specifications it provides, and that a contractor is entitled to an equitable adjustment under the Changes clause if the Government provides defective specifications. The basis for this legal premise may be best set forth in Greenbrier Industries, ASBCA 22121, 81-1 BCA ¶15,057, where the Board noted at 74,135:

> Since each appears to be an innocent party, the law of warranty permits the [contractor] to have recourse against the Government as author of the specifications, the root cause of the … production problems.

The Government's failure to provide SDC program code in electronic format for Programmable Parts as required by the TDP (FACTS 20a) can be considered either as a Government constructive change under the doctrine of implied warranty of specifications or as a constructive change for failure to provide required property under the Government provided property clause. The result is the same. The Government is legally responsible for all costs that SDC has and will incur due to that failure. If the Government is insistent that SDC develop those codes, than the Government would be responsible for all developmental and production costs associated therewith.

The Government is also liable for increased costs of performance if the specification prescribes procedures and tests (or fails to provide such procedures and tests) that make performance at the contemplated level of production impossible. See *e.g.*, La Crosse Garment Manufacturing Co. v. United States, 432 F.2d 1377 (Ct. Cl. 1970). The lack of clearly-defined "go/no-go" test procedures for acceptance, the ambiguities in performance specifications, and the specification-listed old and obsolete test equipment and procedures (FACTS 20b-d) clearly prohibit production of the Hawk circuit boards on a build-to-print, mass production basis. These defects fall within the types noted in La Crosse, where the Board explained at 180-81:

> "Mass production" is a variable; there are countless degrees between laborious production of units, one at a time, and there rapid flow on a production line.

* * *



225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

> Performance may become unsatisfactory and costs may increase in varying degrees by reason of [specification defects] which may cause difficulties, interruptions, slowdowns and delays which interfere with mass production without making it impossible. The measure for determination of damages is therefore the degree of interference with satisfactory production.

Here, SDC's damages as a result of these interferences may also rise to the level of commercial impracticality due to the anticipated very high additional cost of performance because of the defects and deficiencies.

The specs and drawings which call for use of Ozone Depleting Chemicals during cleaning and preparation of the PWBA run afoul of current EPA regulations. FACTS 20e. This also makes the specifications defective. See, *e.g.*, Castle Construction Company, ASBCA 28509, 84-1 BCA ¶17,045.

Given that AMCOM has waived the delivery schedule and must take SDC as AMCOM currently finds SDC (see section IIIB below), specification defects and deficiencies must be corrected, with attendant costs, so as to allow SDC to perform before AMCOM may unilaterally reestablish a new delivery schedule.

**B. AMCOM has Waived the Delivery Schedule and Must Take SDC as it Finds SDC in order to Unilaterally Reestablish a New Delivery Schedule.**

The delivery schedule specified in the Contract is 8 August 2000 for two first articles, and 2/3 February 2001 for the first 22 production units with first article. FACTS 3. We are now in 2003, and SDC has not delivered (and cannot with current specification defects and deficiencies deliver) units called for by the schedule. We are way beyond any reasonable period of forbearance, and the Government has clearly waived the delivery schedule. *E.g.*, D. Joseph De Vito v. United States, 413 F 2d 1147 (Ct. Cl. 1969).

Any AMCOM unilaterally reestablished delivery date must be reasonable based on the performance capabilities of SDC at the time the schedule is unilaterally reestablished. See *e.g.*, Spasors Electronics Corp., ASBCA 12877, 70-1 BCA ¶8119. Without curing the specification defects and deficiencies, SDC will be unable to perform. AMCOM must first correct the specification defects and deficiencies before AMCOM can unilaterally reestablish a delivery schedule.

The Contract must come to some end. Since AMCOM has indicated that it cannot or will not correct the specification, performance completion according to the Contract is not a viable option, nor is a termination for default as AMCOM has waived the delivery schedule. It appears the only viable alterative for the parties is a termination for convenience.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

### C. In any Convenience Termination, SDC is Entitled to Recover All its Material Costs.

### 1. The Contract Authorized an Up-Front Material Buy of Material for 129 Boards.

The Contract incorporated SDC's offer (FACTS 5), which included a one-time, up-front buy of material for 129 boards. FACTS 8-11. Contract pricing was based on a one-time, up-front buy of material for 129 boards. FACTS 12, 13.

The Contract contained the First Article Clause at FAR 52.209-4, without Alternate I. This would normally put the risk of purchase of production quantities prior to first article approval on the contractor. However, that is not the case here because of the incorporation of SDC's offer into the Contract, and the Government's clear influence on and acceptance of Contract pricing --- pricing which included a one-time, up-front buy of material for all quantities, including option quantities, required by the Contract. The Government would be obligated to reimburse SDC for SDC's entire up-front buy of material quantities if the Contract were terminated for convenience. This outcome is dictated, not only be the Contract itself, but also by well recognized legal principles of Mistake in Integration, Interpreting Ambiguities, and Estoppel.

With respect to a Mistake in Integration -

While it appears that there is more of a conflict between provisions (incorporation of SDC's offer versus incorporation of FAR 52.209-4 without Alternate I), the Contract must be reformed to reflect the parties intent. That intent is evidenced by the FACTS 8-13, which show the incorporation of SDC's offer into the Contract and the Government's influence on and acceptance of SDC pricing. Both of these factors show that the parties intent was to authorize SDC to make a one-time, up-front buy of all material quantities necessary to deliver, whether first article or production (including option quantities).

With respect to Ambiguity –

Where two Contract provisions appear to conflict, the overriding principle of contract interpretation is to interpret a contract as whole so as to avoid rendering terms meaningless, to avoid conflict, and to fulfill the principal purpose of parties. Here those principles dictate that the incorporation of SDC's offer means that the Contract must be read to mean that FAR 52.209-4 with Alternate 1 applies.

The Contract clearly incorporated SDC offer, which included a one-time, up-front buy of material for 129 boards. The principal purpose of the one-time, up-front buy of material for 129 boards, which was reflected in Contract pricing, was to save money for the Government. The Government participated in and accepted this pricing strategy. Reading the Government's acceptance of the incorporated offer as an agreement to reimburse SDC for the

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

one-time, up-front buy of material for 129 boards is the only way to: (i) avoid rendering SDC's incorporated offer meaningless, (ii) avoid conflict between SDC's offer and Contract pricing, and (iii) fulfill the parties' principal purpose of saving the Government money.

With respect to Estoppel (*See, e.g.*, American Electronics Laboratories v. United States, 774 F.2d 1110,1113 (1985) -

All the elements of estoppel are met.

1. The Government knew that SDC's offer and pricing were based on the one-time, up-front buy of material for 129 boards.

2 The Government, in accepting SDC's offer, intended for SDC to make a one-time, up-front buy of material for 129 boards, and/or SDC had a right to so believe.

3 SDC was not aware that the Government did not intend for SDC to make a one-time, up-front buy of material for 129 boards.

4 SDC relied on the Government's conduct by making the one-time, up-front buy of material for 129 boards.

Consequently, the Government is stopped from denying that the Contract authorizes a one-time, up-front buy of material for 129 boards.

**D. Impact on TBE of a termination for convenience.**

In the event that AMCOM terminates the Contract for convenience, there would be no impact on TBE. Under standard termination for convenience procedures, the Government is obligated to reimburse SDC its allowable costs, including material costs and costs of settlements with subcontractors, *e.g.*, TBE.

Under TBE's Subcontract, TBE is entitled to be reimbursed at the Subcontract price with respect to deliverable Subcontract items ready for delivery at the time of any SDC convenience termination. Since all items required by the Subcontract have been completed, TBE is entitled to be paid the full Subcontract price of $403,297.58. See FAR 49.108-3(a), 49.205(a). SDC is entitled to be reimbursed these costs.

If SDC or the Government requires TBE to take action other than delivery (*e.g.*, to take special action with respect to inventories, prepare justifications), such costs could be categorized as termination settlement expenses. In addition to the Subcontract price, TBE would be entitled to be reimbursed any such costs. A separate account should be opened to accumulate such costs. These possible additional TBE costs are allowable costs to SDC in the event AMCOM terminates the Contract for convenience.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

SDC

TBE would deliver all Subcontract material to SDC, who would in turn provide them to the Government. Since the subcontracted material is conforming, the Government could provide the termination inventory to any replacement Hawk circuit card contractor as Government furnished material.

V. **Conclusion.**

It appears that the only viable option for all parties is to terminate the Contract for convenience because, *inter alia*, the Contract specification is defective, the Contract delivery schedule has been waived, and there appears to be no other way to end the Contract. Since SDC's offer incorporated in the Contract and the Contract's pricing included the one-time, up-front buy of material for 129 boards, the Government is obligated to reimburse SDC the costs of that material. TBE is entitled to be reimbursed in accordance with standard termination accounting. The Government is entitled to Contract inventories, which in turn can supply to other contractors as Government furnished material."

SDC believes that the TBE position is the correct legal position. In order to reach settlement SDC has proposed the above counter offer.

We hope to resolve this matter as soon as possible.

Sincerely,

V.P. Gilchrist

Virginia P. Gilchrist
President

VPG/eds



225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601
http://www.sdchsv.com

**DEFENSE CONTRACT MANAGEMENT AGENCY**
DEFENSE CONTRACT MANAGEMENT AGENCY ATLANTA
ATTN: DCMAE-GATC
2300 Lake Park Drive, Suite 300
Smyrna, GA 30080-4091
Tel: (678) 503-6351
Fax: (678) 503-6034
E-mail: Paul.Siemons@dcma.mil

IN REPLY REFER TO DCMAE-GATC

CERTIFIED MAIL
7004 2510 0004 0768 9830

March 25, 2005

SUBJECT: Final Decision on Terminated Contracts DAAH01-00-C-0077, Systems Development Corporation, Huntsville, AL, Docket A049531EA

Systems Development Corporation
ATTN: Ms. Virginia P. Gilchrist, President
225 Spragins Street, Suite G
Huntsville, AL 35801

Dear Ms. Gilchrist:

This constitutes the final decision of the Contracting Officer relative to your proposal dated April 23, 2004 in the gross amount of $789,058.00 for Contract DAAH01-00-C-0077. It is my final decision that Systems Development Corporation (SDC) is entitled to $403,563.00. SDC has previously been paid $37,268.00 so the net payment will be $366,295.00.

SDC's contract for circuit card assemblies for the HAWK program, DAAH01-00-C-0077, vas terminated for convenience on February 17, 2004. The obligated amount of this contract was $430,000. SDC's final settlement proposal, in the net amount of $789,058.00, was dated April 23, 2004. A partial payment request was approved in the amount of $37,268 on August 24, 2004.

You have not provided adequate support for costs claimed, other than those of the subcontractor, Teledyne Brown Engineers (TBE), and indirect costs allocable thereto. The details follow:

| Cost Elements | Proposed (08/04/04) | TCO Position |
|---|---|---|
| Purchased Parts On Hand | $321,497 | $357 |
| Other Costs | 19,303 | 0 |
| G&A Expenses | 297,500 | 55,338 |
| Subtotal: | $ 638,300 | $ 55,695 |
| Profit | 63,830 | 0 |
| Settlement Expenses | 14,316 | 0 |
| Total | $ 716,446 | $ 55,695 |
| Settlements With Subcontractors | 72,612 | 391,913 |
| Acceptable Finished Product | 0 | 0 |
| Gross Settlement | $ 789,058 | $ 447,608 |
| Disposal and Other Credits | 0 | 0 |
| Net Proposed Settlement | $ 789,058 | $ 447,608 |
| Adjustment for Loss Ratio | | (44,045) |
| Subtotals | 0 | $ 403,563 |
| Prior Payments | 0 | (37,268) |
| Net Payment Requested | $ 789,058 | $ 366,295 |

**Purchased Parts**

Only $357 of purchased parts were delivered by TBE to SDC. The balance of the $321,497 is actually costs attributable to your settlement with your subcontractor, and is discussed in the segment on Settlement with Subcontractors, below.

**Other Costs**

You proposed the labor costs of a buyer (500 hours - $15,281.00), a procurement clerk (147 hours - $2,364.00) and a data entry clerk (200 hours - $1,656.00) as Other Cost. No support was provided for these costs. You assert that the amounts proposed are based on judgmental estimates. During the four years this program was in progress prior to termination, SDC did not establish a job cost number for this project, nor has it charged any direct cost for this program to a specific job/project within its cost accounting records. These functions are normally recorded as G&A expense in the contractor's books and records. The costs represent normal procurement related G&A activities incurred on the contract which should be recouped from the normal application of the G&A rate.

Where the allocation base is insufficient to allow recovery of a cost, the cost may be allocated directly to the terminated contract. However, in this case, you have provided no explanation that shows recovery through G&A is inappropriate for this one purchase order. Through the normal application of the final G&A expense rate this final decision allows $55,338 in G&A expenses for recovery of the claimed effort. Further, without timecards or contemporaneous support, any direct charges become mere speculation.

**G&A Expenses**

A similar problem exists with the proposed G&A expenses. You proposed the labor cost of an Executive (2,000 hours) and a Contract Administrator (2,000 hours) as G&A expense. During the four years this program was in progress prior to termination, SDC did not establish a job cost number for this project, nor did it charge any direct cost for this program to a specific job/project within its cost accounting records. The proposed costs represent normal indirect G&A activities incurred on the contract which should be recouped from the normal application of the G&A rate. Also, the claimed labor hours are based on the contractor's unsupported judgmental estimates. This final decision applies the negotiated final FY02 G&A rate of 14.12 percent to subcontract settlement amount of $391,913. This allows for the normal recovery of costs associated with this contract.

**Profit**

The contractor applied a 10 percent profit rate to its total contract cost to compute its proposed profit of $63,830 ($638,300 x 10 percent). Where a contractor would have sustained a loss on a terminated contract if it had been completed, the FAR requires that the terminated settlement amount be adjusted to reflect that fact (FAR 49.303). The rationale for this requirement is that a contractor should not be better off as a result of a termination for convenience than it would have been if the contract had been fully performed. You were in a loss position in the performance of contract DAAH01-00-C-0077. The appropriate adjustment in this instance is calculated as follows:

The contract was for $430,000. SDC issued a subcontract to Teledyne Brown in the amount of $403,297.58. When G&A at 14.12 percent is added to the subcontract costs, the contractor's performance costs rise to $460,243. Full contract performance requires SDC setup and labor costs to maintain the inventory and provide it per the schedule. The out years are only for labor and burdens since the material is included in the base year. For a quantity of 21, (one year after having produced 24 units and therefore that much more efficient) the cost is $1,221.00 per unit. Thus for this contract, SDC labor would have cost more than $29,304.00 (24*$1,221.00). Adding this to the material cost means the contract would have been sustained an even larger loss than the loss based just on subcontractor costs and burden.

| | | | | | |
|---|---|---|---|---|---|
| Net Settlement Amount | = Settlement Expenses | + Price for Acceptable Units | + Remainder of Negotiated Settlement After Subtracting Settlement Expenses and the Contract Price of Acceptable Units | * | Contract Price / Incurred Costs before T4C + Estimated Cost to Complete |
| | = 0 | + 0 | + 447,608 | * | $430,000 / ($447,608.00 + 29,304.00) = $476,912.00 |
| | = | | +447,608 | * | .9016 |
| | = 403,563 | | | | |
| | 447,608 TCO determined settlement amount prior to loss calculation | | | | |
| | $44,045 Loss applied | | | | |

## Settlement Expenses

The contractor made a judgmental estimate of the hours required for settlement of the termination, including negotiations. SDC multiplied the labor rates of the Executive (105 hours) and Contracts Administrator (125 hours) to arrive at estimated labor cost and burdened it to arrive at the estimated settlement expense. The final decision allows no direct charges for these G&A type employees whose full salaries remain charged to the G&A expense pool. Through the normal application of the final G&A expense rate this final decision allows $55,338 in G&A expenses for recovery of G&A effort.

## Settlements With Subcontractors

TBE proposed $394,109 of which $391,913 has been determined to be allowable. The proposed amount has been reduced for $1,750 of other costs which represents an adjustment to the inventory valuation, the adjustment of G&A to the final rates($302), and profit on these amounts ($144).

In summary, it is my final decision that Systems Development Corporation (SDC) is entitled to $403,563.00 for contract DAAH01-00-C-0077.

This decision may be appealed to the cognizant Board of Contract Appeals, which for this contract is the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, Seventh Floor, Falls Church, Virginia 22041. If you decide to appeal, you must, within 90 days from the date you receive this decision mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract number. You should also include a certification of the claim in accordance with the Disputes clause of your contract. With regard to appeals to the agency board, you may proceed under the

board's small claim procedure for claims of $50,000.00 or less or its accelerated procedure for claims f $100,000.00 or less. Instead of appealing to the agency board of contract appeal, you may bring .n action directly in the United States Court of Federal Claims (except as provided in the Disputes Act of 1948, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this claim. The rules of the ASBCA are located at http://www.law.gwu.edu/asbca/rule.htm#RULES.

You may choose to try settling this dispute through the use of Alternate Dispute Resolution (ADR) techniques. The Defense Contract Management Agency is committed to the use of ADR whenever possible. Please note that the ASBCA is also favorably disposed to the use of Alternate Dispute Resolution. ADR techniques utilized by the Board include settlement judges (third party neutrals/mediators); mini-trials; and summary trial with binding decisions. Should you be interested in using some form of ADR to attempt to resolve this dispute, either outside or within the context of an ASBCA appeal, please contact me. It should be noted that this offer to use ADR or use of its procedures does not in any way alter the respective 90-day and 12-month appeal deadlines at the ASBCA and COFC or respective procedural requirement for filing an appeal. Nor would your election to pursue ADR preclude you from contemporaneously filing a formal and timely appeal with either adjudicative body. The offer to ADR or use of its procedures does not constitute a reconsideration of this final decision

Should you have any questions, please contact the undersigned at (678) 503-6351, FAX (678) 503-6034, or e-mail Paul.Slemons@dcmae.mil.

PAUL E. SLEMONS
Termination Contracting Officer

cc:
DCMAE-GAG/Leigh Owens, Esq.

**lemons, Paul**

| | |
|---|---|
| **om** | Slemons, Paul |
| | Friday, March 25, 2005 1:33 PM |
| **o:** | 'Virginia P. Gilchrist' |
| **ubject:** | sdc final3.doc |
| **ttachments:** | sdc final3.doc |

c final3.doc (104 KB)

**SENDER: *COMPLETE THIS SECTION***

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

SYSTEMS DEVELOPMENT CORP.
ATTN: MS. VIRGINIA GILCHRIST
225 SPRAGINS STREET, SUITE G
HUNTSVILLE, AL 35801

DAAH01-00-C-0077

***COMPLETE THIS SECTION ON DELIVERY***

A. Received by *(Please Print Clearly)* Lakeeta Perkins B. Date of Delivery 3-30-05

C. Signature X Lakeeta Perkins ☐ Agent ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number *(Copy from service label)* 7004 2510 0004 0768 9830

PS Form 3811, July 1999 Domestic Return Receipt 102595-99-M-1789

**Slemons, Paul**

| | |
|---|---|
| **·:** | Slemons, Paul |
| | Tuesday, March 29, 2005 1:41 PM |
| | 'gcarpenter@sdchsv.com' |
| **Subject:** | RE: Payment for Final Decision on Terminated Contract DAAH01-00-C-0077, Docket A049531EA |

Please prepare a commercial invoice for $366,295.00 , fax it to me and I will process it for payment. This does not constitute that SDC agrees with my position and will in no way prejudice your rights.

-----Original Message-----
From: Gilliam Carpenter [mailto:gcarpenter@sdchsv.com]
Sent: Monday, March 28, 2005 3:54 PM
To: Slemons, Paul
Subject: Payment for Final Decision on Terminated Contrcat DAAH01-00-C-0077, Docket A049531EA

Mr. Slemons:

Now that your Final Deceision on contract DAAH01-00-C-0077 has been published, when may we expect to receive payment?

Standard Form 1034
Revised January 1980
Department of the Treasury
TM 4-2000

# PUBLIC VOUCHER FOR PURCHASES AND SERVICES OTHER THAN PERSONAL

VOUCHER NO.
1

DEPARTMENT, BUREAU, OR ESTABLISHMENT AND LOCATION
Columbus Center
South Entitlement Operations
P O Box 182264
Columbus, OH 43218-2264

DATE VOUCHER PREPARED
March 29, 2005

CONTRACT NUMBER AND DATE
DAAH01-00-C0077

REQUIREMENT NUMBER AND DATE

SCHEDULE NO.

PAID BY

PAYEE'S NAME AND ADDRESS
SDC, Incorporated
225 Spragins Street. Suite G
Huntsville, AL 35801
EIN 58-2344926

DATE INVOICE RECEIVED

DISCOUNT TERMS

PAYEE'S ACCOUNT NUMBER

SHIPPED FROM | TO | WEIGHT | GOVERNMENT B/L NUMBER

| NUMBER AND DATE OF ORDER | DATE OF DELIVERY OR SERVICE | ARTICLES OR SERVICES (*Enter description, item number of contract or Federal supply schedule, and other information deemed necessary*) | QUANTITY | UNIT PRICE COST | UNIT PRICE PER | AMOUNT (1) |
|---|---|---|---|---|---|---|
| | | Payment for Final Decision on Terminated Contract DAAH01-00-C-0077, Docket A049531EA<br>APPROVED FOR PAYMENT<br>Paul E Slemmons, TCO | 1 | | | $366,295.00 |

(Use continuation sheet(s) if necessary) (Payee must NOT use the space below) TOTAL $366,295.00

PAYMENT:
☐ PROVISIONAL
☐ COMPLETE
☐ PARTIAL
☐ FINAL
☐ PROGRESS
☐ ADVANCE

APPROVED FOR = $
EXCHANGE RATE = $1.00
BY[2]
TITLE

DIFFERENCES
Amount verified; correct for
*(Signature or initials)*

Pursuant to authority vested in me, I certify that this voucher is correct and proper for payment.

*(Date)* *(Authorized Certifying Officer)*[2] *(Title)*

ACCOUNTING CLASSIFICATION

PAID BY: CHECK NUMBER | ON ACCOUNT OF U.S. TREASURY | CHECK NUMBER | ON *(Name of bank)*

CASH $ | DATE | PAYEE[3]

PER

TITLE

[1] When stated in foreign currency, insert name of currency.
[2] If the ability to certify and authority to approve are combined in one person, one signature only is necessary; otherwise the approving officer will sign in the space provided, over his official title.
[3] If the voucher is receipted in the name of a company or corporation, the name of the person writing the company or corporate name, as well as the capacity in which he signs, must appear. For example: "John Doe Company, per John Smith, Secretary", or "Treasurer", as the case may be.

Previous edition usable 1034-119-06 NSN 7540-00-900-2234

PRIVACY ACT STATEMENT
The information request on this form is required under the provisions of 31 U.S.C. 82b and 82c, for the purpose of disbursing Federal money. The information requested is to identify the particular creditor and the amounts to be paid. Failure to furnish this information will hinder discharge of the payment obligation.

**Slemons, Paul**

---

| | |
|---|---|
| ~~n: | cscassig@ogden.disa.mil |
| | Friday, April 01, 2005 11:57 AM |
| . | Slemons, Paul |
| **Subject:** | DAAH0100C0077\ \75123\ \ \SERC002Z\SERC002Z |

Document Type: Invoice

Contract Issue Date: 2004/02/17

Shipment Number: SERC002Z

Shipment Date: 2005/03/25

Invoice Number: SERC002Z

Invoice Date: 2005/04/01

Has been Submitted by Girtha Thompson on 2005/04/01.

**Virginia Gilchrist**

| | |
|---|---|
| **From:** | Virginia Gilchrist |
| **Sent:** | Thursday, January 27, 2000 9:03 AM |
| **To:** | 'WILLIAMS-GM@redstone.army.mil' |
| **Subject:** | FW: Questions on DAAH01-00-R-0013 |
| **Importance:** | High |

Ms. Williams-
The first 18 pages of the MIS-41341 are on the CD. We do have access to the test station and are evaluating our options in this area. I will call you later today for discussions about obsolete parts.

Thank You-
Virginia Gilchrist

-----Original Message-----
From: Virginia Gilchrist
Sent: Tuesday, January 25, 2000 3:49 PM
To: 'WILLIAMS-GM@ccsmtp.redstone.army.mil'
Subject: FW: Questions on DAAH01-00-R-0013
Importance: High

Right now we are waiting on the response as relates to the updated specification information.

Thank you-
Virginia Gilchrist

-----Original Message-----
From: WILLIAMS-GM@ccsmtp.redstone.army.mil [SMTP:WILLIAMS-GM@ccsmtp.redstone.army.mil]
Sent: Tuesday, January 25, 2000 2:09 PM
To: vpgilchrist@sdchsv.com
Subject: Re: Questions on DAAH01-00-R-0013

Virginia,

In our conversation earlier today you indicated that you do have the first 18 pages of MIS-41341. The acceptance requirements for the circuit card assembly are defined in MIS-41341. Paragraph 6.3 of this document indicates that a Teledyne L200 Series Test Station must be used to test this circuit card assembly, and You said that you do have access to this test station via Teledyne Brown. If this is the case, you should have the answer to the main questions you had about this requirement.

I will be checking into the question you had about updated specification information.

Please verify that the statements above are correct and if you have any additional questions/concerns, indicate what they are and I will get back to you as soon as possible.

______________________________ Reply Separator ______________________________
Subject: Questions on DAAH01-00-R-0013
Author: "vpgilchrist@sdchsv.com" <vpgilchrist@sdchsv.com> at Internet
Date: 1/20/00 9:55 AM

The following questions have arisen as we are preparing the response to this requirement:

1. Are there Acceptance Test Procedures already existing for this item? If so, can we have a copy?
2. The first 18 page of MIS-41341 is missing from the information that we have-can this data be provided?
3. Is there updated specification information available for this requirement? For example, MIL-STD-2000 has been deleted and the schools are no longer held.

If you have any questions about these questions feel free to contact me or Ovoy Horton at 726-6300.

Thank You
Virginia Gilchrist

SDC, Inc.

30 November 1999

Mr. John Nelson
Small Business Office
U. S. Army Aviation and Missile Command
Redstone Arsenal, AL

Dear Mr. Nelson:

SDC, Inc. is pleased to have the opportunity to support the Command by fabricating circuit card assemblies for the HAWK Missile System.

SDC is leasing manufacturing facilities from Teledyne Brown Engineering (TBE), 300 Sparkman Drive. SDC technicians will handle the assembly of the boards and our quality personnel will monitor the overall effort. TBE test technicians, in a subcontracting role, will test the boards. SDC will perform at least 55% of the effort and TBE activities will represent no more than 45% of the effort.

We look forward to supporting the Aviation and Missile Command.

Respectfully,

V. P. Gilchrist

V. P. Gilchrist
Chief Executive Officer
SDC, Inc.

Concurrence

January Dennison
Director, New Business Development
Advanced Programs
Teledyne Brown Engineering

215 Wynn Drive, Suite 318
Huntsville, Alabama 35805
Phone: 256.726.6300
Fax: 256.726.6301
http://www.sdchsv.com

PSC

DEPARTMENT OF THE ARMY
UNITED STATES ARMY AVIATION AND MISSILE COMMAND
REDSTONE ARSENAL, ALABAMA 35898-5000

REPLY TO
ATTENTION OF

December 6, 1999

Small and Disadvantaged
Business Utilization Office

Ms. Donna H. Glenn
Assistant District Director
US Small Business Administration
2121 8th Avenue North, Suite 200
Birmingham, Alabama 35203-2398

Dear Ms. Glenn:

The following requirement is hereby offered to SBA for 8(a) subcontracting:

a. Description: Circuit Card Assembly, NSN: 5998-01-319-4313, APN: 13235072, Missile System: HAWK.

b. Estimated Quantity: Known quantity 24 each, Maximum quantity 25 each. Incremental quantity range = min 9 each, known 24 each, maximum 25 each X unit price =$191,774.94. Option for 5 out years are as follows: FY00 = 5-16, FY01 = 5-16, FY02 = 11-30, FY03 = 7-21, FY04 = 7-21. The maximum quantity for options will be capped at 75 each, based on history = $575,324.81. The total dollar value for incremental and options is $767,099.75.

c. SIC Code: 3674/500 employees.

d. Anticipated dollar value: See breakdown in (b.) above.

e. Type of contract anticipated: Firm-Fixed-Price.

f. Special capabilities or disciplines needed for contract performance: Ability to produce items described in (a.) above.

Acquisition history: This is a first time breakout to small business, prior procurement history is with Raytheon Co. contract DAAH01-96-C-0182, awarded July 29, 1996.

No SBA district or regional office has asked for this acquisition for the 8(a) Program.

Received pkg 20 Dec 99

No solicitation for this specific acquisition has been issued as a small business set-aside and no other public communication (such as in the Commerce Business Daily) has been made evidencing this command's clear intention to set-aside the acquisition for small business.

There are no known 8(a) concerns which have expressed an interest in this specific requirement as a result of self-marketing, responses to sources sought or publication of advanced acquisition requirements.

It is recommended that this requirement be sole source to Systems Development Corporation, (SDC), 215 Winn Drive, Huntsville, Alabama 35805.

It is anticipated that the award will be made in accordance with the Memorandum of Understanding (MOU) between the SBA and DOD in regard to the 8(a) Program delegation of authority. We will ensure the appropriate revised DFARS language governing the MOU 8(a) Program is included in the contract.

Systems Development Corporation, Inc has the capability required for contract performance.

Confirmation of your acceptance of this requirement should be furnished this Command, ATTN: AMSAM-SB. If you are unable to accept for the above listed firm, this offer is negated and should be returned to this office immediately so that the acquisition process will not be unduly delayed. Your response is requested as soon as possible but not later than December 10, 1999.

Request authority for direct negotiations with the 8(a) subcontractor.

Sincerely,

John F. Nelson
Chief, Small and Disadvantaged
Business Utilization Office

CF: AMSAM-AC-ML-L (J. Adams)

AMSAM-SB 1 Dec 1999

MEMORANDUM FOR AMSAM-AC-ML-L, James Adams

Subject: 8(a) Set-Aside, AMSAM-SB CONTROL No: SB-00-04 Circuit Card Assembly, NSN: 5998-01-319-4313, APN: 13235072, PRON: D1943064, Missile System: HAWK.

The Small and Disadvantaged Business Utilization Office recommends 8(a) set-aside of subject requirement to the Small Business Administration. The SADBU primary recommendation for 8(a) subcontractor is Systems Development Corporation, (SDC), 215 Winn Drive, Huntsville, Alabama 35805.

1. (Actual selection of the 8(a) subcontractor is the responsibility of the Small Business Administration.)

2. This office concurs with the recommended SIC Code 3674/500 employees.

3. Your concurrence or nonconcurrence is required within five working days from the date of this memorandum. Any necessary extension in response time must be coordinated with this office within the aforestated five days.

4. Upon concurrence, this office will forward a letter to the Small Business Administration offering this requirement to them as an 8(a) set-aside.

5. Graduation date of this 8(a) contractor is February 25, 2001. Contractor Vendor Code: 75123.

6. Please correct the DD Form 2579 to reflect any optional quantities and/or option years and any increase in the total dollar amount as a result of options. Dollar amount of known quantity, and total for known and all option quantities. DD Form 2579 will be signed by this office when package is returned with all applicable changes made.

7. Please state what type contract award is anticipated.

8. Please see SDC letter enclosed.

9. Point of contact for this action is AMSAM-SB, Todd Couch, 876-3567or Lee Ford, 876-5318.

Encl

John F. Nelson
Chief, Small and Disadvantaged
Business Utilization Office

CONCUR ✓ Jed 12-2-99

NONCONCUR________

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. Contract ID Code: Firm-Fixed-Price

Page 1 Of 4

2. Amendment/Modification No.: P00002

3. Effective Date:

4. Requisition/Purchase Req No.: SEE SCHEDULE

5. Project No. (If applicable):

6. Issued By — Code W31P4Q
US ARMY AVIATION & MISSILE COMMAND
AMSAM-AC-LS-MB
IRENE WATSON (256)876-4293
REDSTONE ARSENAL AL 35898-5280

EMAIL: IRENE.WATSON@REDSTONE.ARMY.MIL

7. Administered By (If other than Item 6) — Code S0101A
DCMA BIRMINGHAM
BURGER PHILLIPS CENTER
1910 THIRD AVE NORTH RM 201
BIRMINGHAM AL 35203-2376

SCD C PAS NONE ADP PT HQ0338

8. Name And Address Of Contractor (No., Street, City, County, State and Zip Code)

SYSTEMS DEVELOPMENT CORP
215 WYNN DR SUITE 318
HUNTSVILLE AL 35805

TYPE BUSINESS: Small Disadvantaged Business Performing in U.S.

Code 75123 Facility Code

☐ 9A. Amendment Of Solicitation No.

9B. Dated (See Item 11)

☒ 10A. Modification Of Contract/Order No.: DAAH01-00-C-0077

10B. Dated (See Item 13): 2000MAY09

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing items 8 and 15, and returning ________ copies of the amendments: (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. Accounting And Appropriation Data (If required)
NO CHANGE TO OBLIGATION DATA

## 13. THIS ITEM ONLY APPLIES TO MODIFICATIONS OF CONTRACTS/ORDERS
It Modifies The Contract/Order No. As Described In Item 14.

KIND MOD CODE: C

☐ A. This Change Order is Issued Pursuant To: The Changes Set Forth In Item 14 Are Made In The Contract/Order No. In Item 10A.

☐ B. The Above Numbered Contract/Order Is Modified To Reflect The Administrative Changes (such as changes in paying office, appropriation data, etc.) Set Forth In Item 14, Pursuant To The Authority of FAR 43.103(b).

☒ C. This Supplemental Agreement Is Entered Into Pursuant To Authority Of: MUTUAL AGREEMENT

☐ D. Other (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return ________ copies to the Issuing Office.

14. Description Of Amendment/Modification (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

SEE SECOND PAGE FOR DESCRIPTION

Contract Expiration Date: 2004DEC31

Except as provided herein, all terms and conditions of the document referenced in item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. Name And Title Of Signer (Type or print)

16A. Name And Title Of Contracting Officer (Type or print)
CAROLYN GAY
CAROLYN.GAY@REDSTONE.ARMY.MIL (256)955-9197

15B. Contractor/Offeror

________________________
(Signature of person authorized to sign)

15C. Date Signed

16B. United States Of America

By ________________________
(Signature of Contracting Officer)

16C. Date Signed

NSN 7540-01-152-8070
PREVIOUS EDITIONS UNUSABLE

30-105-02

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA FAR (48 CFR) 53.243