MAY-8-2007 09:31A FROM: TO:12025148624 P.20

# Valuation Fundamentals: Comparison to Other M&A Transactions

Financial and valuation information on these guideline transactions are presented in the following Table ($000 except for ratios).

| *Target* | *Acquirer* | *Closing Date* | | *Selling Price* | *Sales* | *% of Sales* |
|---|---|---|---|---|---|---|
| ANTIN | SYSTECH | April | 2005 | $ 2,600 | $ 5,725 | 45.4% |
| DynCorp | Veritas | October | 2003 | 850,000 | 1,600,000 | 53.1 |
| TAMSCO | ESSI | May | 2003 | 66,500 | 115,000 | 57.8 |
| AMCORP | MTC | Oct. | 2002 | 10,600 | 12,000 | 88.3 |
| Sytex Group | Lockhead | April | 2005 | 480,000 | 425,000 | 112.9 |
| IMSI | Anteon | Oct. | 2004 | 29,000 | 30,000 | 96.7 |
| STI | Anteon | Sept. | 2004 | 15,000 | 20,000 | 75.0 |
| **Mean:** | | | | | | **75.6%** |

- 216 -

P.21

TO:12025148624

MAY-8-2007 09:31A FROM:

# Valuation Fundamentals: Comparison to Recent M&A Transactions

I also reviewed the sales prices of similar companies in M&A transactions.

I have identified seven recent transactions as being similar to SDC to use as guidelines in valuing the Company, which depicts the premiums being paid in the defense sector. The chosen companies were selected as being most comparable because of such factors as similarities in line of business, markets, size and profitability.

In addition, two recent transactions occurred related to predominately service type companies, Galaxy Scientific and Joseph Sheirs Associates. In both of these instances the Selling Price to Sales approximated 100% or were in excess of 100%. Consequently, the use of 75.6% is reasonable and may be understated.

Finally, a review of data submitted by INPUT for 2005 shows average price to revenue for 56 transactions shows a 1.41 or 141% factor. Once again this shows the .756 or 75.6% factor is reasonable and may be on the conservative .

- 217 -

Schedule 3a

# SDC
# Difference in Acatual Rate
# Versus Rate Anticipated
# With Larger Volume

| | 2003 | 2004 | 2005 | 2006 | Schedule |
|---|---|---|---|---|---|
| Actual G&A Rate | 14.4% | 15.9% | 12.1% | 19.7% | Schedule 3b |
| Projected Rate | 4.8% | 4.8% | 4.8% | 4.8% | 1 |
| Difference | 9.6% | 11.1% | 7.3% | 14.9% | |

Premise was 02 (?) normal year

Note

1. The projected rate is based on the actual FY2002 rate, which is consistent with the volume projected over the future periods.

Ben decreased

= "all go back"

Schedule 3b

# SDC
## Actual G & A Rate Calculation
## By Fiscal Year

| | 2003 | 2004 | 2005 | 2006 | Notes |
|---|---|---|---|---|---|
| G & A Pool | $ 468,231 | $ 253,874 | $ 214,049 | $ 286,980 | 1 |
| G & A Base | $ 3,245,485 | $ 1,597,868 | $ 1,775,320 | $ 1,457,620 | 1 |
| Total | 14.4% | 15.9% | 12.1% | 19.7% | |

Note

1. The G & A expense pool and g & a base is derived from the internal financial statements.

Schedule 4

# Unrecovered Lease Costs Associated With Contract DAAH01-00-C-0077

| | | Note |
|---|---|---|
| Amount Paid - Lease Cost | $ 9,000 | 1 |

Note

1. SDC was charged $9,000 by Teledyne Brown for unused lease costs.

Schedule 5

# SDC
# Unrecovered Lease Costs
# Associated With Contract
# DAAH01-00-C-0077

| | | Note |
|---|---|---|
| Payments to Employee | $ 25,000 | 1 |
| Legal Fees | 4,750 | 1 |
| | $ 29,750 | |

Note

1. The costs are the actual payments made to the employees and law firm representing the company.

been awarded or should not have been awarded?
A. No.
Q. Do you know of anyone in your office who may have reviewed this and decided that the contracts should have been awarded?
A. No. Mitt Merritt was our small business guy and ombudsman for AMCOM at the time, and he pushed for this contract to be awarded to the company. And I didn't hear anything about it until afterwards, but after it was done I talked with some of these people and got the same opinion.
MR. RIGGS: If you will mark that as the next number.
(Exhibit No. 24 marked for identification.)
BY MR. RIGGS:
Q. That's Exhibit Number 24. Mr. Tignor, let me show you what's been marked as Exhibit Number 24. You appear on the document as both a sender and a receiver. I'm sorry. Yes, a sender and receiver of e-mails. Do you recall this e-mail, this set of e-mails?
A. That's June 2002. It's on my birthday in June.
Q. I want to ask you some questions about the PROM data

and the chips. To your knowledge, were usable workable chips ever provided to SDC?
A. Yes, they were.
Q. Okay. What about the chips that failed?
A. What chips that failed? I don't know which one you are talking about.
Q. Okay.
A. We gave chips to Virginia's company, and we also tested them on the Lockheed machine over at -- John Miller's machine, the GETS1000. We had them tested on that, and they worked before we gave it to them.
Q. Okay. What's this sentence that says, "The card was sent to Barstow for testing and it failed"? What's that mean?
A. I don't know what card that is. Do you know what version that is or if it was -- obviously it was a bad card to start with. Is it one that was built by the company or is it just a card that came from the field or what?
Q. I have no idea. The e-mail essentially appears to indicate the card had the EPROM chip removed and reprogrammed by AMCOM RDECC. The card was sent to Barstow for testing and it failed.

Were the chips on the failed card the chips that were given to SDC?

A. No. We proved them to be good before we gave them to her.

Q. And those would be --

A. All you need to do is take a chip and set it on a Data L29, and it programs it and you can take one chip after the other and keep programming it. So, if You have a good set of chips, original chips, you can continue.

Q. Now, that would be a different method of programing the chips as was provided by the contract. The contract required digital data?

A. Well, there's -- you know, you can get a CD with the chips on it. And if you have some type of a programmable device, you can program a chip. The easiest way is to have the chip correctly reprogrammed and just copy from it.

Q. So the chips that were provided, were they basically for the first article or were they for the production quantity?

A. Well, she hadn't produced any first article exhibit yet. This was back in the development stages of it

Q. -- read from the computer?
A. Right.
Q. And the documents before you today are not documents that could be used, read from a computer, to be adequate to produce the parts?
A. These look like just copies -- and they are from '87. Like I stated, we got some mylar data on the CDs from Raytheon in '03, '02, somewhere around in there.
Q. But that data was not ever provided, as far as you know, to SDC?
A. I don't know if it was or not. I think the door was closed on us by then.
Q. My question was you don't have actual knowledge that that data was provided?
A. No. We tried to deliver it, though. We did have somebody go to SDC to try to deliver it, and we weren't allowed in the building.
Q. I see. Who was that?
A. One of the contracting people. I don't know who it was.
Q. Do you know what the date of that was?
A. No.
Q. Do you know whether or not it was before or after the

So, if the corporate income tax return is filed with the Internal Revenue Services, it's for credibility, making sure that the financial statements that I'm utilizing are reasonable.

Q. All right. Turning over to page three, you say you reviewed numerous depositions.

A. Right.

Q. That's not very specific. Can you tell me which depositions?

A. Well, I don't have that with me. Unfortunately, I just don't have the whole list. Mr. Riggs provided me with about five or six depositions is what I recall, and I went through them very quickly just to get the gist of what was being stated within the deposition.

The fact is I didn't really rely upon that, any of those depositions, to any level of degree, because of the fact that I was focusing strictly on the accounting. So, my review of the depositions were again nothing other than a cursory review to have a general basis of what some of the issues were relative to the improper actions of the Army.

But I can provide you with a list. After this

So that's what those factors are all about. But I'm not trying to say that SDC is was going to perform like these publicly traded companies. That's not the premise.

Q. Mr. Agresto, I understand that you are not offering your legal opinion on the substance of the actions of the government, but the fact that you are calculating these damages, and you referred several times to the actions of the government, what's your understanding of those actions?

A. Well, the it's actually identified -- the government's -- not the government. The company's position is identified in their filing. So, I mean it's whatever those actions are. I am not here to testify what the actions of the government were. My premise is that these were -- that actions resulted in the breach of contract, and these are the breach of contract claimed damage calculations that I have made.

So I'm not specifically dealing with any of the actions because I'm not aware of what the specific actions are other than what I've read in depositions. But that's strictly my reading of it. But this

really isn't important to me, because I've been directed to base the calculations based upon the breach of contract.

Q. So your starting premise is that there was a breach of contract, and you don't really have any basis for looking behind that statement?

A. That's correct.

Q. Okay. I may have asked you this in the first part of your deposition, but I'll ask it again. You used a ten percent figure in calculating the lost profits. What is that based on?

A. I believe the ten percent factor was the factor that was used in the determination of being a reasonable profit for the termination claim, number one, and then secondly, I looked at it under what's called the DoD Weighted Guidelines to determine if a ten percent profit factor was reasonable, and I calculated that to be the case based upon the type of work that SDC does.

So it's a combination of both. What was accepted by the TCO under the termination claim and then, secondly, looking at the profit factor under the DoD Weighted Guidelines, and then I guess,

A. It's my response to Exhibit 39.
Q. 39 was the denial of your request for termination for convenience?
A. Yes.
Q. Towards the bottom of the second paragraph of a fairly long paragraph you said, "Your assertion that this situation was remedied by the provision of four programmed chips that were dropped off at my offices without any supporting documentation is not a sufficient remedy." I take it from that phrase that you actually -- you did receive programmed chips from the government?
A. There was a package dropped off at my office with the receptionist by a courier from Redstone which Mr. Riggs just put in front of you. We've never opened that package. We had no idea what it was or where it came from.
The receptionist came back and brought it to me and said some guy just left this up front. It was only after we went in and looked at the documentation on 0077 and matched it to the number that we realized that that was a package that had come from AMCOM.
And I directed my people not to open the package

and to leave it as it was because without any documentation, without anything to confirm that there were successful tests, and Mr. Tignor had told me on the phone which I documented in a memorandum for the record that they had tried to test those chips at Barstow and they had, quote, blown up and they were going back trying to correct the problem, then I was not willing to take the risk of accepting a package with no documentation, with nothing that would take the risk off of SDC. I couldn't afford it.

Q. So you don't know -- as you sit here today, you don't know whether these chips are any good?

A. I have no clue.

Q. Did you call anybody?

A. I called Mr. Tignor, and he said that he thinks they came from over at RDECC, but he was not sure where they came from. And I'm still not sure where they came from either because, as I said, they were left with the receptionist by a courier.

Q. Okay. And that was in June of 2003?

A. Yes.

Q. And do you recall offhand the day on which the contract was terminated? It was ultimately

of questions. In the complaint, which I don't intend to make an exhibit, the amended complaint --

MR. RIGGS: That's fine.

BY MS. STENTIFORD:

Q. -- you set out through your attorney several counts against the government that constitute the complaint. And my question to you in each event, and we'll go through them count by count, you make claims for specific amounts of damages, and my question to you is, count one, defective specifications, page seven of the amended complaint, you claim the sum of three hundred and ninety-seven thousand dollars for damages caused by the failure to provide specifications free of defects.

I'll let you confirm that that's what the complaint says.

A. That's what it says.

Q. What is your basis for claiming three hundred and ninety-seven? How were you damaged to the extent of three hundred and ninety-seven thousand dollars by the purported defective specifications?

MR. RIGGS: To the extent that she participated in the calculation of damages, she can answer that

question. I'll represent to you that the calculation of damages were done by myself and an accountant.

MS. STENTIFORD: Well, it's her claim.

MR. RIGGS: To the extent that she knows.

THE WITNESS: Well, I guess having been run around in circles by the Aviation and Missile Command for approximately four years, I probably would have made the number higher, because we spent an enormous amount of time and energy trying to get this Technical Data Package straightened out when they knew before they awarded this contract to us that we could not build the package based on things that have been presented during these depositions.

BY MS. STENTIFORD:

Q. You say they knew. They say they didn't know.

A. It's documented. It's in writing.

Q. So, basically it was your inconvenience that you say supports the claim for your --

A. It wasn't just inconvenience. We tried with everything we had to be able to build these cards because circuit cards in and of themselves are not a major manufacturing effort. But with the number of problems associated with the Technical Data Package,

the first thing we did was to put in the request for the things that were in the contract that said do not attempt to manufacture. So we did exactly what the contract told us to do.

As I sit here today, we still don't have the things that the contract required and we still have not had the contract changed. So all of the things that transpired after that were our attempt to try to help the government correct their defective data package.

Q. Okay. Count two says the covenant of fair dealing and cooperation, and you claim damages in the amount of five hundred thousand dollars. Can you tell me what that was based on?

MR. RIGGS: Same response from me as the first.

THE WITNESS: I think the response would be the same as the earlier one I just gave in terms of fair dealing and cooperation. If they knew in January, or somebody at AMCOM knew in January of 2000 that nobody could build that with Raytheon, and they awarded a contract to us in May, they just ran us around in circles for no reason.

BY MS. STENTIFORD:

Q. Well, I might characterize it as they attempted to work around the difficulties that may have been presented, and that's why the chips were provided. I don't want to argue with you.

MR. RIGGS: No. We both have done pretty well in this series of depositions about arguing with witnesses, and I appreciate your consideration.

BY MS. STENTIFORD:

Q. We'll just move on to count three of your complaint which is a count for bad faith. I assume you have the same response.

A. Same.

Q. I think the claim there is seven hundred and fifty thousand dollars in damages.

A. Yeah.

Q. And what -- if you can tell me, what -- how that number -- what that number is based on.

A. I have no idea.

Q. Okay. And count four is a claim for nineteen thousand, three hundred and sixteen dollars under the count of failure to pay appropriate termination for convenience costs. Do you know what that is?

A. I'm pretty sure there was some costs we had in our

termination for convenience response proposal, our proposal back that we did not get payments for.

Q. And can you tell me -- just generally can you tell me what kind of things those were?

A. It was probably labor, nineteen through sixteen.

Q. And what -- whose labor?

A. Probably mine and Gil's, probably. I can't be sure.

Q. And that would be the time you spent writing the correspondence that we reviewed today? Is that what you're including?

A. Writing correspondence, attending meetings, answering phone calls, responding to e-mails. We spent a lot of time trying to work this issue.

Q. But there wouldn't be any manufacturing time included in that?

A. We didn't build anything, so, no.

Q. And just further down the page, count five, superior knowledge, and the claim there is --

A. Five hundred thousand.

Q. -- five hundred thousand dollars?

A. Same answer.

Q. Okay.

MR. RIGGS: Joan, let me correct one thing. The

nineteen thousand, three-oh-three is based on a denial by the contracting officer in his contracting officer final decision which is listed as other costs. He gave zero for that. We claim nineteen three-oh-three -- it's in the -- it's somewhere in the decision where it's explained. I don't know where it is, but if it's not, labor costs for the work that they did with respect to wheel spinning, for want of a better term to describe it.

BY MS. STENTIFORD:

Q. The last question, you don't dispute -- I don't think anybody disputes that you did receive a check, a payment from the government on the termination when the government terminated the contract for convenience. It made a payment to you in the amount of, I think it was, three hundred and ninety-six dollars.

A. Three hundred and sixty-six.

Q. Three hundred and sixty-six thousand dollars?

A. Yeah.

Q. And you don't dispute that you received that?

A. No, no.

MS. STENTIFORD: I have nothing else.

Q. Let me show you what's been marked as Exhibit Number 5. That's a list of attendees. I've looked down it. I don't see your name. But if you would tell me whether or not you attended that meeting.
A. No, I don't recall that meeting.
Q. Did Mr. Tignor report to you the substance of the meeting?
A. No. I supported Mr. Tignor. It wasn't the other way around. So he was not -- he did not have to report to me.
MR. RIGGS: Okay, I see. Virginia, if you would find -- I'll find it real quick.
Would you mark that as the next numbered exhibit?
(Exhibit No. 13 marked for identification.)
BY MR. RIGGS:
Q. Here's the next numbered exhibit. Let me show you what has been marked as Exhibit Number 13. What is that document?
A. It is a waiver to allow the use of cancelled specs in an action.
Q. Your name appears on the Bates stamped SDC 1104 as the POC, Point of Contact.

A. Yes.
Q. Did you prepare this document?
A. Yes.
Q. For whoever the PM or assistant manager was?
A. Yes.
Q. What's the purpose of this document?
A. Back in the nineties the acquisition executive out of OSD made a determination that the military government would not be using -- relying on MIL specs to define our requirements anymore. We were to get away from that. And because of that, many organizations, government bodies, started canceling MIL specs, military specifications.
And when they were used in our Technical Data Packages where we could not -- we couldn't rely on the information anymore to define the TDP. Even though the specs may still have been good, it was cancelled without replacement.
And what this waiver does, this was a process that was put in place that allows the government -- our legal office at AMCOM said that for a procurement package, you cannot allow the use -- require the use of cancelled specs, and this waiver allows us to

waive that requirement, I mean to get us around that.
 And this particular MIL spec was still good. And there was not a viable replacement to call out, so we got the waiver prepared and signed to allow the MIL-S-13949 to be still be used in the manufacture of this circuit card.
Q. As far as you know, or do you know, whether or not the solicitation itself advised the contractor that a waiver was obtained to use cancelled MIL specs?
A. I don't know.
 MR. RIGGS: Mark this as the next exhibit, please.
 (Exhibit No. 14 marked for identification.)
BY MR. RIGGS:
Q. The number on the bottom of that is 1134. That's the exhibit. Mr. Farris, let me show you what's been marked as Exhibit Number 14. Have you seen that document prior to today?
A. I'm sure I have. I don't recall seeing it, no. It's been eight years ago.
Q. Excuse me. What is this document?
A. It is just a routing form that we use, used to use,

to exchange action items among the people who reviewed Technical Data Packages at AMCOM to let us know that we have an action to be worked. It was hand delivered to different offices.

Q. And it's related to the part number we are talking about?

A. It means that a procurement action is in the works for that particular part number, and that whichever office it's addressed to has an action to work, and gets this particular action ready to go out for solicitation.

Q. There is a reminder at the bottom that says, "During the strategy meeting held on Wednesday, 16 June 1999, it was determined that due to the fact that the TDP has cancelled MIL-SPECS that cannot be replaced, requirement will be restricted to Raytheon Company."

A. I have no recollection of a strategy meeting. I know I was not part of one. I was paid by the SAM-D office to support them in trying to resolve these kind of issues. And even though I don't recall this, I'm sure the resolution was my office preparing this waiver form, because that was the only cancelled spec in this packet.

Q. What I'm concerned with is the language that says, "Cancelled MIL-SPECS that cannot be replaced."
A. That's true. That's why we allowed to use the cancelled spec on this form.
Q. I see. Okay.
A. So this overrode that problem.
MR. RIGGS: I see. If you would mark that as the next number.
(Exhibit No. 15 marked for identification.)
BY MR. RIGGS:
Q. Let me show you what's been marked as Number 15, Exhibit 15. It doesn't have your name on it. It was produced to us in discovery.
Based on your review, is it related to contract 0077.
A. I can't recall when they did this. I didn't do it. It had some purpose, but I don't recall. It was a generic waiver that applied to all procurements, not just this particular one.
Q. I see. Let's go back to Exhibit Number 13 just a minute. That was done in, it looks like, September 15th, 1999. At the time you prepared the waiver for the part number in question on contract 0077, did you

identified by the auto manager for something that's needed for supply, then it initiates a business process and a request goes to several organizations. We have the technical data division that looks at our configuration management status. It comes to my group, which is the -- does an engineering producibility review. Then it goes to quality assurance and they do a quality review. Then it goes to our drawing repository, and they develop -- now they do a CD. I think back then they were doing hard copy drawings.

All that's done in preparation of a solicitation going out on the street. And through that review we determine whether or not a spares part can be competed or not. And during that review, if we find that it can't be competed for any reason, there's something missing, then we go to the project office that has the authority over that part, that weapons system, and then it is their responsibility to tell to us to restrict that item to whomever source that's been approved. In the case of Hawk, it's usually Raytheon. And that's how the process works.

Now, say my office does that engineering

Farris
EXHIBIT
13

AMCOM and PEO AVIATION STANDARDS EXECUTIVE
WAIVER REQUEST FORM

Type of Waiver:

_____ Major Defense Acquisition Program (MDAP) Solicitation/Contract
___ MIL-STD/MIL-SPEC
___ Process

_____ NON-MDAP Solicitation/Contract
_X_ MIL-STD/MIL-SPEC
_____ Process

_____ Management and Manufacturing Processes (Two-Year)
_____ Weapon System
_____ Rebuy
_____ Spare
_____ Service

1. Requester:
Program: HAWK PRON D1943064 Date Submitted: 09/15/1999
POC: John Farris Office Symbol: AMSAM-RD-SE-IO
Phone: 876-7254 DSN: ________
Solicitation: ________ Contract: ________
Part Number: 13235072 NSN: 5998-01-319-4313

2. MIL SPEC/STD/M&M PROCESS required. MIL SPEC/STD/M&M PROCESS number: MIL-S-13949

MIL SPEC/STD/M&M PROCESS title: Sheet, Printed Wiring Board, General Specification for

3. Mission statement: Describe the mission the requested MIL SPEC/STD/PROCESS is to support:

Spare Part Procurement

4. Product/Process description: Describe in detail the product or process covered by the requested MIL SPEC/STD/M&M PROCESS.

Printed Wiring Board raw materials including copper clad laminates, pre-pregs, bonding film, etc.

5. Commercial equivalents. (N/A FOR M&M PROCESSES) Describe one or more commercially available products which serve as the

nearest equivalents to those described by the applicable MIL SPEC/STD.

IPC 4101

6. Differences between military and commercial products: Describe the differences, if any, between the product(s) or process (es) defined by the applicable MIL SPEC/STD and the nearest commercial equivalent(s). **(N/A FOR M&M PROCESSES)**

MIL-S-13949 requires specific testing and frequencies and has a QPL which requires specific re-certification periods. IPC 4101 does not require specific tests and has no certification requirements.

7. Mission impact. **(N/A FOR M&M PROCESSES)** Describe the functional impacts of using the commercial equivalent product(s) in lieu of those specified by MIL SPEC/STD to mission accomplishment; if impacts make use unacceptable, provide supporting information.

There is inadequate information and history to predict what functional differences there are between materials produced to IPC 4101 as opposed to MIL-S-13949. This is one of the reasons to be concerned. There is no reliability data for products built to IPC 4101.

8. Conversion. Can the MIL SPEC/STD be converted to a MIL-PRF, Interface STD or Standard Practice? Describe the actions being taken or justification for non-conversion.

At present there is no action being taken to convert MIL-S-13949 to any other type of document. The IPC Board is to meet in October and plans to address amending IPC 4101 to include the testing requirements of MIL-S-13949.

9. Military-unique document requirement **(N/A FOR M&M PROCESSES)**. Describe, if applicable, how the differences between the product defined by the applicable MIL SPEC/STD and that of the commercial equivalent(s) are such that a clear requirement for a military-unique specification or standard is established.

There is 25 years of history that demonstrates that materials procured and tested to MIL-S-13949 have a high degree of reliability. IPC 4101 leaves the determination of testing

requirement up to the buying activity. This is a "fox in the hen house" scenario.

10. Economic analysis. (N/A FOR M&M PROCESSES) Provide a summary of economic/cost analysis showing the economic impact of using the commercially equivalent product(s) or MIL PRF, versus those defined by the applicable MIL SPEC/STD. If impacts make use unacceptable, provide supporting information.

To date no material suppliers have offered a price decrease for IPC 4101 materials over MIL-S-13949.

11. Follow-on Action: Describe the actions being taken to eliminate the need for citing the MIL SPEC/STD/Process in future acquisitions.

No follow-on action is being taken at present pending the IPC Board decision regarding amending IPC 4101 to include the testing requirements of MIL-S-13949. If the decision is made to not amend the IPC 4101, AMCOM could create a MIS which would include the requirements of MIL-S-13949.

12. REQUESTING OFFICIAL:

OTTO HSU
HAWK Configuration Manager

Otto Hsu
PM or System Manager

16 Sept 1999
Date

- 245 -

13. WAIVER DISPOSITION

✓ Approved primarily for the following reason:

___ Requirement for military-unique MIL SPEC/STD

___ Unacceptable mission impact by using NGS or industrial-wide standard alternative

stable base stuff with respect to these intercepts.
Did I misunderstand your testimony?
A. No. The intercepts never addressed the stable base. The intercepts addressed -- there was no -- these intercepts never addressed stable base issues.
Q. Okay. But as a result of the information that you acquired in that time frame, you initiated a document which you are going to provide to counsel to restrict the procurement to Raytheon?
A. Correct.
Q. And at least prior to the award the contracts office was aware of your office's recommendation not to award this to SDC, but restrict it to Raytheon?
A. The response went back to the acquisition center.
Q. Whose responsibility, in the great scheme of things from an engineering perspective, would it have been to determine the adequacy of the stable base drawings?
A. This is going to sound very confusing.
Q. I'll work at it.
A. My office is responsible for the tech lead. I don't know if you have ever heard of a tech lead. It is a business process where when a requirement is