# TAB 92

government counsel has referred to it as unfortunate Exhibit Number 8 -- I'm glad to have it, personally. Would you look around over there and see if you've got Exhibit Number 8 in your pile? Here it is. Got it.

In Exhibit Number 8, I believe that the lower e-mail is written by you; is that correct?

A. Uh-huh, yes.

Q. And in here the AMC/AMSC is 3N?

A. Yes.

Q. What does that mean?

A. It is a code that is assigned by the technical review as a result of a technical review of a Technical Data Packet to determine whether or not it is -- it has all the data needed to produce the part by anybody. And a 3N is a restricted code, meaning there is some reason why you cannot release this TDP for a full and open competitive action. And N specifically means there is special test equipment involved.

Q. Do you know when the technical review that you're referring to may have taken place?

A. Here's what happened in this case. We went through the normal technical review. It was assigned a G

code, meaning that it was fully competitive potentially. That was probably a mistake. Someone didn't catch the -- those page three and page ten of the mylar being unreadable.

So, it went through the acquisition center to be solicited. Okay. When these intercept actions started coming in, that's when we noticed that it required special test equipment in the testing spec, and that's when we recommended that it be restricted to Raytheon based on that reasoning.

And then I prepared a document to file a 3N code restricting this procurement to Raytheon.

Q. Okay. And that was --

A. It was after it went out on the street for the solicitation.

Q. But it was sometime in the 2000 time frame, 1999-2000-2001 time frame?

A. I can't confirm exactly when it happened.

Q. Would you have in your records something that could tell us the date that that was prepared?

A. Yes.

Q. Is that something you would be willing to provide to counsel to provide to us?

A. Yes.
Q. It's not classified confidential --
A. No.
Q. -- or whatever? Okay.
MR. RIGGS: Joan, we would request that record. I understand discovery ends at the end of this week. And if need be, I can ask for a short extension to get that document, but I hope that wouldn't be necessary.
MS. STENTIFORD: I'll have to look at the document. I mean I'll agree to look at it, and if it's producible, I'll produce it.
MR. RIGGS: Thank you. I appreciate that courtesy.
THE WITNESS: Can I confer with Joan for a minute?
BY MR. RIGGS:
Q. You certainly may. Why don't you guys use the office out here?
(Discussion off the record.)
BY MR. RIGGS:
Q. Let me understand in early 2000 your office became aware of the problems with the PROM data and the

stable base stuff with respect to these intercepts.
Did I misunderstand your testimony?
A. No. The intercepts never addressed the stable base. The intercepts addressed -- there was no -- these intercepts never addressed stable base issues.
Q. Okay. But as a result of the information that you acquired in that time frame, you initiated a document which you are going to provide to counsel to restrict the procurement to Raytheon?
A. Correct.
Q. And at least prior to the award the contracts office was aware of your office's recommendation not to award this to SDC, but restrict it to Raytheon?
A. The response went back to the acquisition center.
Q. Whose responsibility, in the great scheme of things from an engineering perspective, would it have been to determine the adequacy of the stable base drawings?
A. This is going to sound very confusing.
Q. I'll work at it.
A. My office is responsible for the tech lead. I don't know if you have ever heard of a tech lead. It is a business process where when a requirement is

identified by the auto manager for something that's needed for supply, then it initiates a business process and a request goes to several organizations. We have the technical data division that looks at our configuration management status. It comes to my group, which is the -- does an engineering producibility review. Then it goes to quality assurance and they do a quality review. Then it goes to our drawing repository, and they develop -- now they do a CD. I think back then they were doing hard copy drawings.

All that's done in preparation of a solicitation going out on the street. And through that review we determine whether or not a spares part can be competed or not. And during that review, if we find that it can't be competed for any reason, there's something missing, then we go to the project office that has the authority over that part, that weapons system, and then it is their responsibility to tell to us to restrict that item to whomever source that's been approved. In the case of Hawk, it's usually Raytheon. And that's how the process works.

Now, say my office does that engineering

producibility review, and during that review they should have caught that that stable base drawing had a couple pages that were blurred and could not be used for producibility to make that part. That did not happen. So, it went out.

And I say my office. I didn't see that because that's not my job at the time. It is now, but at that time I wasn't doing that. That was another part of my office. At that time I was supporting SAM-D to resolve these kind of issues.

When intercept actions pre-award issues popped up, our post-award actions popped up, I would intervene and try to answer them without having to get SAM-D involved. I got them involved if I needed to.

So, I didn't see anything before it went out on the street for solicitation, but other people in my office did, and they should have caught that that stable base had some bad images. If they had, it would have been restricted at that time to Raytheon based on illegible drawings. But it didn't happen.

Q. Okay. Were you involved in any of the discussions or issues over the programmable parts and programmable

# TAB 93

Meeting 4 Aug 03 - SDC Contracts

List of attendees:

| | |
|---|---|
| Virginia P. Gilchrist | 382-4600 |
| MARTIN J. HNETKA | 382-4600 |
| [illegible] Riggs | 534-4440 |
| [illegible] | 842-0593 |
| Mit MERRITT | 876-5441 |
| WADE GRIFFIN JR | 876-6659 |
| WES SMITH | 842-0537 |
| Patti W. Page | 955-9197 |
| LARRY NICHOLS | 842-9354 |
| Rosalio Rodriguez Jr | 822-5359 |
| W.G. BOWERSOK | 876-7182 |
| Bob Worth | 313-0993 |
| John W. Smith | 832-5282 ext. 1528 |
| Irene Watson | 876-4293 |
| Terry W. Hill | 876-7221 |
| William Carpenter | 382-4600 |

# TAB 94

letter, it was because I was the supervisor of the contracting officer as a checks and balance type deal. So, you know --

Q. And you did attend some meetings with respect to that again as a supervisory contracts officer?

A. Right.

Q. Do you recall attending a meeting in my office in this building in August of 2003 concerning what we call mylar stable base drawings?

A. Yes, I think I remember the occasion.

Q. Do you remember the mylar drawings that we showed you on that occasion as well as the other MICOM representatives -- excuse me -- AMCOM representatives?

A. I know the mylars was talked about during that meeting, but I was not the technical representative. I'm not that familiar with the quality of drawings and stuff like that.

Q. Do you recall Mr. Tignor or any of the other technical people indicating that the mylars that we presented were not sufficient to manufacture from?

A. Not specifically. I can't remember him stating that specifically.

# TAB 95

**Watson, Irene M ACQ**

**From:** Hill, Jerry W ACQ
**Sent:** Thursday, September 04, 2003 4:09 PM
**To:** Smith, Wes G LEGAL; Page, Patti W ACQ; Watson, Irene M ACQ
**Cc:** Bowersox, Wilbur G ACQ
**Subject:** FW: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

-----Original Message-----
**From:** Tignor, Jerald F SAMD
**Sent:** Thursday, September 04, 2003 3:56 PM
**To:** Hill, Jerry W ACQ
**Cc:** Farris, John W
**Subject:** RE: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

Mr Hill,

Contract DAAH01-00-C-0077 Part Number 13235072, NSN 5998-01-319-4313. (enclosure 1) Digital to Analog and Analog to Digital (DAAD) Circuit Card
Raytheon has said they will not help on the DAAD card, or provide a better Mylar drawing, or Gerber files. We paid them for Level III documentation and they provided something much less.

SDC Contract DAAH01-01-D-0013 Part Number 13234917, NSN 5999-01-297-1851. Squelch Amplifier- still say there is no reason why it can't be built.

SDC Contract DAAH01-00-P-0741, Part Number 13385560, NSN 5998-01-157-3697, not sure still what SDC's problem is.

Jerald F. Tignor (Jerry)
Missile Systems Management Branch, SAMD
Building 7612, Room 226, Phone (256) 313-6952 Fax 6622
Redstone Arsenal, AL 35761

-----Original Message-----
**From:** Hill, Jerry W ACQ
**Sent:** Tuesday, August 26, 2003 10:00 AM
**To:** Tignor, Jerald F SAMD
**Cc:** Page, Patti W ACQ; Watson, Irene M ACQ; Bowersox, Wilbur G ACQ; Smith, Wes G LEGAL
**Subject:** FW: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

Gerald, You were going to let us know if you can get the necessary documendation from Raytheon that would allow for SDC to perform on the contracts. We need your answer (ASAP).
-----Original Message-----
**From:** Page, Patti W ACQ
**Sent:** Tuesday, August 26, 2003 10:31 AM
**To:** Watson, Irene M ACQ
**Cc:** Bowersox, Wilbur G ACQ; Hill, Jerry W ACQ
**Subject:** FW: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

tignor
EXHIBIT
25

FYI
-----Original Message-----

**From:** Smith, Wes G LEGAL
**Sent:** Tuesday, August 26, 2003 10:21 AM
**To:** Page, Patti W ACQ
**Subject:** RE: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

John says in his message below that the 0741 part should only be procured from Raytheon, I guess regardless of whether the drawings are good or not, since we know we don't have good electronic data.. I just wanted him to find out whether the drawings we gave SDC are good for purposes of handling the SDC claim that I expect any day now.

But, have we given up on Tignor being able to rectify the TDP problems on the two circuit card assemblies by obtaining further drawings and data? Has anyone heard from Tignor?

-----Original Message-----
**From:** Page, Patti W ACQ
**Sent:** Tuesday, August 26, 2003 10:11 AM
**To:** Smith, Wes G LEGAL
**Subject:** RE: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

Does this mean that again, the info below is not necessarily true? It specifically addresses each contract separately. I just stopped an award for the same NSN as 0741 based on this and now I have to go retrieve the package until we get yet another verification that what we say IS what we say!! Can you tell I'm a little touchy on this subject?

Oh well, such is life.

Patti

-----Original Message-----
**From:** Smith, Wes G LEGAL
**Sent:** Tuesday, August 26, 2003 9:43 AM
**To:** Page, Patti W ACQ; Watson, Irene M ACQ
**Subject:** FW: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

I asked John Farris to go and take a look at the drawings for 0741. To my knowledge, they haven't been verified as being like the ones for 0077, or good drawings. He said he'd try to do it today.

Wes Smith
Attorney/Advisor
AMCOM Legal Office
842-0537

-----Original Message-----
**From:** Farris, John W
**Sent:** Tuesday, August 26, 2003 8:10 AM
**To:** Watson, Irene M ACQ
**Cc:** Tignor, Jerald F SAMD; Smith, Wes G LEGAL; Rodriguez, Rosalio "LEO"
**Subject:** RE: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

Irene-

The condition of the TDPs for the subject NSNs are as follows:

NSN 5999-01-297-1851, PN 13234917, Electronic Component:
TDP is valid, stable base drawings are in good condition; all documentation is available.
AMC/AMSC Code is 1G, fully competitive.

NSN 5998-01-319-4313, PN 13235072, Circuit Card Assembly:
TDP has missing data (Computer Program digital data). AMCOM copy of stable base drawings are inadequate, requires special test equipment.
TDP is restricted to Raytheon, AMC/AMSC is 3N. Part is only procurable from Prime at this time.

NSN 5998-01-383-9443, PN 13385560, Circuit Card Assembly:
TDP has missing data (Computer Program digital data), requires special test equipment.
TDP will be restricted to Raytheon, AMC/AMSC will be 3N. Part is only procurable from Prime at this time.

John Farris
Industrial Operations Div
AMSAM-RD-SE-IO-TL
Engineering Directorate
876-7254, DSN 746-7254

-----Original Message-----
**From:** Watson, Irene M ACQ
**Sent:** Monday, August 25, 2003 9:56 AM
**To:** Tignor, Jerald F SAMD; Wertz, Robert L SAMD; Farris, John W; Smith, Wes G LEGAL
**Cc:** Bowersox, Wilbur G ACQ; Hill, Jerry W ACQ; Page, Patti W ACQ
**Subject:** NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313
**Importance:** High

IMMC has verified that subject NSNs are FMS Case customer buys. This office still **URGENTLY** needs to know the validity of the TDP due to pending actions. Request you provide a specific answer for each NSN.

Irene Watson
AC-LS-M
6-4293

Watson, Irene M ACQ

| | |
|---|---|
| **From:** | Page, Patti W ACQ |
| **Sent:** | Thursday, August 28, 2003 4:09 PM |
| **To:** | Hill, Jerry W ACQ; Watson, Irene M ACQ |
| **Cc:** | Bowersox, Wilbur G ACQ |
| **Subject:** | FW: RE: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313 |

FYI

Patti

-----Original Message-----

| | |
|---|---|
| **From:** | Farris, John W |
| **Sent:** | Thursday, August 28, 2003 4:06 PM |
| **To:** | Smith, Wes G LEGAL; Page, Patti W ACQ |
| **Subject:** | RE: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313 |

Wes and Patti-

Sorry, I almost forgot to send this out. The stable bases for NSN 5998-01-383-9443 are in good condition and usable for manufacturing purposes. However, we still don't have the computer programs indicated in the Tech Data package.

The condition of the TDPs for the subject NSNs are as follows:

NSN 5999-01-297-1851, PN 13234917, Electronic Component:

TDP is valid, stable base drawings are in good condition, all documentation is available.

AMC/AMSC Code is 1G, fully competitive.

NSN 5998-01-319-4313, PN 13235072, Circuit Card Assembly:

TDP has missing data (Computer Program digital data). AMCOM copy of stable base drawings are inadequate, requires special test equipment.

TDP is restricted to Raytheon, AMC/AMSC is 3N. Part is only procurable from Prime at this time.

NSN 5998-01-383-9443, PN 13385560, Circuit Card Assembly:

TDP has missing data (Computer Program digital data), requires special test

**Watson, Irene M ACQ**

**From:** Hill, Jerry W ACQ
**Sent:** Tuesday, August 26, 2003 11:00 AM
**To:** Tignor, Jerald F SAMD
**Cc:** Page, Patti W ACQ; Watson, Irene M ACQ; Bowersox, Wilbur G ACQ; Smith, Wes G LEGAL
**Subject:** FW: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

Gerald, You were going to let us know if you can get the necessary documendation from Raytheon that would allow for SDC to perform on the contracts. We need your answer (ASAP).

-----Original Message-----
**From:** Page, Patti W ACQ
**Sent:** Tuesday, August 26, 2003 10:31 AM
**To:** Watson, Irene M ACQ
**Cc:** Bowersox, Wilbur G ACQ; Hill, Jerry W ACQ
**Subject:** FW: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

FYI

-----Original Message-----
**From:** Smith, Wes G LEGAL
**Sent:** Tuesday, August 26, 2003 10:21 AM
**To:** Page, Patti W ACQ
**Subject:** RE: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

John says in his message below that the 0741 part should only be procured from Raytheon, I guess regardless of whether the drawings are good or not, since we know we don't have good electronic data.. I just wanted him to find out whether the drawings we gave SDC are good for purposes of handling the SDC claim that I expect any day now.

But, have we given up on Tignor being able to rectify the TDP problems on the two circuit card assemblies by obtaining further drawings and data? Has anyone heard from Tignor?

-----Original Message-----
**From:** Page, Patti W ACQ
**Sent:** Tuesday, August 26, 2003 10:11 AM
**To:** Smith, Wes G LEGAL
**Subject:** RE: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

Does this mean that again, the info below is not necessarily true? It specifically addresses each contract separately. I just stopped an award for the same NSN as 0741 based on this and now I have to go retrieve the package until we get yet another verification that what we say IS what we say!! Can you tell I'm a little touchy on this subject?

Oh well, such is life.

Patti

-----Original Message-----
**From:** Smith, Wes G LEGAL
**Sent:** Tuesday, August 26, 2003 9:43 AM
**To:** Page, Patti W ACQ; Watson, Irene M ACQ
**Subject:** FW: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

I asked John Farris to go and take a look at the drawings for 0741. To my knowledge, they haven't

been verified as being like the ones for 0077, or good drawings. He said he'd try to do it today.

Wes Smith
Attorney/Advisor.
AMCOM Legal Office
842-0537

-----Original Message-----
**From:** Farris, John W
**Sent:** Tuesday, August 26, 2003 8:10 AM
**To:** Watson, Irene M ACQ
**Cc:** Tignor, Jerald F SAMD; Smith, Wes G LEGAL; Rodriguez, Rosalio "LEO"
**Subject:** RE: NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313

Irene-

The condition of the TDPs for the subject NSNs are as follows:

NSN 5999-01-297-1851, PN 13234917, Electronic Component:
TDP is valid, stable base drawings are in good condition, all documentation is available.
AMC/AMSC Code is 1G, fully competitive.

NSN 5998-01-319-4313, PN 13235072, Circuit Card Assembly:
TDP has missing data (Computer Program digital data). AMCOM copy of stable base drawings are inadequate, requires
special test equipment.
TDP is restricted to Raytheon, AMC/AMSC is 3N. Part is only procurable from Prime at this time.

NSN 5998-01-383-9443, PN 13385560, Circuit Card Assembly:
TDP has missing data (Computer Program digital data), requires special test equipment.
TDP will be restricted to Raytheon, AMC/AMSC will be 3N. Part is only procurable from Prime at this time.

John Farris
Industrial Operations Div
AMSAM-RD-SE-IO-TL
Engineering Directorate
876-7254, DSN 746-7254

-----Original Message-----
**From:** Watson, Irene M ACQ
**Sent:** Monday, August 25, 2003 9:56 AM
**To:** Tignor, Jerald F SAMD; Wertz, Robert L SAMD; Farris, John W; Smith, Wes G LEGAL



SDC 1307

**Cc:** Bowersox, Wilbur G ACQ; Hill, Jerry W ACQ; Page, Patti W ACQ
**Subject:** NSNs 5999-01-297-1851, 5998-01-383-9443, and 5998-01-319-4313
**Importance:** High

IMMC has verified that subject NSNs are FMS Case customer buys. This office still **URGENTLY** needs to know the validity of the TDP due to pending actions. Request you provide a specific answer for each NSN.

Irene Watson
AC-LS-M
6-4293

# TAB 96

489

SDC

November 12, 2004

DCMA Atlanta
ATTN: DCMAE-GATC/P. Slemons
2300 Lake Park Drive, Suite 300
Smyrna, GA 30080-4091

Dear Mr. Slemons:

Unfortunately after discussions with our subcontractor, they are unwilling to accept the inventory in order to reduce their claim. As a good faith attempt to settle, we offer to discount the subcontractor costs, SDC costs, other than settlement costs, and profit at 20%. The proposal therefore is as follows:

| | | |
|---|---|---|
| Settlements with Subcontractor | $313,530 | (80% x $391,913) |
| Other Cost | 15,442 | (80% x $ 19,303) |
| G & A | 238,000 | (80% x $297,500) |
| Profit | 31,353 | (80% x 39,191) |
| Settlement Expense | 19,316 | |
| | $617,641 | |

We understand that this amount is in excess of contract value but it should be noted that the excess costs are due to delays and disruption caused by the Government and therefore should be considered as an equitable adjustment to the original contract. This will partially reimburse SDC for the excess costs incurred resulting from the Government actions. Our subcontractor TBE has provided the following analysis to substantiate their entitlement to payment for the inventory:

**"GOVERNMENT OBLIGATIONS ON SDC HAWK I CONTRACT**

**I. SUMMARY.**

A. In May 2000, AMCOM awarded Contract No. DAAH01-00-C-0077 ("the Contract") to SDC for supply of Hawk circuit card units. The Contract was awarded as a build-to-print, production contract with a Level 3 Technical Data Package ("TDP"). The TDP provided by the Government contains defects and deficiencies that preclude performing the Contract on a build-to-print, production basis. The Government has not corrected

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601

and/or resolved defects and deficiencies of the TDP to allow production on a build-to-print basis.

B. The delivery schedule specified in the Contract was: (i) for two first articles - 8 August 2000; and, (ii) for the first twenty-two 22 production units with first article – 2/3 February 2001. After the above specified delivery schedules passed, the Government failed to terminate the Contract or reestablish a new delivery schedule for the Contract. Consequently, the Government has waived the delivery schedule for the Contract, and no delivery schedule currently exists. To unilaterally reestablish a new delivery schedule, the Government must take the contractor (SDC) as the Government finds SDC. That means without correcting the TDP to allow production on a build-to-print basis, and providing SDC the information/equipment it needs, the Government cannot unilaterally reestablish a new delivery schedule.

C. During negotiations for the Contract, the parties understood and agreed that SDC's pricing was based on SDC acquiring all material required for contract performance on a one-time buy, including material necessary for option quantities. Accordingly, the Contract authorized SDC to procure all material quantities necessary for contract performance, including unexercised option quantities, prior to first article approval. Pursuant to such contract authority, on 6 June 2000, SDC awarded Purchase Order SDC006 ("the Subcontract") to TBE to acquire material for parts required by the Contract. TBE did acquire all the material required by the Subcontract with SDC, which parts are ready for delivery. The Government cannot now refuse to accept and pay for material acquired/contracted for prior to first article approval.

## II. FACTS.

**The Basic Contract**

1. The Government and SDC executed the Contract in May 2000.

2. The Contract is a build-to-print, production Contract for 2 first articles and 22 production units, with remaining possible units priced in range quantities as options (up to a total of 129 units). Contract, Section B.

3. The Contract's delivery schedules are listed as —

   a. for two first articles - 8 August 2000 (Contract CLIN 0001AA);

   b. for the first twenty-two 22 production units with first article – 2/3 February 2001 (Contract CLIN 0001AD).

5. SDC's Offer was incorporated in the Contract. Contract, SF26, Block 18.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600

SDC

6. At Contract provision I-65, the Contract contains the First Article Clause at FAR 52.209-4, without Alternate I. The clause without Alternate I puts the risk of purchase of production quantities prior to first article approval on the contractor. The clause with Alternate I permits the contractor to purchase production quantities prior to first article with the approval of the contracting officer.

7. The Contract contained the standard contract provisions for fixed-price supply contracts, including the FAR 52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) clause. Contract clause I-43.

**SDC's Offer**

8. In SDC's Proposal Revision B (dated 13 March 2000), submitted to AMCOM's Geraldine Williams, SDC's proposed prices were based on buying material for the entire quantity of 129 Boards, which includes first articles and production units (including option quantities), as an up-front, one-time buy.

9. In a 31 March 2000 Memo to AMCOM's Geraldine Williams, DCMC Industrial Specialist Charles Kirch noted that:

   a. he had performed a material cost review of SDC's proposal at AMCOM request;

   b. he approved of SDC's pricing concept of a one-time, up-front material buy (but questioned some of SDC's cost and pricing data for the material);

   c. any other material pricing methodology would mean that SDC's option year pricing would have to be very high;

   e. the economic incentives of a one-time, up-front buy was obvious; and

   f. the material could be a separate contract line item.

10. In SDC's Proposal Revision C (dated 4 April 2000), submitted to AMCOM's Geraldine Williams, SDC -

   a. noted that it continued its proposal pricing based on the concept of a one-time, up-front material buy for the entire quantity of 129 Boards (which includes first articles and production units (including option quantities), as an up-front, one-time buy), and

   b. revised its pricing based on Mr. Kirsh's comments.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601

SDC

c. Revision C, Attachment B pricing basic contract quantities (24) and option range quantities (105) , total 129 is based on the one-time, up-front buy of material for 129 boards.

11. In a 2 May 2000 letter, SDC's Ms. Gilchrist

a. accepted AMCOM's counter offer for a fixed quantity of 2 first article and 22 production units and option year pricing as reflected in SDC's Revision C proposal; and

b. reiterated unit prices, to include prices for option year ranges in Attachment A to that letter, which, for option years: (I) are the same as reflected in Revision C, Attachment B, and (ii) do not include costs for materials for option years.

12. *Unit prices, including option unit prices, as reiterated in Attachment A to Ms.* Gilchrist's 2 May letter and as stated in the Contract, were clearly based on the one-time, up-front material buy communicated to AMCOM by SDC and DCMC.

13. Costs of a one-time, up-front material buy: (i) were priced into Contract quantities, (ii) were the basis of the award price; and, (iii) AMCOM was, or should have been, aware of such pricing.

**<u>The Subcontract</u>**

14. After award of the Contract, SDC took timely action to make a one-time, up-front material buy as the parties had envisioned for material quantities required for Contract performance. Namely, on 6 June 2000, SDC awarded TBE the Subcontract (SDC Purchase Order SDC006) in the amount of $397,771.58 to acquire material for parts required for SDC Contract performance.

15. By Revision 2 to the Subcontract, dated 11 July 2000, the total Subcontract purchase price for delivery of material to fabricate, assemble, and deliver 129 Hawk circuit cards, including kitting and delivery to SDC, was increased to $403,297.58 to cover costs for receiving, inspection, and kitting.

16. TBE did timely acquire Contract conforming parts required by the Subcontract with SDC, which parts are ready for delivery.

17. TBE has completed all Subcontract requirements and awaits only delivery instructions and payment for final Subcontract close-out.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601

SDC

## The TDP

18. The specifications and TDP purport to be Level III, ready for build-to-print, mass production.

19. The specifications and TDP were not ready for build-to-print, mass production. Generally, the TDP appears to be a package that was developed in the 1960's or 1970's and accepted as a Level III package, while, in fact, several key pieces of data and procedures had not been procured from the developer by the government. These items include: (1) electronic programmable parts data, (2) electronic raw board fabrication and test data (*i.e.*, ICT and Gerber files), and (3) a clear and unequivocal set of functional test procedures that can be used for test, debug and acceptance of the finished product. It also appears that these packages have not been checked or updated to reflect what technical data is actually available from the development effort, and it fails to include newer regulations by military and non-military government agencies (e.g. EPA) and updated MIL-Specs and MISs.

20. Specific data defects and deficiencies include, but are not limited to, the following.

   a. The TDP references program code in electronic format for Programmable Parts that has not been made available by the Government as provided in the TDP. The data is not available to SDC, and the Government has indicated that it will not make the required data available to SDC. Such data is required for build-to-print production of the Hawk circuit cards.

   b. There are no clearly-defined "go/no-go" test procedures for acceptance that can be performed by production technicians that document results showing the boards are acceptable to the government.

   c. Ambiguity in the MIS or performance spec, such as MIS-41341, appears to require that all the boards (not only First Articles) meet all the contents of the performance spec, even though the government said it was not actually desired that the production boards be subjected to life-draining environmental tests. The exact set of tests required for acceptance testing should be clearly defined in the RFP and contract.

   d. The TDP and referenced MISs (performance specs), list old, obsolete and expensive test equipment for use in testing the boards, equipment and procedures more appropriate for a developmental, not a production, effort.

   e. The specs and drawings call for use of Ozone Depleting Chemicals during cleaning and preparation of the PWBAs. However, current EPA regulations discourage or prohibit use of such materials in modern-day board processing and assembly.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601

494

SDC

21. While the parties have been discussing alternatives in an attempt to overcome specification and TDP defects/deficiencies so that SDC might complete the Contract, AMCOM has been unable to supply the necessary data and procedures that will allow SDC to perform the Contract on a build-to-print, production basis.

## III. ANALYSIS.

### A. The Defective Specifications Provided by the Government Constitute a Constructive Change, Entitling SDC to an Equitable Adjustment..

The law is very clear that the Government warrants the adequacy of specifications it provides, and that a contractor is entitled to an equitable adjustment under the Changes clause if the Government provides defective specifications. The basis for this legal premise may be best set forth in Greenbrier Industries, ASBCA 22121, 81-1 BCA ¶15,057, where the Board noted at 74,135:

> Since each appears to be an innocent party, the law of warranty permits the [contractor] to have recourse against the Government as author of the specifications, the root cause of the ... production problems.

The Government's failure to provide SDC program code in electronic format for Programmable Parts as required by the TDP (FACTS 20a) can be considered either as a Government constructive change under the doctrine of implied warranty of specifications or as a constructive change for failure to provide required property under the Government provided property clause. The result is the same. The Government is legally responsible for all costs that SDC has and will incur due to that failure. If the Government is insistent that SDC develop those codes, than the Government would be responsible for all developmental and production costs associated therewith.

The Government is also liable for increased costs of performance if the specification prescribes procedures and tests (or fails to provide such procedures and tests) that make performance at the contemplated level of production impossible. See *e.g.*, La Crosse Garment Manufacturing Co. v. United States, 432 F.2d 1377 (Ct. Cl. 1970). The lack of clearly-defined "go/no-go" test procedures for acceptance, the ambiguities in performance specifications, and the specification-listed old and obsolete test equipment and procedures (FACTS 20b-d) clearly prohibit production of the Hawk circuit boards on a build-to-print, mass production basis. These defects fall within the types noted in La Crosse, where the Board explained at 180-81:

> "Mass production" is a variable; there are countless degrees between laborious production of units, one at a time, and there rapid flow on a production line.
>
> * * *

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600

SDC

Performance may become unsatisfactory and costs may increase in varying degrees by reason of [specification defects] which may cause difficulties, interruptions, slowdowns and delays which interfere with mass production without making it impossible. The measure for determination of damages is therefore the degree of interference with satisfactory production.

Here, SDC's damages as a result of these interferences may also rise to the level of commercial impracticality due to the anticipated very high additional cost of performance because of the defects and deficiencies.

The specs and drawings which call for use of Ozone Depleting Chemicals during cleaning and preparation of the PWBA run afoul of current EPA regulations. FACTS 20e. This also makes the specifications defective. See, *e.g.*, Castle Construction Company, ASBCA 28509, 84-1 BCA ¶17,045.

Given that AMCOM has waived the delivery schedule and must take SDC as AMCOM currently finds SDC (see section IIIB below), specification defects and deficiencies must be corrected, with attendant costs, so as to allow SDC to perform before AMCOM may unilaterally reestablish a new delivery schedule.

**B. AMCOM has Waived the Delivery Schedule and Must Take SDC as it Finds SDC in order to Unilaterally Reestablish a New Delivery Schedule.**

The delivery schedule specified in the Contract is 8 August 2000 for two first articles, and 2/3 February 2001 for the first 22 production units with first article. FACTS 3. We are now in 2003, and SDC has not delivered (and cannot with current specification defects and deficiencies deliver) units called for by the schedule. We are way beyond any reasonable period of forbearance, and the Government has clearly waived the delivery schedule. *E.g.*, D. Joseph De Vito v. United States, 413 F 2d 1147 (Ct. Cl. 1969).

Any AMCOM unilaterally reestablished delivery date must be reasonable based on the performance capabilities of SDC at the time the schedule is unilaterally reestablished. See *e.g.*, Spasors Electronics Corp., ASBCA 12877, 70-1 BCA ¶8119. Without curing the specification defects and deficiencies, SDC will be unable to perform. AMCOM must first correct the specification defects and deficiencies before AMCOM can unilaterally reestablish a delivery schedule.

The Contract must come to some end. Since AMCOM has indicated that it cannot or will not correct the specification, performance completion according to the Contract is not a viable option, nor is a termination for default as AMCOM has waived the delivery schedule. It appears the only viable alterative for the parties is a termination for convenience.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601

C. In any Convenience Termination, SDC is Entitled to Recover All its Material Costs.

1. The Contract Authorized an Up-Front Material Buy of Material for 129 Boards.

The Contract incorporated SDC's offer (FACTS 5), which included a one-time, up-front buy of material for 129 boards. FACTS 8-11. Contract pricing was based on a one-time, up-front buy of material for 129 boards. FACTS 12, 13.

The Contract contained the First Article Clause at FAR 52.209-4, without Alternate I. This would normally put the risk of purchase of production quantities prior to first article approval on the contractor. However, that is not the case here because of the incorporation of SDC's offer into the Contract, and the Government's clear influence on and acceptance of Contract pricing --- pricing which included a one-time, up-front buy of material for all quantities, including option quantities, required by the Contract. The Government would be obligated to reimburse SDC for SDC's entire up-front buy of material quantities if the Contract were terminated for convenience. This outcome is dictated, not only be the Contract itself, but also by well recognized legal principles of Mistake in Integration, Interpreting Ambiguities, and Estoppel.

With respect to a Mistake in Integration -

While it appears that there is more of a conflict between provisions (incorporation of SDC's offer versus incorporation of FAR 52.209-4 without Alternate I), the Contract must be reformed to reflect the parties intent. That intent is evidenced by the FACTS 8-13, which show the incorporation of SDC's offer into the Contract and the Government's influence on and acceptance of SDC pricing. Both of these factors show that the parties intent was to authorize SDC to make a one-time, up-front buy of all material quantities necessary to deliver, whether first article or production (including option quantities).

With respect to Ambiguity –

Where two Contract provisions appear to conflict, the overriding principle of contract interpretation is to interpret a contract as whole so as to avoid rendering terms meaningless, to avoid conflict, and to fulfill the principal purpose of parties. Here those principles dictate that the incorporation of SDC's offer means that the Contract must be read to mean that FAR 52.209-4 with Alternate 1 applies.

The Contract clearly incorporated SDC offer, which included a one-time, up-front buy of material for 129 boards. The principal purpose of the one-time, up-front buy of material for 129 boards, which was reflected in Contract pricing, was to save money for the Government. The Government participated in and accepted this pricing strategy. Reading the Government's acceptance of the incorporated offer as an agreement to reimburse SDC for the

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601

SDC

one-time, up-front buy of material for 129 boards is the only way to: (i) avoid rendering SDC's incorporated offer meaningless, (ii) avoid conflict between SDC's offer and Contract pricing, and (iii) fulfill the parties' principal purpose of saving the Government money.

With respect to Estoppel (*See, e.g.*, American Electronics Laboratories v. United States, 774 F.2d 1110,1113 (1985) -

All the elements of estoppel are met.

1. The Government knew that SDC's offer and pricing were based on the one-time, up-front buy of material for 129 boards.

2 The Government, in accepting SDC's offer, intended for SDC to make a one-time, up-front buy of material for 129 boards, and/or SDC had a right to so believe.

3 SDC was not aware that the Government did not intend for SDC to make a one-time, up-front buy of material for 129 boards.

4 SDC relied on the Government's conduct by making the one-time, up-front buy of material for 129 boards.

Consequently, the Government is stopped from denying that the Contract authorizes a one-time, up-front buy of material for 129 boards.

**D. Impact on TBE of a termination for convenience.**

In the event that AMCOM terminates the Contract for convenience, there would be no impact on TBE. Under standard termination for convenience procedures, the Government is obligated to reimburse SDC its allowable costs, including material costs and costs of settlements with subcontractors, *e.g.*, TBE.

Under TBE's Subcontract, TBE is entitled to be reimbursed at the Subcontract price with respect to deliverable Subcontract items ready for delivery at the time of any SDC convenience termination. Since all items required by the Subcontract have been completed, TBE is entitled to be paid the full Subcontract price of $403,297.58. See FAR 49.108-3(a), 49.205(a). SDC is entitled to be reimbursed these costs.

If SDC or the Government requires TBE to take action other than delivery (*e.g.*, to take special action with respect to inventories, prepare justifications), such costs could be categorized as termination settlement expenses. In addition to the Subcontract price, TBE would be entitled to be reimbursed any such costs. A separate account should be opened to accumulate such costs. These possible additional TBE costs are allowable costs to SDC in the event AMCOM terminates the Contract for convenience.

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601

SDC

TBE would deliver all Subcontract material to SDC, who would in turn provide them to the Government. Since the subcontracted material is conforming, the Government could provide the termination inventory to any replacement Hawk circuit card contractor as Government furnished material.

V. **Conclusion.**

It appears that the only viable option for all parties is to terminate the Contract for convenience because, *inter alia*, the Contract specification is defective, the Contract delivery schedule has been waived, and there appears to be no other way to end the Contract. Since SDC's offer incorporated in the Contract and the Contract's pricing included the one-time, up-front buy of material for 129 boards, the Government is obligated to reimburse SDC the costs of that material. TBE is entitled to be reimbursed in accordance with standard termination accounting. The Government is entitled to Contract inventories, which in turn can supply to other contractors as Government furnished material."

SDC believes that the TBE position is the correct legal position. In order to reach settlement SDC has proposed the above counter offer.

We hope to resolve this matter as soon as possible.

Sincerely,

V. P. Gilchrist

Virginia P. Gilchrist
President

VPG/eds

225 Spragins Street, Suite G
Huntsville, AL 35801
Phone: (256) 382-4600
Fax: (256) 382-4601