# TAB 99

owns the PROM data. It's proprietary to Raytheon and you can't get it from Raytheon.
And then you have just told me that Raytheon provided it to the government, and these chips that you provided were actually programmed from Raytheon data provided to the government that the government now controls.
A. I didn't know if it was Raytheon or not, but I said it was provided to the government. Once it goes to the government, it's owned by the government.
Q. I see. So my question is, when was that data that you are referring to provided to the government?
A. The mylar data looks like it was created back in '87 and provided to the drawing file.
Q. I'm referring -- I'm sorry. I'm referring to the PROM data that you referred to in Exhibit Number 5.
A. That was probably when the ECP was submitted for the DAAD card, which would be '87-'88 time frame.
Q. Okay. So your testimony is that the government owned the PROM data prior to January 23rd, 2002?
A. The government felt like they owned the PROM data because it was Level III documentation. The Level III documentation that we found over there is in

black and white that was not adequate.
Q. Okay. So the PROM data that was in the Technical Data Package was not adequate; is that correct?
A. That's true.
Q. Now, what data did you program these chips from that you now claim is adequate, and when did the government acquire that data, if you know?
A. I think we took a data card apart, copied the programing on the chips, and reprogrammed it and then tested it. That's what I think, but I wouldn't swear to it.
Q. So you reverse engineered it?
A. Yeah.
Q. So it wasn't made from digital data provided by Raytheon to the government, these chips you are talking about programing?
A. No.
MR. RIGGS: Why don't we take about four or five minutes?
(Discussion off the record.)
MR. RIGGS: We'll mark that, Jim, please, the next number.
(Exhibit No. 26 marked for identification.)

# TAB 100

an expert in this case?

A. Well, Mr. Riggs and I had a mutual client many years ago, and we have had a business relationship over many years. And he asked me if -- to assist the company in a termination for convenience claim, and then I guess it was just a progression into making the calculations of these damages specific for this contract.

Q. So, have you been retained by Mr. Riggs as an expert in other cases?

A. Yes.

Q. How many?

A. Over the course of my career, probably four or five.

Q. What was the most recent?

A. Well, this is the most recent one. Prior to that as an expert, it was probably John Cocker, Cocker Handler. I'm not even sure what the last name is, but it was back a number of years ago.

Q. What kind of case was that?

A. That was a case related to the -- he was a subcontractor at the Department of Energy, and there was a reduction in effort, and there were damages that the government was seeking against him, and the

company was seeking damages against them related to changes in the contract, is what I recall.

Q. Did you testify in that case?

A. Yes, I did.

Q. All right. Down in section Roman Numeral II, which reads, "Scope of Effort," still on page two of your report, you list four kinds of documents that you reviewed.

A. Yes.

Q. I have to tell you, Mr. Agresto, I don't know a lot about accounting, so these are going to seem basic questions. So, bear with me, if you will.

What information relevant to your damages or your report on damages did you obtain from the financial statements from fiscal year 2001 through 2006?

A. Well, in order to determine the damages, one of the things I did was I calculated what was the expected profits had not the improper actions taken place and had the company continued its normal course of business, and I compared that to the actual profits.

So, I would have extracted out of that the actual profit, and also determining the level of

revenue that the company was maintaining during that period of time also.

Q. And how did you come up with your amount of what you call expected profits?

A. Well, what I did was there's a schedule that's an exhibit in the report that goes through the calculation, and I believe it's Schedule 1 and subsequent schedules thereafter. Basically what I did was I took the revenue number from 2002 and increased it forward by three percent per year under the assumption that the company would generate an increase of approximately three percent per year, which I thought was on the conservative side.

I calculated a profit factor of ten percent, which was consistent with the profit for the termination for convenience proposal, and then I looked at that ten percent profit, determining whether it was reasonable under the DoD rated guidelines methods.

I took that ten percent profit factor as being a reasonable number, reduced it by the company's expressly unallowable costs under FAR Section 31, come up with a profit, and then further reduced it by

the interest and depreciation to come up with what's called earnings before interest, depreciation, and amortization.

From there on, I then took that information, and based upon company's factors, I made a projection of what the loss in profits were, in addition to the loss in company value.

Q. Okay. So, going back to the beginning of what you said, you increased -- you assumed -- basically you guessed that there might be a three percent increase in expected revenue?

A. Well, I wouldn't use the word guess. I mean I think that that's a valid assumption that three percent escalation factor is reasonable based upon my experience, you know, with companies of similar size, that a three percent escalation is actually, if anything, on the low end and a conservative number.

Q. Do you know how long SDC has been in business?

A. Not exactly, no.

Q. Do you know whether three percent is -- whether they have ever achieved a three percent increase in revenue over a year?

A. Oh, sure, yeah. I actually know that they

# TAB 101

A. That's correct.

Q. And how is that -- how could there be lost profits under this contract when -- well, how could there be lost profits under this contract when SDC has received over four hundred thousand dollars on a contract that was only guaranteed for one year at a hundred and twenty-nine thousand dollars?

A. Right. I think we aren't saying that it was -- I'm not saying, I should say, that it was under this contract. It was caused by the fact that the management of the company SDC had spent so much time on that contract trying to remedy the problems that were experienced under that contract, which I think is the basis of why they received the damage calculations that we had originally submitted.

That was the impact caused by 0077. It was not intended to reflect that it was the lost profit under that contract. And that's where I think there was this misunderstanding initially, and actually that was one of the reasons that I revised my report was because I think I wasn't clear enough initially that the impact was not under this contract, but it was caused by the contract.

That's the basis of the calculation. Again, it's not related to the specific contract, it's the amount of effort that was spent under 0077 that was taken away from other functions of the management of the company.

Q. Okay. Well, moving on to page four, you have a list of three items. And are those the things that you claim management was prevented from doing as a result of contract 0077?

A. That's correct.

Q. And did SDC, to your knowledge, have plans to expand its existing business base, specific class?

A. Well, they had estimates of what they expected to do. And yes, there were estimates that were used for purposes of billing and making projections. So, yes, they were planning on increasing their business base.

Q. Are you aware of any particular contract that SDC was prevented from either being awarded or bidding on as a result of contract 0077?

A. No, I'm not aware of any specific job.

Q. Can you explain what you mean by number three, "Denied SDC growth in markets it was not active"? I don't understand that.

A. Basically a company is active in its specific marketplace, and the company expectations are to expand their market. And in this particular case management spent so much time on trying to resolve the problems related to 0077 they were denied that opportunity.

Q. Okay. So that's your -- that's your entire explanation, summation, of the loss of profits measure of damages, that because SDC was -- I don't want to characterize what you said SDC was doing. SDC continued to be involved in resolving contract 0077 and was prevented from doing anything else?

A. Well, again I wouldn't say that they were prevented from doing anything else. I think that's an exaggeration of what I'm saying. I think what I'm saying is specifically what's written there is because they were spending time on 0077, they were unable to devote as much time as they would have typically been doing in expanding their business base and going and getting future business and going into new markets.

It's not like they did zero. It's the fact that they spent a significant amount of time on 0077,

which denied them the opportunity to do more than what they did. And based upon that, what I did was I made these calculations which are details in the exhibits and schedules of how these dollars were calculated.

Q. How is that different from your subparagraph two, loss in company value? Isn't that the same thing as lost profits?

A. No. The difference between lost profits is the fact that the company loses profit. Loss of company value is basically the difference between what somebody -- a company is worth based upon revenue and profitability. The denial or the reduction in revenue profitability places a value on the company. It's just as simple as this. If somebody had a company that was doing $4 million in revenue versus a company that was doing $10 million dollars in revenue, the company's value would be less.

Somebody would be willing to pay more for a company doing $10 million dollar in revenue who had a significantly broader scope of effort than one who is doing $4 million who has less of a scope of effort.

So, those are two specific different types of

# TAB 102

of questions. In the complaint, which I don't intend to make an exhibit, the amended complaint --

MR. RIGGS: That's fine.

BY MS. STENTIFORD:

Q. -- you set out through your attorney several counts against the government that constitute the complaint. And my question to you in each event, and we'll go through them count by count, you make claims for specific amounts of damages, and my question to you is, count one, defective specifications, page seven of the amended complaint, you claim the sum of three hundred and ninety-seven thousand dollars for damages caused by the failure to provide specifications free of defects.

I'll let you confirm that that's what the complaint says.

A. That's what it says.

Q. What is your basis for claiming three hundred and ninety-seven? How were you damaged to the extent of three hundred and ninety-seven thousand dollars by the purported defective specifications?

MR. RIGGS: To the extent that she participated in the calculation of damages, she can answer that