IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Filed: November 5, 2007

| | | |
|---|---|---|
| SYSTEMS DEVELOPMENT CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 06-232-C (Judge Lawrence M. Baskir) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

# PLAINTIFF'S RESPONSE TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

Howell Roger Riggs
Attorney for the Plaintiff
Dick, Riggs, Miller & Stem, LLP
200 Clinton Avenue West
Regions Center, Suite 1050
Huntsville, Alabama 35801
Telephone: (256) 564-7317
Facsimile: (256) 564-7319
hriggs@drmslaw.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SYSTEMS DEVELOPMENT CORPORATION, | ) | |
| Plaintiff, | ) | November 5, 2007 |
| v. | ) | Case No. 06-232-C (Judge Lawrence M. Baskir) |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

Comes now the Plaintiff, Systems Development Corporation, (hereinafter referred to as "SDC") and responds to the Defendant's Opposition to Plaintiff's Cross Motion for Summary Judgment as follows:

## I. SDC'S CROSS MOTION FOR SUMMARY JUDGMENT IS IN ACCORDANCE WITH THE PROCEDURAL RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS, AS WELL AS, THE SPECIAL ORDER OF THIS COURT.

In opposition to SDC's Cross Motion for Summary Judgment, the Government asserts that said motion fails to meet the standards of Rule 56 of the *Rules of the United States Court of Federal Claims*, as well as, this Court's April 21, 2006, Order. Specifically, the Government alleges that SDC's Cross Motion fails to "identify material issues genuinely in dispute," and "consists of only six paragraphs of SDC's legal conclusions." (Def.

Opp. at 1, n.1) The complete lack of understanding of the fundamental purpose of a motion for summary judgment evidenced by these assertions serves as a reference point for evaluating the merits of the Government's entire opposition to SDC's cross motion for summary judgment.

Failing to identify disputed issues of material fact is not a flaw in a cross motion for summary judgment pursuant to Rule 56. In fact, it is the absence and not the presence of disputed issues of material fact, which serves as the only proper basis for any motion for summary judgment. SDC agrees with the Government in saying that its Cross Motion for Summary Judgment fails to identify any disputed issues of material fact. SDC's failure to identify any such disputed issues was by design, as SDC intended its cross motion to be based upon the absence of disputed issues of material fact. Exactly what the Government envisions as the justification for its position here is unclear, but what is clear is that the Government does not understand even the most basic elements of a motion for summary judgment. SDC's failure to identify disputed issues of material fact is not an appropriate basis for an objection to its cross motion for summary judgment.

The form and substance of SDC's Cross Motion for Summary Judgment is proper pursuant to Rule 56. SDC's cross motion for summary

judgment contains six (6) paragraphs; however, these paragraphs contain averments of fact and law, not legal conclusions. SDC's cross motion for summary judgment states that no genuine issues of material fact exists regarding the elements of legal liability as to each of the five (5) causes of action stated in its First Amended Complaint. The sixth paragraph of said motion adopts the pleadings, discovery, and the statement of uncontroverted facts as the grounds for the previous assertions. SDC has expended a great deal of effort in tailoring its motion to the precise claims at issue. Further, SDC has already prepared its statement of uncontroverted facts, which is to accompany its motion.[1] Should the averments of SDC's cross motion for summary judgment be accepted by the Court, they could certainly provide sufficient justification for the entry of summary judgment against the Government.

The Government objects to SDC's cross motion for summary judgment as violative of the Court's Special Procedures Order; however, the Government fails to state any specific violation as the basis for its objection. SDC's cross motion for summary judgment surmises that, based upon the facts as presented in its statement of uncontroverted facts, as well as, in the pleadings and discovery materials provided in this case, it is

[1] This document has been provided to counsel of record for the Government, and is presumably awaiting her revisions prior to filing.

entitled to a summary judgment based upon the claims which have been made by virtue of the record in this case. Further, the legal elements of each of the common law actions at issue in this case are identifiable from SDC's cross motion and brief in support. In the Government's Opposition, it fails to raise any issue with the legal elements of SDC's claims. Predominantly, the Government disputes SDC's factual assertions. However, because SDC has complied with the procedural rules established by this Court for filing a motion for summary judgment, the Government's "procedural" objection to the form of SDC's motion is without merit.

## II. SDC'S CROSS MOTION FOR SUMMARY JUDGMENT WAS TIMELY FILED.

In opposition to SDC's Cross Motion for Summary Judgment, the Government has argued that, "the deadline for filing dispositive motions in this case was July 9, 2007 therefore the plaintiff's motion is untimely." (Def. Opp. at 1) Presumably, this timeliness objection refers to the schedule established in the parties' Joint Status Report, filed on May 7, 2007. However, the terms of the parties' Joint Status Report do not preclude the Plaintiff's Cross Motion for Summary Judgment.

First, it is worth of notation that the Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment was not filed until July 23, 2007. Second, and more importantly, SDC's dispositive motion is a cross motion

for summary judgment, made pursuant to Rule 56 of the *Rules of the United States Court of Federal Claims*. According to the terms of Rule 56, after the service of a motion for summary judgment by the adverse party, the party against whom summary judgment is sought may move for a summary judgment in its own favor. This procedural device is known as a cross motion for summary judgment. A cross motion for summary judgment can only be filed after a party has been served with a motion for summary judgment. The Joint Status Report compiled by the parties to this action does not alter the *Rules of the United States Court of Federal Claims*, and does not revoke the availability of this procedural device.

On August 1, 2007, SDC applied for and did receive leave of this Court to file its response to the Government's motion for summary judgment, which it did file in the form of a cross motion for summary judgment. Further, on September 25, 2007, and again on October 11, 2007, the Government was ordered by this Court to respond to SDC's Cross Motion for Summary Judgment. Thus, SDC's cross motion for summary judgment is clearly in accord with the applicable procedural rules, as well as, the orders of this Court.

## III. THE UNITED STATES COURT OF FEDERAL CLAIMS HAS JURISDICTION TO CONSIDER SDC'S CLAIMS.

In its opposition, the Government has revisited its previous argument that this Court is without jurisdiction to consider SDC's claims because of SDC's purported failure to submit a certified claim to the contracting officer. In support of this position, the Government has again relied upon the language and varying claim amounts embodied in SDC's submissons to the contracting officer, as well as SDC's alleged failure to demand a final decision. (Def. Opp. at 4-6)

Though this issue has received thorough treatment in SDC's previous filings, SDC again asserts that the relevant legal standard concerning the jurisdiction of this court and claims submitted to contracting officers, fully contemplate consideration of the circumstances surrounding the "claims" in determining their sufficiency. For example, a proposal for settlement becomes a claim for final decision when settlement negotiations reach an impasse. James M. Ellet Construction Company, Inc. v. U.S., 93 F.3d 1537, 1541-42 (Fed. Cir. 1996)(citing Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995)(in banc) and Sharman Co. v U.S., 2 F.3d 1564, 1568-69 (Fed. Cir. 1993)). Also, request for a final decision can be implied from the context of the submission or the desires of the submitting contractor. Heyl & Patterson, v. O'Keefe, 986 F.2d 480, 483 (Fed. Cir.

1993); Transamerica Insurance Corp. v. U.S., 973 F.2d 1572, 1576 (Fed. Cir. 1992). Further, the Government's insistence upon strict adherence to the form of the claims submitted can lead to reversible error in determining matters of jurisdiction. Placeway Construction Corporation v. U.S., 920 F.2d 903, 908 (Fed. Cir. 1990).

Without revisiting the matters previously discussed in detail, SDC would remind the Court that the record conclusively demonstrates that SDC submitted no less than four (4) claims to the contracting officer in this action. (Tab 36, 350-360; Tab 96; Tab 97; Tab 98, 524-551) These claims, some of which were initially couched as proposals for settlement, included demands for payment of monies owed to SDC by virtue of the same malfeasance which currently embodies the claims before the Court. These claims contained chronologies of events, as well as, legal and factual assertions that were more than sufficient to put the contracting officer on notice that SDC was pursuing a potentially very large claim for damages based upon defective specifications, breach of the covenant of good faith and fair dealing, bad faith, superior knowledge, and potentially for failure to pay appropriate termination for convenience costs. These submissions contained numerous references to the contents of the contracting officer's file, as well as copies of relevant documents sufficient to put the contracting

officer on notice of each of the claims made by SDC in this litigation. Furthermore, in support of its claims here, SDC asserts that its submission were reasonably sufficient to put the contracting officer on notice that the claims contained therein were meritorious.

## IV. THE TERMINATION FOR CONVENIENCE CLAUSE DOES NOT PREVENT SDC'S RECOVERY FOR THE LISTED CAUSES OF ACTION.

In its opposition, the Government has advanced a new assertion, namely that the Termination for Convenience clause present in the Contract prevents SDC's recovery in sum. In arguing this point the Government states that SDC asked for and received a termination for convenience and "was paid its costs incurred in performing the contract. CSFU ¶¶ 13, 33, 103, 122." (Def. Opp. at 6-7) SDC's position is diametrically opposed to this line of reasoning.

The Termination for Convenience clause does not prevent SDC's recovery because SDC was never paid its costs incurred in performing the contract. Presumably, what the Government meant to say was that SDC was paid the costs that the contracting officer determined were incurred in performing the contract. This presumptive interpretation is supported by the Government's submissions to the Consolidated Statement of Uncontroverted Facts, paragraphs 123 thru 144. In fact, paragraph 122, which was cited by the Government, references only the amount proposed

by SDC as part of the settlement negotiations with AMCOM, which is not the true value of SDC's efforts.

By exerting substantial effort in the pursuit of this action, SDC has made every attempt to refute the Government's assertions here, though apparently without detection. The Government asserts that SDC is attempting to "sow confusion" and lard the record with "irrelevant and confusing facts" and "repeating its meritless arguments." (Def. Opp. at 7) However, SDC asserts that the Government's inability or unwillingness to understand the claims presented, as well as, the record of facts supporting them, is the result of the same dismissive and uninformed perspective that was the cause of damage complained of herein. SDC's submissions to the record in this case include all of the facts involving the parties' relationship prior to the execution of the contract, as well as, the facts concerning the specifications provided, and the predominant share of those facts pertain to the administration of the contract. These are the principle issues upon which SDC's claims are based.

The Government's submissions to the record in this case support only its asserted position of "contract, termination, then payment, case closed." What the Government does not seem to understand is that SDC maintains that the act of awarding the contract in the first place was an act

of bad faith. Also, while SDC has asserted a claim relative to the termination, the majority of SDC's claims concern the way in which AMCOM chose to administer the contract. These issues are not even addressed by the Government's overly simplified approach. In blindly following its simplistic view of the case, the Government must be ignoring the evidence presented by SDC in "larding the record," which establishes that AMCOM awarded the contract to SDC despite knowledge that it was impossible to perform. (Tab 47; Tab 50)

Perhaps the heart of the problem has been discovered. The fact that this case is not a simple breach of contract, but is instead one of overt bad faith and defective specifications is what SDC has literally been saying since before the contract was terminated, and it is apparent that the Government has never stopped to consider the viablility of SDC's claims. It is with the knowledge that this Court will scrutinize the merits of the claims presented, that SDC has made its submissions to the record in this action. If said submissions appear to be voluminous, it is only an indicia of the strength of SDC's case and the truly egregious nature of AMCOM's conduct.

SDC greatly resents the quantification of its attempt to adequately support its own claims as an attempt to confuse the issue. It is in great part

the Government's own refusal to acknowledge SDC's claims which has resulted in any confusion that is now present. SDC disputes that the Termination for Convenience Clause acts as a complete bar to recovery for its claims here, particularly given that one of said claims is a challenge to the Contracting officer's Termination for Convenience decision.

## V. THE GOVERNMENT PROVIDED SDC WITH DEFECTIVE SPECIFICATIONS.

In its opposition, the Government asserts that all of SDC's claims are variations of its claim for Defective Specifications. The Government's position again demonstrates a complete lack of understanding of the claims at bar. It is not AMCOM's use of defective specifications which solely supports SDC's claims for bad faith, breach of the covenant of good faith and fair dealing, and superior knowledge; it is AMCOM's **knowledge** that said specifications were defective and its **insistence** upon performance despite the known impossibility, and AMCOM's **refusal** to acknowledge SDC's request for adequate information which support SDC's claims. Each of SDC's causes of action encompasses its own legal elements, which are adequately supported by the record, despite the Government's continued refusal to acknowledge their viability.

### A. THE SPECIFICATIONS PROVIDED TO SDC WERE DEFECTIVE.

In its opposition, the Government has argued that the specifications provided to SDC were not design specifications, but instead were performance specifications. Further, the Government has asserted that the specifications were not defective. Specifically, the Government argues that the specifications are not defective because they were the same specifications that had been used by Raytheon for years. (Def. Opp. at 9) Again, the Government's treatment of these issues displays a complete lack of understanding of the claims asserted by SDC, as well as, a willful refusal to acknowledge the record evidence in this action.

Contrary to the Government's assertion, SDC has never admitted that the "specifications it was provided have been used by Raytheon for years to supply these same circuit cards." SDC's assertion has always been that it was not provided the specifications previously used by Raytheon to produce the Circuit Card Assembly. This assertion is supported by the record in this case.

At his deposition, in the presence of counsel for both parties, Mr. Jerald Tignor, who provided technical support to AMCOM during the administration of the contract in question, stated that at the time the contract was awarded to SDC the specifications were inadequate and **"looked like scrambled eggs."** (Tab 35, 348) (emphasis added) Upon

inspection of the TDP, in August 2003, Mr. Tignor discovered that while AMCOM had paid Raytheon for Level III documentation, (i.e. sufficient to enable the part to be produced in by a third party) it had received something much less. (Tab 35, 349; Tab 95) After reviewing the specifications contained in the Technical Data Package (TDP) Mr. Tignor contacted Raytheon in an attempt to try to complete the TDP with adequate specifications, **but no such assistance was achieved in time to assist SDC**. (Tab 35, 348)

This evidence alone is sufficient to show that AMCOM did not possess Raytheon's full complement of specifications, at least not in a form that was usable. There is no dispute that the specifications once held by Raytheon were sufficient to build the part, but that issue is of no consequence here. SDC was provided only with that information owned by AMCOM, which was defective and prevented SDC from manufacturing the Circuit Card Assembly. Thus, contrary to the Government's assertion, it is undisputable that the specifications at issue were defective, and there is substantial evidence in the record to support that proposition.

### B. THE SPECIFICATIONS IN SDC'S CONTRACT ARE DESIGN SPECIFICATIONS THAT CARRY A WARRANTY OF FITNESS.

The Government has argued that the specifications contained in the parties' contract to supply Circuit Card Assemblies for the Hawk Missile System were all performance specifications, as opposed to design specifications. Specifically, the Government has stated that SDC cannot point to any content of the contract which contains design specifications. (Def. Opp. at 11) Further, the Government argues that the contract contains no directions whatsoever, not even general instructions relating to the method or means of supplying the items required under the contract. (Def. Opp. at 12) These assertions are completely misguided and false.

Generally, a design specification is one setting forth, in detail, the materials to be used and the manner in which the work is to be performed. Hawaiian Bitumuls & Paving Division of Dillingham Construction Pacific, Ltd. v. U.S., 26 Cl.Ct. 1234, 1240 (1992). In contrast, a performance specification sets forth an objective requiring the contractor to exercise its own discretion in achieving performance. Id.

Here, SDC was provided with numerous design specifications as part of the contract. In the interest of completely defeating the Government's argument, SDC directs the Court's attention to Government's own admission of the inclusion of design specifications, as well as, the design

specifications included in the TDP and Mylar drawings which were incorporated into the contract. (Tab 2; Tab 59)

The first paragraph of the Government's Answer to the Defendant's First Amended Complaint "admits the allegations of the first and second sentences of paragraph 1 of the amended complaint to the extent they are supported by the contract." (Tab 33, 334) Thus, the Government has admitted that the Contract in question is a "build-to-print contract" (i.e. a contract based upon design specifications). (Tab 32, 305) This is not a "semantic game" as the Government alleges, unless, of course, direct quotations are now within the province of semantics.

In its opposition, the Government admits that SDC was provided with a list of parts to be used in the manufacture of the Circuit Card Assembly. (Def. Opp. at 11, citing CSUF ¶ 1) That list is a design specification. Further, the Government admits that the TDP, which is comprised primarily of highly detailed design specifications, was incorporated into the contract. (Def. Opp. at 12) These specifications indicate in precise detail where each hole, wire, transistor, screw, circuit card, and other piece parts are to be placed within the Circuit Card Assembly. (Tab 2; Tab 59) In addition, the specifications indicate precisely the way in which the parts are to be arranged and connected, in addition to the relative capacities and outputs

for all of the components. (Tab 2; Tab 59) Generally, the specifications incorporated into the contract indicate the exact configuration that the Circuit Card Assembly must meet in order to process and transmit the digital information produced and required by the advanced weaponry system in which it is designed to operate.

In light of the record evidence in this case it is truly unbelievable that the Government continues to assert that no design specifications are present. Clearly, a performance specification simply directing delivery of a Circuit Card Assembly would be useless to AMCOM, as there would be no guarantee of compatibility, capacity, or even quality of the final product. Based upon common sense alone, it is clear that a contract to build an electronic circuit component to a missile system would contain some specific directions regarding the manufacturing processes, parts to be used, as well as, instructions on digital programming. For all of these reasons, SDC continues to assert that the specifications contained in the TDP and the Contract are definitive of the term "design specification."

## VI. THE GOVERNMENT INTERFERED WITH SDC'S PERFORMANCE OF THE CONTRACT.

The Government has argued that the undisputed facts in paragraphs 97 and 49-51 defeat SDC's claims of interference with its ability to perform the contract.

First, SDC presumes that the Government is referring to SDC's claims for breach of the covenant of good faith and fair dealing, bad faith, and superior knowledge, as no claim has been made for tortious interference. Despite this mischaracterization, SDC maintains that the record does not support the Government's position.

Upon inspection it is clear that paragraph 97 of the Consolidated Statement of Uncontroverted Facts refers only to one particular instance of cooperation between SDC and AMCOM. Specifically, this paragraph refers to the joint effort, which occurred some two (2) years after the award of the contract, whereby SDC and AMCOM decided to joined forces to attempt to produce just one (1) fully programmed circuit board. This circuit board was one of many piece parts that SDC was not able to manufacture due to the deficiencies present in the contractual specifications. As paragraph 97 relates, even the combined efforts of SDC and AMCOM did not result in the successful completion of this necessary task, further proving that the specifications present in the contract were defective. Furthermore, the Government's attempt to assert this isolated incident as definitive evidence contrary to SDC's argument that AMCOM hindered its performance is unreasonable.

Finally, it is unclear what the Government has attempted to glean from paragraphs 49-51. While these paragraphs do refer to AMCOM's efforts in supplying unusable Mylar Drawings, these facts are hardly supportive of the argument that AMCOM did not interfere with SDC's performance. In fact, paragraphs 49-51 are supportive of SDC's claims with regard to interference and defective specifications.

## VII. THE RECORD SUPPORTS SDC'S CLAIM OF BAD FAITH.

In its opposition, the Government argues that SDC has submitted no evidence whatsoever that anyone at AMCOM acted in bad faith in the administration of the contract. (Def. Opp. at 14) Further, the government implies that SDC has admitted that AMCOM's actions were an honest mistake. (Def. Opp. at 14)

SDC is aware that government officials are presumed to act in good faith. However, because this action does not entail any accusation of fraud or quasi-criminal wrongdoing, SDC need not present "clear and convincing" or "well-nigh irrefragable" proof in order to rebut the good faith presumption. Tecom, Inc. v. United States, 66 Fed. Cl. 736, 769 (2005). Instead, AMCOM's lack of good faith may be inferred from a lack of substantial evidence, gross error, or the like. Id.

Without completely revisiting previous arguments and factual discussions, SDC asserts that the record in this case supports at least that AMCOM had knowledge that the Contract was impossible to perform prior to its award to SDC (Tab 47; Tab 50), that SDC notified AMCOM on several occasions of the perceived problems with the Contract (Tab 47; Tab 50; Tab 54, 401-402; Tab 53, 400; Tab 70, 423-424; Tab 71, 425-427; Tab 74, 430-432; Tab 75; Tab76, 434-437; Tab 77, 438-439), that AMCOM continued to insist upon performance of the contract despite knowledge of the critical flaws present in the specifications, even going so far as to threatened to terminate the Contract for default (Tab 106, 599-601) , and finally, that AMCOM engineers have reviewed the TDP incorporated into the Contract and have found it to be critically flawed in the same manner as has been alleged by SDC since the Contract's inception (Tab 35, 348-349; Tab 88, 465-468; Tab 90; Tab 92, 479; Tab 95, 482-488).

SDC again asserts that evidence of this weight and volume would be sufficiently clear and convincing evidence of the absence of good faith to rebut any contrary presumption; however, such an irrefragable showing is not necessary pursuant to the standard announced by this Court in Tecom. Therefore, because the evidence demonstrated by SDC is sufficient to

carry the higher standard of proof, it must certainly be sufficient to carry the less strenuous standard announced in this Court's more recent decisions.

Finally, SDC **does not** acknowledge that AMCOM's award of the Contract was at worst a mistake. (Def. Opp. at 14, citing CSUF ¶ 113) Paragraph 113 states that SDC believes that AMCOM's decision to open the contract to competition was a mistake that could have been prevented by review of the TDP. (CSUF ¶ 107-113) However, AMCOM's decision to award the Contract to SDC came after its decision to open the Contract to competition, and after the documented discovery of critical problems with the Contract. (Tab 47; Tab 50) Further, AMCOM continued to insist that SDC perform the contract despite its own knowledge of impossibility and requests from SDC to review the Contract. These critical facts, which are not chronologically contemplated by paragraph 113, are the key actions which elevated AMCOM's "mistake" to Bad Faith.

## VIII. AMCOM FAILED TO DISCLOSE ITS SUPERIOR KNOWLEDGE TO SDC.

The Government argues that AMCOM did not fail to disclose its superior knowledge to SDC. Specifically, the Government asserts that it believed that it owned sufficient information to allow for performance of the contract, and that it believed that it would have no difficulty in obtaining information from Raytheon. (Def. Opp. at 15) Further, the Government

argues that it had "**<u>no reason to disclose the 'unavailability' of the data to SDC, nor to disclose that only Raytheon could produce the part</u>**." (Def. Opp. at 15)(emphasis added) Additionally, the Government again attempts to rely upon paragraph 113 of the Consolidated Statement of Uncontroverted Fact for the proposition that SDC concedes that the decision to award the contract was a mistake, bearing no conscious decision to harm SDC.

SDC disputes that AMCOM believed it owned sufficient information to allow performance of the Contract. Specifically, AMCOM's own internal communications indicate that it possessed full knowledge that the contract could only be performed by Raytheon. (Tab 47; Tab 50) This information was discovered by AMCOM subsequent to its decision to open the contract for competition, which was the mistake referred to by SDC in paragraph 113 of the CSUF. The impossibility of performance of this Contract was known to AMCOM prior to the Contract's award to SDC, thereby removing the award from the realm of innocent mistakes, and placing it squarely within the province of intentional action. (Tab 47; Tab 50)

Almost unbelievably, the Government has argued that it had no reason to disclose information regarding the impossibility of performance of the Contract to SDC. Specifically, the Government states that it had no

reason to disclose that only Raytheon would be able to perform the Contract, and that the data necessary to perform the contract would not be made available to SDC. This argument is very telling of AMCOM's true position. It is also completely incorrect.

Of course AMCOM had a reason to disclose information regarding the impossibility of performance of the Contract. First, intentionally failing to disclose such information would be sufficient to rebut the presumption of good faith, even under the highest standard imaginable, as it is intentional conduct which must have been undertaken to cause harm to SDC. Second, the covenant of good faith and fair dealing provides AMCOM with "a reason" to disclose the above referenced information because said covenant imposes a duty upon AMCOM not to act so as to interfere with SDC's performance or to destroy SDC's reasonable expectations regarding the fruits of the contract. Third, failing to disclose information regarding the availability of the critical design specifications called for in the contract can lead to exposure to a claim for defective specifications. Finally, and most relevant at this stage of the response, AMCOM has a duty to disclose information such as the unavailability of data and the impossibility of performance to SDC under the doctrine of superior knowledge, as this is precisely the sort of information which SDC did not have, would have had

no reason to inquire about, was critical to the performance of the contract, and was not disclosed until after SDC had been harmed.

## IX. SDC'S DAMAGES CLAIMS ARE APPROPRIATE.

In its opposition, the Government seeks a dismissal of SDC's claims for damage based upon loss of business value, lost business opportunities, and lost profits. The Government argues that these claims are based on "mere speculation," and are not available as a matter of law. (Def. Opp. at 16) Further, the Government inexplicably seems to attack the credibility of SDC's expert, while simultaneously failing to take exception with any of his credentials or methods. (Def. Opp. at 16) Additionally, the Government again asserts that AMCOM had no reason to believe that there was a problem in procuring the necessary contract data from Raytheon, and therefore, had no reason to disclose the unavailability of data or the impossibility of performance of the contract to SDC. (Def. Opp. at 17)

SDC acknowledges that this Court has previously had the opportunity to deny damages for lost profits and lost business opportunities, such as in the case of Olin Jones Sand Co. v. United States, 225 Ct.Cl. 741 (1980). However, this Court's decisions in this regard have been based upon the circumstances of those particular cases. SDC asserts that its claims for damages represent the "natural and probable consequence of breach,"

which this Court has previously acknowledged as a valid basis for recovery. Olin Jones at 742 (citing Ramsey v. United States, 121 Ct.Cl. 426, 433 (1951)); Neely v. United States, 152 Ct.Cl. 137 (1961).

SDC's expert, Ernest J. Agresto, is a former DCAA auditor and certified public accountant who specializes in working with federal government contractors. Mr. Agresto considered financial information, plans, and projections supplied by SDC, as well as, marketplace comparisons, to compile his report of damages in this action. (Tab 103) In calculating the damage to SDC resulting from the Contract, Mr. Agresto used well established methodologies within his industry. (Tab 100; Tab 101; Tab 103) The damages asserted by SDC, and supported by the testimony and calculations of its expert, are not based upon mere speculation.

Finally, the Government's renewed argument that it had no reason to inform SDC of the impossibility of performance of the contract or the unavailability of necessary information is not only false, but is also irrelevant to the issue of the applicability of lost profit damages. First, this argument has the effect of a concession to SDC's claims of bad faith, defective specifications, superior knowledge, and breach of the covenant of good faith and fair dealing, as the government that it had knowledge that

only Raytheon could manufacture the Circuit Card Assembly, and that the necessary specifications were unavailable. Second, as discussed previously, the record evidence demonstrates that AMCOM acted in bad faith by withholding its superior knowledge of the impossibility of performance of the contract and the unavailability of critical information. Othewise, even if AMCOM did not have this knowledge prior to the award of the contract, its refusal to act upon SDC's numerous requests and inquiries for information must still constitute a breach of its contractual duties of good faith and fair dealing. For all of these reasons AMCOM did have a duty to disclose the flaws present in the contract to SDC. Because AMCOM failed to abide by this duty, SDC incurred significant damage which did not end with the termination of the contract, but instead continued to have detrimental effects upon SDC's ability to successfully pursue new business opportunities. Therefore, the Government's claim of innocence in an attempt to escape liability for the natural and probable consequence of its own actions is not a sufficient defense.

Respectfully submitted on this the 5th day of November, 2007.

/s/Howell Roger Riggs
Howell Roger Riggs
Attorney for Plaintiff

OF COUNSEL:

**Dick, Riggs, Miller & Stem, LLP**
200 Clinton Avenue West
Regions Center, Suite 1050
Huntsville, Alabama 35801
Telephone: (256) 564-7317
Facsimile: (256) 564-7319
hriggs@drmslaw.net

CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2007, I caused two (2) copies of the foregoing motion to be served on the parties via electronic filing, and by placing the same in the U.S. Mail, properly addressed and postage prepaid, to the following:

Joan M. Stentiford
Attorney for Defendant
Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 616-0341
Fax: (202) 514-8624

/s/ Howell Roger Riggs
Howell Roger Riggs